UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------- x

JONATHAN COHEN, SANDRA FABARA,
STEPHEN EBERT, LUIS LAMBOY, ESTEBAN
DEL VALLE, RODRIGO HENTER DE REZENDE,
DANIELLE MASTRION, WILLIAM
TRAMONTOZZI, JR., THOMAS LUCERO, AKIKO
MIYAKAMI, CHRISTIAN CORTES, DUSTIN
SPAGNOLA, ALICE MIZRACHI, CARLOS GAME,
JAMES ROCCO, STEVEN LEW, FRANCISCO
FERNANDEZ, and NICHOLAI KHAN,

                    Plaintiffs,

          -against-

G & M REALTY L.P., 22-50 JACKSON AVENUE
OWNERS, L.P., 22-52 JACKSON AVENUE, LLC, ACD
CITIVIEW BUILDINGS, LLC and GERALD
WOLKOFF,

                    Defendants.

---------------------------------------------------------------- x

:
:
:  Index No. 13-cv-05612 (FB) (RLM)
:
:
:  Hon. Frederic Block
:
:
:  **DEFENDANTS' FED. R. CIV. P.**
:  **52 AND 59 MEMORANDUM IN**
:  **SUPPORT OF MOTION TO SET**
:  **ASIDE FINDINGS OF FACT**
:  **AND CONCLUSIONS OF LAW**
:  **AND FOR A NEW TRIAL, OR**
:  **ALTERNATIVELY, TO**
:  **VACATE THE JUDGMENT IN**
:  **PLAINTIFFS' FAVOR AND**
:  **ENTER JUDGMENT FOR**
:  **DEFENDANTS, OR**
:  **ALTERNATIVELY,**
:  **FOR REMITTITUR**

MARIA CASTILLO, JAMES COCHRAN,
LUIS GOMEZ, BIENBENIDO GUERRA,
RICHARD MILLER, KAI NIEDERHAUSEN,
CARLO NIEVA, RODNEY RODRIGUEZ, and
KENJI TAKABAYASHI,

                    Plaintiffs,

          -against-

G & M REALTY L.P., 22-50 JACKSON AVENUE
OWNERS, L.P., 22-52 JACKSON AVENUE, LLC, ACD
CITIVIEW BUILDINGS, LLC and GERALD
WOLKOFF,

                    Defendants.

---------------------------------------------------------------- X

:
:
:  Index No. 15-cv-03230 (FB) (RLM)
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

572701_1/03726-0002

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...............................................................................................ii

PRELIMINARY STATEMENT .......................................................................................... 1

OVERVIEW...................................................................................................................... 1

ARGUMENT.................................................................................................................... 3

POINT I

     The Court Applied a Standard of "Recognized Stature"
     That Was Incorrect as a Matter of Law ....................................................................... 4

POINT II

     The Court's Finding That 45 of the Works Had Achieved Recognized Stature Is
     Clearly Erroneous and Against the Clear Weight of the Evidence............................11

     A.     The 37 works Denominated by this Court as
           "The Long-Standing Works"..................................................................12

     B.     The 12 Works Denominated by this Court as
           "The Other Works" .................................................................................23

POINT III

     The Court Clearly Erred on the Law and Finding of Willfulness.............................25

POINT IV

     The Court's Factual Findings on the Statutory Damages Factors
     Were Clearly Erroneous, and Constitutes an Abuse of Discretion ...........................31

POINT V

     The Court Should Remit the Statutory Damages Award.........................................34

CONCLUSION..............................................................................................................35

i

## TABLE OF AUTHORITIES

**Cases**                                                                                                           **Page(s)**

*Atlantic States Legal Found v. Karg Bros.*,
841 F. Supp. 51 (N.D.N.Y. 1993)........................................................................................................3

*Bleistein v. Donaldson Lithographing Co.*,
188 U.S. 239 (1903) ............................................................................................................ 5, 6, 23

*Bridgeport Music, Inc. v. Justin Combs Publishing, Inc.*,
507 F. 3d 470 (6th Cir. 2007) ................................................................................................. 35

*Bryant v. Media Right Prods.*,
603 F.3d 135 (2d Cir. 2010)................................................................................................ 26, 31

*Carter v. Helmsley-Spear, Inc.*
861 F. Supp. 303 (S.D.N.Y. 1994), *aff'd in part, vacated in part, rev'd in part*,
71 F.3d 77 (2d Cir. 1995) .................................................................................................... 6, 23

*Cohen v. G&M Realty L.P.*,
988 F. Supp. 2d 212 (E.D.N.Y. 2013)............................................................... 26, 27, 29, 30

*Cohen v. G&M Realty L.P.*,
Case No. 13-CV-05612 (FB)(RLM), 15-CV-03230 (FB)(RLM),
2018 U.S. Dist. LEXIS 22662 (E.D.N.Y. Feb. 12, 2018) ................................................*passim*

*Connors v. Conn. Gen. Life Ins. Co.*,
272 F.3d 127 (2d Cir. 2001)...................................................................................................3

*Danjaq LLC v. Sony Corp.*,
263 F.3d 942 (9th Cir. 2001) ................................................................................................27

*Dweck Law Firm, LLP v. Mann*,
03 Civ. 8967 (SAS), 2004 U.S. Dist. LEXIS 19601 (S.D.N.Y. Sept. 30, 2004)....................................34

*FTC v. Chapman*,
714 F.3d 1211 (10th Cir. 2013) .............................................................................................34

*Graper v. Mid-Continent Casualty Co.*,
756 F.3d 388 (5th Cir. 2014) ................................................................................................26

*Marshall v. Marshall*,
08 CV 1420 (LB), 2012 U.S. Dist. LEXIS 45700 (E.D.N.Y. Mar. 30, 2012)........................................27

*Martin v. City of Indianapolis*,
192 F.3d 608 (7th Cir. 1999), *aff'g*, 982 F. Supp. 625 (S.D. Ind. 1997). .............................................. 7, 8

ii

*Network Enters. v. APBA Offshore Prods.*,
01 Civ. 11765 (CSH), 2006 U.S. Dist. LEXIS 67564 (S.D.N.Y. Sept. 20, 2006), *aff'd*,
264 Fed. Appx. 36 (2d Cir. 2008) ........................................................................................ 3

*NFL v. Primetime 24 Joint Venture*,
131 F. Supp. 2d 458 (S.D.N.Y. 2001). ............................................................................... 35

*Pollara v. Seymour*,
344 F.3d 265 (2d Cir. 2003) ................................................................................................ 8

*Safeco Insurance Co. of America v. Burr*,
551 U.S. 47 (2007) ...................................................................................................... 26, 27

*Scott v. Dixon*,
309 F. Supp. 2d 395 (E.D.N.Y. 2004) ........................................................................ 7, 9, 11

*Shu-Tao Lin v. McDonnell Douglas Corp.*,
742 F.2d 45 (2d Cir. 1984) ......................................................................................... 34, 35

*St. Louis, I.M. & S. Ry. Co. v. Williams*,
251 U.S. 63 (1919) .............................................................................................................. 35

*United States v. Aluminum Co. of America*,
148 F.2d 416 (2d Cir. 1945) ................................................................................................ 3

*Yellow Pages Photos, Inc. v. Ziplocal*,
795 F.3d 1255 (11th Cir. 2015) ......................................................................................... 26

**Statutes and Rules**

Fed. R. Civ. P. 52(a)(5) ....................................................................................................... 3

Fed. R. Civ. P. 52(b) ....................................................................................................... 1, 3

Fed. R. Civ. P. 59(a) ........................................................................................................... 3

Fed. R. Civ. P. 59(a)(1)(B) ................................................................................................. 3

Fed. R. Civ. P. 59(a)(2) ...................................................................................................... 3

Fed. R. Civ. P. 59(e) ........................................................................................................... 3

Visual Artists Rights Act of 1990, 17 U.S.C. § 106A ................................................... *passim*

**Other Authorities**

Christopher J. Robinson, *The "Recognized Stature" Standard in The Visual Artists Rights Act*,
68 Fordham L. Rev. 1935 (2000).....................................................................................5

H.R. Rep. No. 101-514 (1990), *reprinted in* 1990 U.S.C.C.A.N. 6915........................................6

James Wm. Moore et al., 9 Moore's Federal Practice § 52.31[2] (2018) .....................................3

4 Nimmer on Copyright, § 14.04[B][3] .............................................................................. 27

Peter H. Karlen, *What's Wrong With VARA: A Critique of Federal Moral Rights*,
15 Hastings Comm. & Ent. L.J. 905 (1993) .......................................................................5

*Visual Artists Rights Act of 1987: Hearing on S. 1619 Before the Subcomm. on Patents, Copyrights and
Trademarks of the Senate Comm. on the Judiciary*, 100th Cong. (1987) ................................... 6

*Visual Artists Rights Act of 1989: Hearing on H.R. 2690 Before the Subcomm. on Courts,
Intellectual Property, and the Administration of Justice of the Committee on the
Judiciary House of Representatives*, 101st Cong. (1989) ..................................................... 6

iv

**PRELIMINARY STATEMENT**

Defendants respectfully submit this memorandum of law in support of their motion pursuant to Fed. R. Civ. P. 52(b) and 59(a) to set aside the Court's findings of fact and conclusions of law and grant them a new trial or, alternatively, to vacate the judgment in plaintiffs' favor and enter judgment for defendants, or alternatively, for remittitur.

**OVERVIEW**

From 1994 to 2013, Gerald Wolkoff generously permitted plaintiffs to take over the exterior of his buildings and use them virtually without restriction to pursue their art. As the Court discussed in denying a preliminary injunction, and as Jonathan Cohen admitted at both the preliminary injunction hearing and at trial, Cohen knew from the time he took over 5Pointz that their run would end when Wolkoff was ready to develop the property. Even apart from the likelihood of future development, the artists never intended or expected their work to be preserved: the very nature of aerosol art—and the way Cohen operated 5Pointz—involves routinely "covering" works with newer works. Over 10,000 works were covered in this manner during the 11 years Cohen was in charge of 5Pointz.

Notwithstanding their understanding of 5Pointz's (and their works') impermanence, plaintiffs sued Wolkoff to enjoin him from ever using his property for any purpose other than to display the works that happened to be on the building at the time they sued. The Court denied a preliminary injunction, and made clear that Wolkoff had the right to demolish the buildings, but then—after the advisory jury concluded that plaintiffs collectively were entitled to recover statutory damages of approximately $650,000—rejected the jury's conclusion that 17 of plaintiffs' 49 works did not have "recognized stature" under the Visual Artists Rights Act ("VARA" or the "Act") and increased the statutory damages more than tenfold.

The Court's ruling was erroneous in multiple respects and should be corrected. Most

notably, the Court applied an incorrect legal standard of "recognized stature" under VARA.  Instead of analyzing the sole relevant question under the statute—whether each work individually had attained sufficient prominence to be one of "recognized stature" *by the time it was painted over*—the Court based its decision on impermissible factors like an expert's after-the-fact personal assessment of the "merit" of the work, Cohen's mere decision to provide wall space (temporarily) for the works—including 10 of his own works—and folio materials irrelevant to the works' stature.

The Court also clearly erred, and ruled contrary to the clear weight of the evidence, in finding recognized stature for numerous works as to which there was no evidence of any recognition at all—including newly-created and interior works that could not possibly have attained the necessary recognition.  And the Court further erred in finding that the defendants acted willfully, and in assessing excessive statutory damages.

The very first time the parties appeared before the Court in this case, His Honor remarked that this was a classic case of "no good deed goes unpunished."  As the Court took pains to explain in its preliminary injunction decision, 5Pointz would never have existed but for Wolkoff's largess.  The Court previously recognized and openly praised the extraordinary contribution Wolkoff personally had made in making 5Pointz available to the artists and to the acceptance of aerosol work as an art form.  In awarding the maximum statutory damages possible for every one of the 45 works found to have achieved recognized stature, the Court plainly ignored all aspects of the good deed for which Wolkoff is being punished.

Defendants respectfully submit that the Court's ruling is legally insupportable under VARA, and at a minimum the $6.75 million awarded to the plaintiffs punishes the defendants to an extent that is greatly excessive and should be reconsidered.

2

572701_1/03726-0002

## **ARGUMENT**

A party may seek to amend or add findings to a judgment on a Fed. R. Civ. P. 52(b) motion, which "may accompany a motion for a new trial under Rule 59(a)."[1]  A party is entitled to a new trial or to have the Court depart from its prior holding where there has been "a manifest error of law or a clearly erroneous mistake of fact on the part of the judge which, singly or in combination, works a manifest injustice."[2]  Fed. R. Civ. P. 59(e) contemplates "[a] motion to alter or amend a judgment" if "it becomes necessary to remedy a clear error of law or to prevent obvious injustice."[3]  A district court reviewing a losing party's Rule 52/59 motion "shirks his duty if he approaches the task defensively, or distracted by a sense of wounded *amour propre*."[4]

In seeking relief from a district court's determinations, factual findings are reviewed for clear error, and questions of law are reviewed de novo.[5]  "A finding of fact 'is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed."[6] And a district court's findings are accorded less deference than a jury's findings.[7] "Pursuant to the Seventh Amendment of the Constitution, appellate review of the fact findings of a jury is forbidden, but this prohibition is not applicable to non-jury cases or to cases with an advisory jury."[8]

---

[1] Fed. R. Civ. P. 59(a)(1)(B) provides that a new trial may be granted "after a nonjury trial, for any reason for which a rehearing has heretofore been granted in a suit in equity in federal court."  And "the court may . . . open the judgment if one has been entered, take additional testimony, amend filings of fact and conclusions of law or make new ones, and direct the entry of a new judgment." Fed. R. Civ. P. 59(a)(2).  *See also* Fed. R. Civ. P. 52(a)(5) ("A party may later question the sufficiency of the evidence supporting the findings, whether or not the party requested findings, objected to them, moved to amend them, or moved for partial findings.").

[2] *Network Enters. v. APBA Offshore Prods.*, 01 Civ. 11765 (CSH), 2006 U.S. Dist. LEXIS 67564, at *7 (S.D.N.Y. Sept. 20, 2006), *aff'd*, 264 Fed. Appx. 36 (2d Cir. 2008).

[3] *Atlantic States Legal Found v. Karg Bros.*, 841 F. Supp. 51, 53 (N.D.N.Y. 1993).

[4] *Network Enters*, 2006 U.S. Dist. LEXIS 67564, at *8.

[5] *Connors v. Conn. Gen. Life Ins. Co.*, 272 F.3d 127, 135 (2d Cir. 2001).

[6] *Id.* (citation omitted).

[7] *United States v. Aluminum Co. of America*, 148 F.2d 416, 443 (2d Cir. 1945).

[8] James Wm. Moore et al., 9 Moore's Federal Practice, § 52.31[2] (2018).

I.      **The Court Applied a Standard of "Recognized Stature"**
        **That Was Incorrect as a Matter of Law**

In concluding that 45 of the 49 works at issue had achieved recognized stature, the Court

applied a standard that cannot be squared with what VARA requires.  In particular, the Court

expressly relied on one person's highly-subjective after-the-fact assessments of the works' artistic

merit—emphasizing Renee Vara's "detailed findings as to the skill and craftsmanship of . . . the

works" and her "compelling expert testimony as to their artistic merit,"[9]—which is an impermissible

factor.  The question under VARA is whether a work had gained sufficient reputation for its high

quality *prior to its destruction*, and an after-the-fact assessment of the merit of the art cannot satisfy the

Act.  At the same time as it erroneously relied on such after-the-fact assessments, as to many of the

works the Court failed to require the one thing VARA does require:  proof that a particular work has

been recognized for its high quality *prior* to its destruction.  Here, Vara failed to prove that any of the

works were recognized for high quality at any time, whether before or after the works were

destroyed.  To the extent that she proved anything at all, it is only that she concluded after being

engaged as a paid expert and seeing the works (on photographs) for the first time that she personally

favored each and every one of them, which establishes nothing at all for purposes of VARA.

The Court also relied heavily, as to many of the works, on Jonathan Cohen's decision to

display them as *per se* proof (even as to his own works) of their recognized stature.  This, too,

misconstrued the statute.  And, finally, the Court's reliance on "folios" filled with materials irrelevant

to the statutory determination was equally erroneous.

Reliance on After-the-fact Assessments of Merit

By relying on after-the-fact assessments of the artistic merit of the works, the Court

fundamentally misinterpreted the recognized stature requirement of VARA.  As an initial matter, the

---

[9] *Cohen v. G&M Realty L.P.* ("*Cohen II*"), Case No. 13-CV-05612 (FB)(RLM), 15-CV-03230 (FB)(RLM), 2018
U.S. Dist. LEXIS 22662, at *31, 32 (E.D.N.Y. Feb. 12, 2018).

4

text of the statute makes clear that the relevant inquiry is not whether a work, judged retrospectively, had merit.  It is whether the work had acquired *recognition* of its merit at the time of its destruction. The use of the word "recognized" necessarily means that the stature of the work must have been established at the relevant time.  Put simply, a single person's 2017 opinion that a work has artistic merit is of no relevance to whether the work had recognized stature in 2013.

The use of the word "stature" makes the same thing clear, particularly when contrasted with the language of the state statutes from which VARA was drawn—which used the phrase "recognized *quality*."  At the time that Congress was considering VARA, a number of states had already enacted moral rights legislation which imposed a "'recognized quality' standard for protected work."[10]  While Congress borrowed from these state statutes, it changed "recognized quality" to "recognized stature."  Whereas "quality" refers to a work's artistic merit, "stature" relates to a work's established reputation.  In making this important change, Congress imposed a "much more stringent" standard that protected only those works that were "highly regarded by the art world or by the public, regardless of quality."[11]

Longstanding federal copyright principles, and VARA's legislative history, buttress what this clear language requires.  As the Supreme Court recognized more than a century ago, courts are ill-equipped to evaluate the artistic and aesthetic merit of art and allowing such judgments would be a "dangerous undertaking."[12]  Indeed, "[i]t would be a dangerous undertaking for persons trained only to the law to constitute themselves final judges of the worth of pictorial illustrations, outside of the

---

[10] Christopher J. Robinson, *The "Recognized Stature" Standard in The Visual Artists Rights Act*, 68 Fordham L. Rev. 1935, 1942-43 (2000).

[11] Peter H. Karlen, *What's Wrong With VARA: A Critique of Federal Moral Rights*, 15 Hastings Comm. & Ent. L.J. 905, 916-17 (1993); *see also* Robinson, 68 Fordham L. Rev. at 1845 n.84 (noting that VARA's use of "recognized stature" instead of "recognized quality" "may have been an attempt to emphasize that the personal aesthetic judgment of the court was not to be a factor in the court's analysis").

[12] *See Bleistein v. Donaldson Lithographing Co.*, 188 U.S. 239, 251-52 (1903).

5

narrowest and most obvious limits."[13]  It is for that reason, the Register of Copyrights explained in the years prior to VARA's passage, that "Congress has so far been unwilling to let judges act of arbiters of aesthetic quality."[14]

The House Judiciary Committee Report on the bill that became VARA directly confirms that "recognized stature" is necessarily determined at the time of the alleged destruction, not after the fact.  In explaining the reasons for removing a "recognized stature" requirement under certain circumstances affecting an artist's honor and reputation, the Committee explained that it was thereby removing a requirement to "prove a *pre-existing standing* in the artistic community."[15]

Reliance on judgments of artistic merit is also inconsistent with the purposes of the "recognized stature" provision, which is the preservation of works of recognized distinction.  As the Register of Copyrights explained, the "recognized stature" concept is "a valuable distinction in separating the truly important work from the broad masses of works that have not gained an international reputation."[16]  And, as the court in *Carter v. Helmsley-Spear, Inc.* instructed, the recognized stature standard "must be interpreted in such a manner as to maintain the preservation purpose" of the law.[17]

If "recognized stature" could turn on after-the-fact judgments of artistic merit, a building owner would have no guidance about what works are required to be preserved, and would be subject to wide-ranging liability based on subjective after-the-fact claims of merit.  Not only would this be unfair, but it would defeat the very purpose of the "recognized stature" requirement:  instead

---

[13] *Id.*

[14] *Visual Artists Rights Act of 1987: Hearing on S. 1619 Before the Subcomm. on Patents, Copyrights and Trademarks of the Senate Comm. on the Judiciary*, 100th Cong. 24-25 (1987) (statement of Ralph Oman, Register of Copyrights).

[15] H.R. Rep. No. 101-514, at 15 (1990), *reprinted in* 1990 U.S.C.C.A.N. 6915, 6925 (emphasis added).

[16] *Visual Artists Rights Act of 1989: Hearing on H.R. 2690 Before the Subcomm. on Courts, Intellectual Property, and the Administration of Justice of the Committee on the Judiciary House of Representatives*, 101st Cong. 73 (1989) (statement of Ralph Oman).  Although the final version of the statute does not require that the work be recognized internationally, this comment underscores the extent to which Congress was seeking to limit protection to truly distinguished works that have gained substantial recognition among a wide audience.

[17] 861 F. Supp. 303, 325 (S.D.N.Y. 1994), *aff'd in part, vacated in part, rev'd in part*, 71 F.3d 77 (2d Cir. 1995).

6

of identifying a manageable class of truly important works for preservation, the statute would effectively require much broader preservation than Congress intended, by making the destruction of *any* work a potential font of liability based on hindsight determinations.

Finally, the Court's broad interpretation of "recognized stature" is particularly inappropriate in the context of inherently temporary aerosol art. The preservationist purpose of VARA's protection against destruction of works of recognized stature simply does not apply to most aerosol art, one of the hallmarks of which is its transitory nature. Because aerosol art involves frequent covering of existing works, aerosol works *by their very nature*—as demonstrated by the history of 5Pointz itself—are not preserved. Even assuming *arguendo* that temporary works can qualify as works of "recognized stature"—a doubtful proposition in light of the preservationist purpose of the provision—courts should be particularly reluctant to adopt such an expansive definition that requires the preservation of works that were never designed to be preserved.

<u>Failure to Require Proof of Pre-Destruction Recognition</u>

The Court made a related error in failing to require what VARA *does* require: proof that each work individually had attained recognized stature *before* it was destroyed. Although the Court made generalized references to the folios offered at trial, as to many of the works—as demonstrated in detail in Section II, *infra*—nothing in the folios evidenced any pre-destruction recognition (or post-destruction recognition, for that matter) of the quality of the work, let alone sufficient recognition to amount to recognized stature under VARA. The vast majority of the folio materials concerned other of plaintiffs' works, discussed their background, or were about unrelated endeavors, all of which is irrelevant, as "it is the artwork that is the subject of the litigation that must have acquired this stature."[18]

In *Martin v. City of Indianapolis*, plaintiff's work was found to have recognized stature based on

---

[18] *Scott v. Dixon*, 309 F. Supp. 2d 395, 400 (E.D.N.Y. 2004).

"certain newspaper and magazine articles, and various letters, including a letter from an art gallery director and a letter to the editor of *The Indianapolis News*, all in support of the sculpture, as well as a program from the show at which a model of the sculpture won 'Best of Show.'"[19]  No evidence remotely approaching this level of merit or recognition exists here for any of the individual works.

Remarkably, even plaintiffs' own recognized stature expert, Vara, had no knowledge before being retained of any of the works at issue, or of any of the artists, except for Cohen, with whom she was passingly familiar.[20]  Thus, the artists somehow became prominent, and the works somehow achieved recognized stature, without plaintiffs' paid expert knowing about it.

This error is also illustrated by the Court's ruling that even multiple works painted mere weeks before they were destroyed or painted on inside building walls, to which the public did not have access, had attained recognized stature.[21]  The plaintiffs offered no evidence of such instant stature, and—had the Court properly interpreted VARA to require pre-destruction stature—it could not have made its recognized stature finding for these works.  As Judge Gleeson explained in *Pollara v. Seymour*, (concurring opinion), a work that has not been meaningfully displayed to the public cannot be a work of recognized stature.[22]

Cohen's Purported Selection of the Works.

That Cohen "selected" these works to be on "long-standing walls" is irrelevant to merit or recognition.  As an initial matter, it is extraordinary that the Court relied on this factor with respect to ten of Cohen's own works.  Cohen's decision to allocate prominent or highly-desirable wall space to his own artwork cannot tenably constitute significant evidence of the recognized stature of those works.  In addition, Cohen's decision to allocate wall space to a particular artist cannot be deemed a

---

[19] 192 F.3d 608, 612 (7th Cir. 1999), *aff'g*, 982 F. Supp. 625 (S.D. Ind. 1997).
[20] 11/1/17 Tr. 1679:9-1680:5, 1680:24-1681:11.
[21] *See* footnotes 27, 29, 31, and 32, *infra*.
[22] 344 F.3d 265, 271 (2d Cir. 2003) (Gleeson, J., concurring).

8

judgment about the stature of the particular work, because it was made *before* the work was ever painted.  At best, Cohen was judging the quality of the *artist*, not the quality of the *work* (which did not yet exist).  But "recognized stature" requires recognition of the particular work, *not* merely of the artist or the work's placement.[23]

Furthermore, another premise of the Court's reliance on this factor—that the longevity of a work was based on a judgment by Cohen about its particular quality—is contrary to the record.  For example, Cohen expressly testified that the longevity of one of the longest-standing works—*Eleanor RIP*—was due to the work's personal meaning to him, not any judgment about its artistic merit.[24] Further, as Akiko Miyakami testified, one reason that determined how long a piece would last was a function of how difficult it was to reach the spot.[25]  Thus, the works on higher floors were not "chosen" by Cohen as exemplars of quality—they remained on the walls not by choice, but by necessity.  Eight of the "long-standing" works, for example, were painted on a higher floor, requiring a man-lift for the artist to paint.[26]

Additionally, contrary to the Court's statement that they "had survived for years," 14 of the "long-standing" works were created in 2013,[27] within months or weeks of plaintiffs starting this

---

[23] *See Scott*, 309 F. Supp. 2d at 400 ("[W]hen determining whether a work of art is of recognized stature under VARA, it is not enough that works of art authored by the plaintiff, other than the work sought to be protected, have achieved such stature.  Instead, it is the artwork that is the subject of the litigation that must have acquired this stature.").

[24] 10/30/17 Tr. 1428:20-1429:15.

[25] 10/30/17 Tr. 1333:23-1334:1.

[26] Cohen's *Eleanor RIP*, Sandra Fabara's *Green Mother Earth*; Christian Cortes's *Skulls Cluster*, *Up High Blue Skulls*, and *Up High Orange Skulls*; and James Rocco's *Bull Face*, *Lord Paz*, and *Face on Jackson*.

[27] Cohen's *7 Angle Time Lapse* and *Patience* was created in spring and summer 2013, respectively (10/30/17 Tr. 1414:12-20, 1431:10-11); Steven Lew's *Crazy Monsters* was created in September/October 2013 (10/30/17 Tr. 1370:3-5); Nicholai Khan's *Dos Equis Man* was created in July 2013 (10/26/17 Tr. 1162:8-9); Carlos Game's *Geisha*, *Marilyn*, *Denim Girl*, and *Black and White 5Pointz Girl* were created in mid- to late 2013 (10/24/17 Tr. 782:24-783:5, 798:12-15, Game's folio pages 44, 46); Luis Gomez's *Inside King Kong* was created in April 2013 (10/24/17 889:19-20); Richard Miller's *Monsters I* was created in April 2013 (10/24/17 Tr. 917:25-918:5); Cohen's and Maria Castillo's *Love Girl and Burner* was created in May 2013 (10/18/17 Tr. 270:20-271:1); Cohen's and Miyakami's *Underwater Fantasy* was created in July or August 2013 (10/26/17 Tr. 1279:25-1280:2); William Tramontozzi, Jr. and Rocco's *Jimi Hendrix Tribute* was created in August 2013 (10/25/17 Tr.

action.   Seven of those 14 works were created after August 21, 2013, when defendants' project's zoning variance was approved, of which Cohen had knowledge, having attended that meeting.[28] Another seven of the eight works that this Court referred to as the "Other Works" were also created after the variance was approved.[29]

Furthermore, despite the Court's comment that these "long-standing" works were on "walls visible to millions on the passing trains,"[30] 11 of these 37 works were in the inside of the buildings,[31] to which the public had no access,[32] which could not possibly have been viewed from the passing trains.  Of the 49 works in the case, no more than 15 of them were visible from a passing train, according to certain of the plaintiffs' uncorroborated testimony.[33]

For all of these reasons, the Court's reliance on Cohen's mere allocation of wall space for works as proof of their recognized stature misconceived what VARA requires, and was therefore erroneous as a matter of law.

Because the Court applied an incorrect recognized stature standard, the judgment should be reversed as a matter of law and a new trial ordered.

---

953:17-18); Bienbenido Guerra and Carlo Nieva's *Return of New York* was created either in May/June or November of 2013 (10/18/17 Tr. 397:14-398:3).

[28] 10/31/17 Tr. 1553:7-1554:2.

[29] Created in September 2013: Henter de Rezende's *Fighting Tree* (10/26/17 Tr. 1124:20-1125:2), Miyakami's *Manga Koi* (10/26/17 Tr. 1289:2-3); Francisco Fernandez's *Dream of Oil* (10/31/17 Tr. 1573:10-11); Cohen's and Miyakami's *Save 5Pointz* (10/26/17 Tr. 1283:18-19); Created in October 2013: Thomas Lucero's *Black Creature* (10/19/27 Tr. 489:20-22); Khan's *Orange Clockwork* (10/25/17 Tr. 1166:13-15); Kenji Takabayashi's *Starry Night* (10/18/17 Tr. 298:20-22).

[30] *Cohen II*, 2018 U.S. Dist. LEXIS 22662, at *30.

[31] Cohen's *Character* and *Inside Wildstyle*; Luis Lamboy's *Inside 4th Floor*, *World Traveler*, *Logo for Clothing Brand aka Monopoly Man*, and *Electric Fish*; Game's *Marilyn*, *Red*, and *Denim Girl*; Gomez's *Inside King Kong*; and Miller's *Monster I*.

[32] 10/30/17 Tr. 1338:24-1340:22 (Miyakami); 10/31/17 Tr. 1529:6-1530:3 (Cohen).

[33] The pieces about which there was testimony regarding visibility from the train: *See* 10/18/17 Tr. 298:15-18; Tr. 300:15-19 (*Starry Night*); 10/19/18 Tr. 387:2-3, 11-13 (*Return of New York*); 10/19/18 Tr. 546:17-19; 547:11-17 (*Up High Orange Skulls*); 10/24/18 Tr. 780:17-23, 783:18-25 (*Geisha*); Tr. 10/24/18 793:24-794:6 (*Faces on Hut*); 10/24/18 Tr. 795:7-796:5 (*Denim Girl*); 10/24/18 Tr. 796:22-797:4 (*Black and White 5Pointz Girl*); 10/24/18 Tr. 838:6-841:20 (*Blue Jay Wall*); 10/25/18 Tr. 922:20-924:17 (*Monsters II*); 10/25/18 Tr. 992:19-22 (*Bull Face*); 10/26/18 Tr. 1282:8-1283:16 (*Save 5Pointz*); 10/30/18 Tr. 1407:18- 22, 1412:21-24 (*Seven Angle Time Lapse*); 10/30/18 Tr. 1420:20-25 (*Outdoor Wild Style*): 10/30/18 Tr. 1423:6-17 (*Clown with Bulbs*); and 10/31/18 Tr. 1568;14-17, 1574:3-10 (*Dream of Oil*).

10

## II.     The Court's Finding That 45 of the Works Had Achieved Recognized Stature Is Clearly Erroneous and Against the Clear Weight of the Evidence

The Court was required, but failed, to make individualized findings of fact on recognized stature for each of the individual works.  The folios contain little or no evidence of any recognition at any level whatsoever for the works at issue, and overwhelmingly consist of materials relating to other of the artists' works and projects.  Vara, of course, testified that each of the 49 works achieved recognized stature. But her opinion was based almost entirely on irrelevant and impermissible factors, such as her after-the-fact assessment of artistic merit, or Google "hits" that said nothing about the stature or merit of the works in question.

We analyze below the specific materials presented in each of the folios.  In summary, of the 1,217 total folio pages that were admitted into evidence and on which the Court based its determination, only 50 image posts relating to one or more of the 49 works at issue were generated by sources other than a plaintiff himself or herself, and 42 pages were plaintiffs' own social media uploads of their works.  And none of the 50 posts contains any meaningful commentary about the work.  In fact, only four of them included any commentary (which were extremely superficial and limited) at all.  The rest of the materials had nothing to do with the work on which the plaintiff sued. This form of self-recognition does not "count" for purposes of determining whether a work has gained recognized stature.[34]  Nor does an extremely limited number of references to or depictions of the works, particularly where they are not accompanied by any commentary or critical review of the work's artistic merit.[35]

---

[34] *Scott*, 309 F. Supp. 2d at 397 (finding plaintiff-artist's own testimony in favor of her Sculpture to be insufficient, even when the Court credited her "as an expert in the art field").

[35] *Id.* at 398 (rejecting "the single article submitted by Plaintiff that was written about the Sculpture . . . published after Plaintiff invited the reporters who wrote the article to view the Sculpture" which "contain[ed] no review of the artistic merit of the Sculpture.").

### A.  The 37 Works Denominated by this Court as "The Long-Standing Works"

  1.  **Cohen's *Eleanor RIP***.  Cohen's 153-page Folio consists of the following:

- Pages 1-86: Cohen's bio and articles about other of his works and projects;
- Pages 87-113:  reference photographs[36] of Cohen's works in the lawsuit;
- Pages 114-117: copyright registrations;
- Pages 118-123: five of Cohen's works (*7 Angle Time Lapse*, a portion of *Clown with Bulbs*, *Underwater Fantasy*, *Love Girl and Burner*, and *Angry Orchard*) were uploaded onto Google Arts & Culture by *Street Art NYC*, which Lois Stavsky, a fact witness for the plaintiffs and a retired English teacher, testified was her blog from where she uploaded 5Pointz images onto Google Arts & Culture;[37]
- Pages 124-130: (1) a single tweet from the Angry Orchard hard cider company posting a link to the *Angry Orchard* piece, which has been retweeted by the 5Pointz Twitter account (page 126); (2) one blog article dated July 23, 2013, by a Jacqueline Hadel, reproducing images of the *7 Angle Time Lapse*, without its title, stating that the author likes the piece (page 128); and (3) one blog article describing Cohen's and Castillo's collaboration on *Love Girl and Burner*, without naming the title of the work, and which does not comment on its artistic merit (page 130); and
- Pages 131-153: reference photographs of Cohen's works before and after the whitewash.

Other than Cohen's reference photographs, there is not a single document in this folio in which *Eleanor RIP* is mentioned or shown.

  2.  **Cohen's *7-Angle Time Lapse***.  Cohen's folio contains a single reference to this work on Google Arts & Culture, and one blog post that refers to it, in which the author wrote that it would be the "final 5 Pointz pictorial" since the "developer is intending to demolish the warehouse and build luxury condominiums."[38]  (In fact, many of the images in the action were placed on the buildings substantially after this author's "final pictorial" comment.)

Angelo Madrigale, a fact witness, and Stavsky testified that they liked this work, as did Vara.[39] Three individuals' personal opinions, two of whom (Madrigale and Stavsky) are admittedly fans of

---

[36] A "reference photograph" refers to a photograph taken of the work as it appeared on the building, in isolation.

[37] 10/30/17 Tr. 1386:13-1391:11.

[38] Cohen folio at 128.

[39] 10/26/17 Tr. 1209:4-25 (Madrigale); 10/30/17 Tr. 1394:25-1395:23 (Stavsky).

5Pointz and testified that they wanted to see the plaintiffs prevail,[40] and two of whom (Madrigale and Vara) were paid, is insufficient, particularly in the absence of any showing of recognition by other art experts members of the art community, or a cross-section of the community.

3. **Cohen's** *Patience*.  Other than the reference photos, there are no documents in this folio showing or referencing this work.

4. **Cohen's** *Character*.  Other than the reference photos, there are no documents in this folio showing or referencing this work, which was placed on one of the inside building walls,[41] which were not viewable by the public.[42]

5. **Cohen's** *Clown with Bulbs*.  Other than Cohen's reference photos, the only mention of this work is a reproduction of a portion of it on Google Arts & Culture posted by Stavsky, without its title and without any commentary.

6. **Cohen's** *Meres Outdoor Wildstyle*.  Other than the reference photos, there are no documents in this folio showing or referencing this work.

7. **Cohen's** *Inside Wildstyle*.  Other than the reference photographs, there are no documents in this folio showing or referencing this work, which was on an inside building wall.[43]

8. **Sandra Fabara's** *Green Mother Earth*.  Fabara's 59-page folio consists of:

- Pages 1-53: Fabara's bio and articles or images of other of her works;
- Page 54:  reference photograph of Fabara's work in this lawsuit;
- Pages 55-56: copyright registration; and
- Pages 57-59: before and after reference photographs of the whitewashed work.

Fabara presented no evidence that this work was recognized by anyone. Aside from Vara effusively praising it (as she did with equal enthusiasm for every one of the 45 pieces), Stavsky saying

---

[40] 10/26/17 Tr. 1219:19-1220:1 (Madrigale); 10/30/17 Tr. 1401:20-1402:3 (Stavsky).
[41] 10/30/17 Tr. 1434:12-1435:19.
[42] 10/30/17 Tr. 1338:24-1340:22 (Miyakami); 10/31/17 Tr. 1529:6-1530:3 (Cohen).
[43] 10/30/17 Tr. 1435:23-1436:8.

she liked it,[44] and Madrigale testifying that Fabara was "one of the well-known pioneers of graffiti art" without commenting on the work at issue itself,[45] Fabara presented no evidence of recognized stature.  Co-plaintiff Bienbenido Guerra, who cited Fabara as having inspired him to become an artist, failed to recognize this work of supposed recognized stature.[46]

9. **Luis Lamboy's *Blue Jay Wall*.**  Lamboy's 79-page Folio consists of the following:

- Pages 1-52: bio and articles concerning other of his works and projects;
- Pages 53-54 and 59-68: reference photographs of Lamboy's works in the lawsuit;
- Pages 55-56: copyright registration;
- Pages 57-58, and 71-72: pages from Google Arts & Culture of his *Blue Jay Wall* and *Angry Orchard* pieces, posted by Stavsky;
- Pages 69-70: the same tweet from the Angry Orchard company about the *Angry Orchard* piece that was included in Cohen's Folio; and
- Pages 73-79: before and after reference photographs of the whitewashed work.

The only evidence in the folio concerning Lamboy's *Blue Jay Wall* is the Google Arts & Culture post by Stavsky, without any commentary or critique, and without a title.

10. **Lamboy's *Inside 4th Floor*.**  Other than the reference photos, there are no documents in this folio showing or referencing this work, which was on an inside building wall.[47]

11. **Lamboy's *World Traveler*.**  Other than the reference photos, there are no documents in this Folio showing or referencing this work, which was on an inside building wall.[48]

12. **Lamboy's *Logo for Clothing Brand aka Monopoly Man*.**   Other than the reference photos, there are no documents in this folio referencing this work, which was on an inside wall.

13. **Lamboy's *Electric Fish*.**  Other than the reference photos, there are no documents in this folio showing or referencing this work, which was on an inside building wall.[49]

---

[44] 10/30/17 Tr. 1396:11-21.
[45] 10/26/17 Tr. 1211:10-1212:8.
[46] 10/19/17 Tran. 505:6-17 (citing Fabara as inspiring him to become an artist); 10/19/17 Tran. 535:4-11 (answering "No, I do not" in response to the question "Do you know the piece that [Fabara] had at 5Pointz that is being seeded [sic] on here?").
[47] 10/24/17 Tr. 844:6-9.
[48] 10/24/17 Tr. 845:1-6, 845:23-846:1.

14. **Esteban Del Valle's** *Beauty and the Beast*. Del Valle's 37-page folio consists of:

- Pages 1-24: Del Valle's bio and articles regarding other of his works;
- Pages 25-26: reference photograph of *Beauty and the Beast*;
- Pages 27-32: (1) a November 14, 2012 article from the *Arts Observer*, where the author writes that he stopped by 5Pointz after a visit to Moma PS1, found *Beauty and the Beast*, without naming its title, and describes it as "gruesome and elegant" (page 28); (2) a July 5, 2013 Queens Library Digital Archives entry of the work (page 30); and (3) a photo of the work uploaded onto Google Arts & Culture by Stavsky on July 14, 2013, without the title of the work (page 32);
- Pages 33-34: copyright registration; and
- Pages 35-37: before and after reference photographs of the whitewashed work.

Del Valle presented just one article, which contains extremely limited commentary on the work, and two databases that reproduce the work without comment.

15. **Christian Cortes's** *Skulls Cluster*.  Cortes's 55-page folio consists of:

- Pages 1-33:  Cortes's bio, articles about other of his works and projects, a printout from the artist's own web site showing him painting the *Up High Orange Skulls* (page 9), an October 25, 2012 Street Art NYC interview (by Lois Stavsky) of Cortes, with an image of *Up High Orange Skulls*, but without the work's title and without any commentary (page 11), and an August 2012 interview with a publication called Senses Lost that reproduces a portion of *Up High Orange Skulls* alongside many other works by Cortes, with Cortes citing it as being his favorite project (page 15);
- Pages 34-42: reference photographs of Cortes's works in the lawsuit;
- Pages 43-44: photograph of *Jackson Avenue Skulls* on Google Arts & Culture, posted by Stavsky on Street Art NYC, without its title;
- Pages 45-46: copyright registration; and
- Pages 47-55: before and after reference photographs of the whitewashed work.

There was no evidence submitted of *Skulls Cluster* being recognized by anyone.

16. **Cortes's** *Jackson Avenue Skulls*.  The sole documentary evidence of recognition for this work is Stavsky's Google Arts & Culture post, without a title or any commentary.

17. **Cortes's** *Up High Blue Skulls*.  There is no evidence of *Up High Blue Skulls* being recognized by anyone.

18. **Cortes's** *Up High Orange Skulls*.  The folio only contains two articles that reproduce

---

[49] 10/24/17 Tr. 850:14-18.

images of this work, but neither comments on its artistic merit.

19. **Carlos Game's** *Geisha*.  Game's 57-page folio consists of the following:

- Pages 1-30: articles about other of Game's works;
- Pages 31-34, 37-40:  reference photographs of the works in this lawsuit;
- Pages 35-36: image of Game's *Marilyn* from a web site called In the Wit of an Eye, written by a friend of the artist, who describes the work as "the most haunting incredible ***unseen*** inside mural"[50];
- Pages 41-46: printouts from Game's Instagram, depicting one work to which he relinquished his rights during the trial (page 42), *Japanese Fantasy* (page 43), *Marilyn* (page 44), *Black and White 5Pointz Girl* (page 45), and *Denim Girl* (page 46); and
- Pages 47-57: before and after reference photographs of the whitewashed works.

*Geisha* is not mentioned anywhere in this folio.  It was also created in September or October 2013,[51] just a few weeks before the whitewash.

20. **Game's** *Marilyn*.  As noted above, Game submitted in his folio only one blog post by a third-party source, describing the work as an "unseen inside mural."[52]

While Game testified that this mural was created in 2009,[53] he posted this image on his Instagram page on October 7, 2013, just days before plaintiffs filed this lawsuit and well after the variance had been approved (page 44 of his folio) and identifies it in the post as being from 2013.

21. **Game's** *Red*.  There is no documentary evidence referencing *Red* in the folio.  This is also an inside work,[54] to which the public had no access.

22. **Game's** *Denim Girl*.  The only documentary evidence Game submitted for this work, which was placed on an inside wall,[55] was his own Instagram post, which is legally and factually insufficient to establish that the work was recognized by anyone other than Game.  Moreover, while

---

[50] The web site is available at https://newyorkcityinthewitofaneye.com/tag/marilyn-monroe/ (last visited March 15, 2018).
[51] 10/24/17 Tr. 824:19-21.
[52] Game confirmed that this was an inside work.  (10/24/17 Tr. 784:11-785:15.)
[53] 10/24/17 Tr. 785:22-786:1.
[54] 10/24/17 Tr. 788:3-6.
[55] 10/24/17 Tr. 792:2-7.

he testified that the work was created in 2009 or 2010,[56] Game's Instagram page shows that the work was created in 2013 and that the image was posted on February 17, 2013 (page 46 of his folio).

**23. Game's *Black and White 5Pointz Girl*.**  The only documentary evidence Game submitted for this work is his own Instagram post.

**24. James Rocco's *Bull Face*.**  Rocco's 61-page folio consists of the following:

- Pages 1-29: Rocco's bio, social media post, and articles about other of his works;
- Pages 30-32, 35-41: reference photographs of Rocco's works in this lawsuit;
- Pages 33-34: copyright registration;
- Pages 42-49: (1) an unidentified Japanese blog post with an image of *Jimi Hendrix Tribute*, which contains no commentary on the work, and no reference to the author or the work's title (page 43), (2) what appears to be a poor copy of an Instagram page from an organization called "Urban Media Showcase" depicting *Jimi Hendrix Tribute* without identifying its authors or the work's title (page 45), (3) a poor copy of co-plaintiff (and co-author) Tramontozzi's Facebook post from September 9, 2013 posting images of *Jimi Hendrix Tribute* (page 46), (4) poor copies of September 2013 Facebook posts of *Jimi Hendrix Tribute* from the accounts of "Lady Fever" and "Robert Corona," who appear to be friends of artists Rocco and Tramontozzi, neither of which references the work's title (page 47), and (5) a photo of *Jimi Hendrix Tribute* on the Google Arts & Culture site, posted by Street Art NYC on October 14, 2013, without the work's title (page 49); and
- Pages 50-61: before and after reference photographs of the whitewashed works.

There is no documentary evidence showing that *Bull Face* was recognized by anyone.

**25. Rocco's *Lord Paz*.**  There is no documentary evidence showing that *Lord Paz* was recognized by anyone.

**26. Rocco's *Face on Jackson*.**  There is no documentary evidence showing that *Face on Jackson* was recognized by anyone.

**27. Steven Lew's *Crazy Monsters*.**  Lew's 61-page folio consists of the following:

- Pages 1-30: Lew's bio, other of his works and projects not involved in this lawsuit, and articles about the demolition of 5Pointz;
- Pages 31-40 and 43-51: pages from Lew's Instagram account depicting the development of *Crazy Monsters* from October 6 to 7, 2013, and his own Facebook posts showing various photos of his works at 5Pointz;

---

[56] 10/24/17 Tr. 792:25-793:3.

17

- Pages 41-42: photograph posted by Stavsky of the work on Google Arts & Culture, without naming the work's title;
- Pages 52-53: reference photograph of *Crazy Monsters*; and
- Pages 53-61: before and after reference photographs of the whitewashed work.

Other than Lew's self-recognition on his own social media accounts, the only documentary reference is a reproduction of *Crazy Monsters* by Stavsky on Google Arts & Culture, with no title or commentary. The bottom portion of this piece was also created in October 2013,[57] making it very unlikely that it could have achieved recognized stature.

**28. Nicholai Khan's *Dos Equis Man*.** Khan's 44-page folio consists of the following:

- Pages 1-22: Khan's bio and articles and social media about other of his works;
- Pages 23-27: reference photographs of Khan's work in this lawsuit;
- Pages 28-29: a November 11, 2013 Russian newspaper article purportedly about *Dos Equis Man*, but with no commentary, attribution to the author or title, or text whatsoever;
- Pages 30-34 and 39: Khan's own Instagram pages depicting the work;
- Pages 35-38: copy of the Instagram page from Jonathan Goldsmith, the actor who portrays the Dos Equis Man in TV commercials, from November 19, 2016, well after the commencement of this lawsuit, who wrote that he was "humbled that my likeness was chosen to be drafted on a canvas"; and
- Pages 40-44: before and after reference photographs of the whitewashed works.

Khan's self-recognition of his work on social media does not count to establish recognized stature. And he submitted only two references to his work: one from a Russian newspaper with no commentary or attribution to him or the work's title, and another Instagram post by an actor whom Khan portrayed in the painting, without any comment on the artistic merit of the work.

**29. James Cochran's *Subway Rider*.** Cochran's 90-page folio consists of:

- Pages 1-62: Cochran's bio, and articles and interviews about other of his works. One interview contains a reference to the *Subway Rider* piece (page 11), but without any commentary or reference to the title of the work;
- Pages 63-68: Cochran's own social media pages and web site;
- Pages 69-70: reference photograph of *Subway Rider*;
- Pages 71-87: (1) Stavsky's Street Art NYC blog posting of an image of *Subway Rider*

---

[57] 10/20/17 Tr. 1370:3-5.

without any commentary or title (page 72); (2) Stavsky's upload of the work on Google Arts & Culture by Street Art NYC without any commentary or title (page 74); (3) Cochran's own Instagram post of the work (page 76); (4) a TimeOut New York article about 5Pointz that depicted a portion of *Subway Rider*, but without its title, indicating that the work was Cohen's then "favorite piece" (page 78); (5) a November 19, 2013 Guardian article commenting on the whitewash, and posting an image of the *Subway Rider* without commenting on the merits of the work or its title (page 81); (6) a Global Street Art Blog article that just contains an interview with Cohen, with no commentary on *Subway Rider* or the work's title (page 83); and (7) a publication called Bit Rebels that discusses pointillism in graffiti and posts the *Subway Rider* as one of many examples of Cochran's work, without the title (page 87); and

- Pages 88-90: before and after reference photographs of the whitewashed work.

Cochran's own reference to his work must be ignored in determining recognized stature. Similarly, mere reproductions of the image without any commentary on the work's artistic merit do not support a finding of recognized stature. Aside from the folio and Vara, Madrigale testified in favor of this work.[58] At most, then, Cochran has only presented a handful of sources that simply reproduced an image of the work and two people who are said to have liked it.

**30. Luis Gomez's *Inside King Kong*.** *Gomez's* 65-page folio consists of the following:

- Pages 1-50: Gomez's bio and articles about other of his works;
- Pages 51-56: copies of Gomez's own web site and social media, which contain no reference to *Inside King Kong*;
- Pages 57-61: photographs of other of Gomez's works;
- Pages 62-63: reference photographs of *Inside King Kong*; and
- Pages 64-65: page from Gomez's own Instagram account depicting the work.

Gomez has presented no evidence from any source other than himself that mentions *Inside King Kong*, which was an inside work.[59]

**31. Richard Miller's *Monsters I*.** Miller's 45-page folio consists of the following:

- Pages 1-25: Miller's bio, his social media pages, and articles about other of his works;
- Pages 26-32: reference photographs of Miller's works in this lawsuit;
- Pages 33-36: Miller's own Instagram and Facebook pages depicting *Monsters II*;
- Pages 37-40: third party social media page showing a video of 5Pointz, in which

[58] 10/26/17 Tr. 1212:10-22 (Madrigale).
[59] 10/24/17 Tr. 891:8-9, 904:10-15.

572701_1/03726-0002

*Monsters II* momentarily appears, as seen purportedly from a ride on the 7 Train, but without identifying the work's title or attributing Miller as the artist; and

- Pages 41-45: Miller's and a third party's social media page showing a photograph of *Monsters II* being destroyed, the latter of which fails to identify the work's title or Miller.

Miller submitted no evidence showing that *Monsters I*, another work placed on an inside building wall,[60] was recognized by anyone.

**32. Cohen's and Maria Castillo's *Love Girl and Burner*.** As shown, Cohen's folio contains two references to this work (on Google Arts & Culture and a blog), without any commentary. This 66-page folio consists of the following:

- Pages 1-42: bio, and articles about other of her works;
- Pages 43-49: reference photographs of *Love Girl and Burner*;
- Pages 50-63: Castillo's own web site, Facebook, and Instagram pages depicting the work; and
- Pages 64-66: before and after reference photographs of the whitewashed work.

Nothing in this folio shows that anyone other than Castillo herself recognized *Love Girl and Burner*. Vara, Madrigale, and Stavsky testified favorably about the work,[61] but that is just a single expert, a single paid member of the art community, and a single member of the general public, all of whom expressed their desire to see the artists prevail.

**33. Cohen's and Miyakami's *Underwater Fantasy*.** Cohen's folio only contained one reference to this work on Google Arts & Culture. Miyakami's 69-page folio consists of:

- Pages 1-31 and 67-69: Miyakami's bio, and articles about other of her works and projects not involved in this lawsuit, except for one January 18, 2014 article that mentions Miyakami as a notable female graffiti artist and depicts *Underwater Fantasy* as her work without mentioning its title, and with no commentary about it (page 17), and another 2014 art gallery press release that depicts *Underwater Fantasy*, with no commentary or any mention of the title of the work (page 19);
- Pages 32-42: reference photographs of her works in this lawsuit;
- Pages 43-51: Miyakami's own social media posts about her works;
- Pages 52-53: copyright registration for *Underwater Fantasy*;

---

[60] 10/24/17 Tr. 915:25-916:9.
[61] 10/26/17 Tr. 1207:12-1208:9 (Madrigale); 10/30/17 Tr. 1394:3-20 (Stavsky).

- Pages 54-55: same photograph of *Underwater Fantasy* on Google Arts & Culture posted by Stavsky found in Cohen's Folio, without the work's title; and
- Pages 56-66: before and after reference photographs of the whitewashed works.

As can be seen, at most, Cohen and Miyakami together have presented a total of three sources that referenced *Underwater Fantasy*, with no commentary on the artistic merit of the work.

**34.  Rocco's and William Tramontozzi, Jr.'s *Jimi Hendrix Tribute*.**  Excluding Tramontozzi's Facebook page, Rocco's folio only contains five examples of this work being depicted in a third party's social media page, two of whom appear to be friends of his and Tramontozzi's.  Tramontozzi's 30-page folio consists of the following:

- Pages 1-16: bio, his web site, and articles mostly about his DJ career, and works that are not a part of this lawsuit;
- Pages 17-19: reference photographs of *Jimi Hendrix Tribute*;
- Pages 20-28: the same social media references contained in Rocco's folio; and
- Pages 29-30: before and after reference photographs of the whitewashed work.

Between them, Rocco and Tramontozzi have only presented references to the work by, at most, five people from the general public, two of whom are their friends.

**35.  Miyakami's and Game's *Japanese Fantasy*.**  Neither artist's folio contains any evidence showing that this work was recognized by anyone other than Miyakami and Game.

**36.  Bienbenido Guerra and Carlo Nieva's *Return of New York*.**  Guerra's 37-page folio contains:

- Pages 1-14: bio, website pages, and other works;
- Pages 15-18: reference photographs of *Return of New York*;
- Pages 19-34: (1) a partial image of the work appearing on the Flickr page of an individual (page 20), with no commentary, title, or attribution to the artists, (2) an image of *Return of New York* appearing on Guerra's and Nieva's own Instagram page (page 22, 24), (3) an image of the work appearing on a third party's blog without commentary, title, or attribution (page 26), (4) a partial photo of the work being sold on Etsy.com for $27 without permission, and with no commentary, title, or attribution (page 28), (5) a partial images of the work being posted by an individual on two web sites with no commentary, title, or attribution (pages 30, 32), and (6) a partial image of the work appearing on Shutterstock with no commentary, title, or attribution (page 34); and
- Pages 35-37: before and after reference photographs of the whitewashed work.

21

Nieva's 41-page folio consists of the following:

- Pages 1-18, 23-24: other of Nieva's works and projects, and his Instagram account;
- Pages 19-22: reference photographs of *Return of New York*;
- Pages 23-28: pages from Nieva's own Instagram account about the work;
- Pages 29-38: certain of the same sources included in Guerra's; and
- Pages 39-41: before and after reference photographs of the whitewashed work.

Excluding their own posts, these plaintiffs collectively have submitted only five instances where *Return of New York* was reproduced anywhere, none of which contain any critique or commentary on the work's artistic merit, the work's title, or even attribution to Guerra or Nieva as having created the work.

**37. Cohen, Lamboy, and Thomas Lucero's *Angry Orchard*.** As discussed, Cohen's and Lamboy's folios contain only two instances where *Angry Orchard* was referenced: it was posted on Google Arts & Culture by Stavsky, and the Angry Orchard hard cider company tweeted the image. Lucero's 39-page folio consists of the following:

- Pages 1-21: bio and articles about other of his works and projects;
- Pages 22-26: reference photographs of his works in the lawsuit;
- Pages 27-31: same tweet from the Angry Orchard company and image of the work posted on Google Arts & Culture by Stavsky, without the work's title;
- Pages 31-32: image of *Black Creature* from an individual's blog, with no commentary about the work, and no title or attribution to the artist;
- Pages 33-37: before and after reference photographs of the whitewashed works; and
- Pages 38-39: Lucero's Instagram page with photographs of the whitewash.

These three artists have come up with a total of two instances where *Angry Orchard* was referenced, but without any commentary on the work's merit, and favorable testimony by Vara and Madrigale, although the latter failed to identify Lucero as one of the authors of this work.[62]

---

[62] 10/26/17 Tr. 1210:14-23 (Madrigale).

22

**B.     The 12 Works Denominated by this Court as "The Other Works."**  For the 12 "Other Works,"[63] the Court did not engage in any independent fact-finding, but instead "adopt[ed] in whole the jurors' findings" because the jurors were "representatives of the community and a 'cross-section of society.'"[64]  The Court clearly erred in not performing the relevant analysis, and in relying on the advisory jury's judgment of the merits of the works (while completely disregarding the same jurors' findings regarding statutory damages, which the Court increased by ten times).

*Carter* expressly precludes a trier of fact from making this determination.[65]  The jurors' role was to determine if art experts, members of the art community, and a cross-section of society had recognized these works; not to substitute their own judgment about the works.  That they may have liked or disliked a particular work is entirely irrelevant.  It is the plaintiffs' burden to establish that the works are known by others as having merit and stature.  The jury's own subjective judgments should have no place in their task or analytical process.  And, in any event, the opinion of seven jurors sitting through a month-long trial[66] does not represent a cross-section of society.

**38. Henter de Rezende's *Fighting Tree*.**  This 51-page folio consists of the following:

- Page 1-30: bio, and other works and projects;
- Pages 31-38: reference photographs of the works in this lawsuit;
- Pages 39-44: references to *Fighting Tree* in (1) a Russian newspaper article with no commentary, no title, and no attribution to the artist (page 40), (2) one person's personal web site, with no commentary or title reference (page 42), and (3) a third party's Flicker site, with no commentary or title reference (page 44);
- Pages 45-46: copyright registration; and
- Pages 47-51: before and after reference photographs of the whitewashed works.

---

[63] Henter de Rezende's *Fighting Tree*, Lucero's *Black Creature*, Miyakami's *Manga Koi*, Fernandez's *Dream of Oil*, Khan's *Orange Clockwork*, Takabayashi's *Starry Night*, Miller's *Monsters II*, and Cohen's and Miyakami's *Save 5Pointz*.

[64] *Cohen II*, 2018 U.S. Dist. LEXIS 22662, at *33-34.

[65] *Carter*, 861 F. Supp. at 325 ("Nor must the trier of fact personally find the art to be aesthetically pleasing; indeed, courts have persistently shunned the role of art critic.  *See, e.g., Bleistein v. Donaldson Lithographing Co.*, 188 U.S. 239, 251-53 (1903).").

[66] The Court incorrectly states that the advisory jury consisted of eight jurors.  One juror called in sick on October 18, 2017, leaving seven.  (10/19/17 Tr. 440:9-441:1.)

Henter de Rezende presented only three instances where *Fighting Tree* was referenced by members of the public, with no commentary about the work.

**39. Lucero's *Black Creature*.**  As discussed, Lucero's folio contains only one reference to this work on one individual's blog, without any information on the work's title or artist, or its merit.

**40. Miyakami's *Manga Koi*.**  As also discussed, Miyakami's folio contains no evidence that this work was ever recognized by anyone.

**41. Francisco Fernandez's *Dream of Oil*.**  Fernandez's 44-page folio contains:

- Pages 1-32: bio and articles about other of his works, except page 28, which shows pages form his own web site depicting photographs of *Dream of Oil*;
- Pages 33-34: reference photograph of *Dream of Oil*;
- Page 35-38: article about Fernandez and various murals he worked on, including *Dream of Oil* (page 38), without commentary on the work or reference to its title;
- Pages 39-41: his own Facebook and Instagram posts about the work; and
- Pages 42-44: before and after reference photographs of the whitewashed work.

Fernandez presented one reference only by somebody other than himself.

**42. Khan's *Orange Clockwork*.** Khan's Folio has no evidence of recognition for this work.

**43. Kenji Takabayashi's *Starry Night*.** Takabayashi's 34-page folio consists of:

- Pages 1-19: bio and articles about other of his works and projects;
- Pages 20-21: reference photographs of the work;
- Pages 22-29: references to *Starry Night* in: (1) an unidentified individual's Flickr page with no commentary on the work or mention of its title (page 23), (2) Stavsky's Street Art NYC Facebook page posting the image without commentary (page 25), (3) the work depicted in a Guardian article without commentary or the work's title (page 27), and (4) the work appearing on a CUNY student's blog (page 29);
- Pages 30-32: before and after reference photographs of the whitewashed work; and
- Pages 33-34: screen shots from a documentary that showed the whitewashed work momentarily in passing, without any identifying it or discussing its merits.

Takabayashi presented only four references to this work, three of which lack any commentary on the work's merit, and none of whom are experts or members of the art community.

**44. Miller's *Monsters II*.**  Miller's folio contains a few instances where this work appears in a video of 5Pointz from the 7 train, and a couple of social media posts showing the work being

24

destroyed, but none of these posts identify or discuss the work or its author.

**45. Cohen's and Miyakami's *Save 5Pointz*.** Neither Cohen's nor Miyakami's folios contains any evidence of this work being recognized by anyone other than Miyakami.

Finally, Vara made much of the "likes" or "hits" shown for some of the works. Anonymous likes (which can be, and are, purchased) and hits or a one or two sentence comment left by a person using a pseudonym prove nothing at all.

In sum, the Court's finding that the plaintiffs "collectively presented over a thousand exhibits in support of their claims that their works at 5Pointz had achieved recognized stature"[67] is clearly erroneous. None of the more than one thousand exhibits even remotely supports a finding of recognized stature. Although the Court remarked "[i]f not a single one of these works meet the recognized stature standard, it is hard to imagine works that would, short of a Caravaggio or Rembrandt"[68]; if every one of these works meets the recognized stature standard, it is hard to imagine works that would not.

### III.    The Court Clearly Erred on the Law and Finding of Willfulness

In fixing the maximum statutory damages award for every one of the works, the Court found that Wolkoff acted willfully, stating that he "knew from the moment the lawsuit was initiated that the artists were pressing their VARA claims" and describing the whitewashing to be "an act of pure pique and revenge for the nerve of the plaintiffs to sue to attempt to prevent the destruction of their art."[69] This is not the correct standard.

In federal statutory law, willfulness cannot be found when the statute could reasonably have been interpreted as not prohibiting the defendant's conduct. Rather, willfulness may be found only when the defendant "'had knowledge that its conduct represented infringement or . . . recklessly

---

[67] *Cohen II*, 2018 U.S. Dist. LEXIS 22662, at *31.
[68] *Id.* at *32.
[69] *Id.* at *40-44.

disregarded the possibility.'"[70]  In determining whether a defendant knowingly or recklessly—and thus willfully—violated VARA, a court must consider whether the defendant engaged in conduct that was *clearly unlawful* under then-existing law.[71]

Willfulness therefore requires more than a merely "erroneous" reading of the statute—it requires conduct so plainly unlawful that it was "objectively unreasonable" in light of "legal rules that were 'clearly established' at the time."[72]  Where a defendant's interpretation of a statute "could reasonably have found support in the courts," a willfulness finding is precluded.[73]  Even federal district court case law does not suffice to make a statutory interpretation "clearly established"; rather, only "court of appeals" authority or "pellucid" statutory language satisfy this test.[74]

Here, when Wolkoff painted over the artwork on November 19, 2013, it was far from "clearly established" that he was violating VARA.  First, no "clearly established" law indicated that VARA covers temporary works of aerosol art.  As the Court acknowledged four years later, "VARA does not directly address whether it protects temporary works," and "this litigation 'marks the first occasion that a court has had to determine whether the work of an exterior aerosol artist—given its general ephemeral nature—is worthy of any protection under the law.'"[75]  The absence of "clearly established" law on this question precludes a finding of willfulness.

Second, no "clearly established" law signaled that the 45 temporary aerosol paintings identified by the Court were works of "recognized stature."  The case law applying the term "recognized stature" is extremely limited, and (as the Court recognized) the Second Circuit has

---

[70] *Bryant v. Media Right Prods.*, 603 F.3d 135, 143 (2d Cir. 2010) (citation omitted).

[71] *See Safeco Insurance Co. of America v. Burr*, 551 U.S. 47, 69-70 & n.20 (2007); *see also Yellow Pages Photos, Inc. v. Ziplocal*, 795 F.3d 1255, 1271-72 (11th Cir. 2015) (*Safeco* applies to meaning of "willfully" in 17 U.S.C. § 504(c)(2)); *Graper v. Mid-Continent Casualty Co.*, 756 F.3d 388, 394-95 (5th Cir. 2014) (same).

[72] *Safeco*, 551 U.S. at 69-70 (citing and describing *Saucier v. Katz*, 533 U.S. 194 (2001), a qualified immunity case).

[73] *Id.* at 70 n.20.

[74] *Id.* at 70.

[75] *Cohen II*, 2018 U.S. Dist. LEXIS 22662, at *2-3, 22 (citing *Cohen v. G&M Realty L.P.* ("*Cohen I*"), 988 F. Supp. 2d 212, 214 (E.D.N.Y. 2013)).

"never had occasion" to interpret the term.[76]  Given this lack of authority, as of November 19, 2013

the position that the 45 works in question were not of "recognized stature" "could reasonably have

found support in the courts."[77]  This is vividly demonstrated by this Court's own refusal—one day

later, on November 20, 2013—to conclude that even a single one of the works was necessarily of

"recognized stature."[78]  The Court noted that "[s]ince VARA does not define 'recognized stature,'

the court ultimately will have to decide whether to embrace the strictures of the academic views

espoused by the defendants or the more expansive ones suggested by the plaintiffs."[79]  If the Court

itself could not define "recognized stature" and could not decide whether the works were covered

by that term after conducting a three-day hearing on this very issue, it is hard to see how Wolkoff's

contemporaneous decision to paint over the works was a violation of "clearly established" law.

Because no "clearly established" law indicated that the 45 works were of "recognized stature,"

Wolkoff's destruction of those works was not a willful violation of VARA.

In addition, Wolkoff's "good faith" belief that his action was lawful precludes a willfulness

finding.[80]  Wolkoff testified as follows:

> Q:  You had not even received the written decision from the
> Court when you whitewashed; correct?
> A:  That is false.  There was a preliminary order – a written
> order.
> THE COURT: Explain that, what knowledge did you have of
> the proceedings?

---

[76] *Id.* at *27.

[77] *Safeco*, 551 U.S. at 70 n.20.

[78] *Cohen I,* 988 F. Supp. 2d at 226.

[79] *Id.*

[80] *Danjaq LLC v. Sony Corp.*, 263 F.3d 942, 959 (9th Cir. 2001) ("[O]ne who has been notified that his conduct constitutes copyright infringement, but who reasonably and in good faith believes the contrary, is not 'willful' for these purposes.'") (citing 4 Nimmer on Copyright, § 14.04[B][3]); *see also Marshall v. Marshall*, 08 CV 1420 (LB), 2012 U.S. Dist. LEXIS 45700, at *91-92 (E.D.N.Y. Mar. 30, 2012) ("Defendant . . . can argue for reduced damages by proving that he 'was not aware and had no reason to believe that his . . . acts constituted an infringement.  He must show both (1) a subjective good faith belief that his conduct was innocent, and (2) that his belief was objectively reasonable under the circumstances.") (Internal citations omitted).

27

THE WITNESS:  I believe – I believe something – I believe that it was a written – from the courts, allowing me to demolish my building.
THE COURT:  That's what your belief was?
THE WITNESS:  That was my belief.[81]

\* \* \*

THE WITNESS: . . . It was my understanding that I can take down the building.  So instead of having any confrontation, or the problems that they were going to have with the artists, I took the decision to whitewash it and get it over and it's over with.  They will be emotional, but it is over with.  Instead of going through a process that would take them either to go to jail or – whatever.[82]

Wolkoff further testified that the prospect of having to pay damages for any VARA violation "never entered my mind" because "[t]he art, they always painted over their own work so it never bothered me.  It never entered my mind."[83]  And while the Court discredits Wolkoff's testimony about the rumblings he heard about the artists becoming irrational and emotional and acting out, the rumblings were not at all "fanciful and unfounded," as the Court dismissively characterized them.[84]  In making this finding, the Court overlooked Cohen's plain admissions on cross-examination that he had threatened to stand in front of the bulldozers or chain himself to the building to prevent demolition of the buildings.[85]  Guerra testified that he "remember[ed] having my hammer in my hand and squeezing it tightly, and then after that I took my tool belt off and walked off the job.  So a couple hours later I was talk[ed into] not going down to 5Pointz to raise hell."[86]

As the Court will recall, it dissolved the TRO and denied plaintiffs' preliminary injunction motion on November 12, 2013, permitting Wolkoff to demolish the buildings.  But even before that, the "[C]ourt, during the hearing, exhorted the plaintiffs to photograph all those [works] which

---

[81] 11/3/17 Tr. 2054:5-15.
[82] 11/3/17 Tr. 2055:19-25.
[83] 11/3/17 Tr. 2057:23-11.
[84] *Cohen II*, 2018 U.S. Dist. LEXIS 22662, at \*42.
[85] 10/31/17 Tr. 1534:14-1536:4.
[86] 10/19/17 Tr. 517:17-22.

they might wish to preserve."[87] On November 7, 2013, the Court had directed the plaintiffs, "if you really really want to preserve this in the best vehicle you can, short of having them on the wall" to go and take pictures "**between now and the time I'm going to render my decision**, because the likelihood is I'm going to allow Mr. Wolkoff to go forward, I'm just not pulling any punches here."[88]

The Court's exhortation was a crystal-clear message to both Wolkoff and the artists that it intended to deny the injunction motion and, moreover, that it anticipated that the works would be gone in short order after it did so.  And while testifying how distraught they were after the whitewash, how valuable the works were, and how important it was for the works to be preserved for generations to come, it turned out that not a single artist had acted on the Court's very direct message that they should prepare themselves for the works to soon be destroyed.[89]

The plaintiffs made no effort to preserve their works because the case was never about the art.  If it were, they would not have placed the works knowing that they would be covered or destroyed.  And if they were, Cohen would have asked Wolkoff sometime between the variance being approved and the whitewash to remove or preserve his and others' works, which he never did.[90]  Or he would have asked to preserve or remove them after learning that Wolkoff at a July 2013 meeting told Marie Flageul, his life partner and the media point person at 5Pointz, that he intended to whitewash the building.[91]  As Cohen admitted in his deposition and at trial, he never asked for permission to remove any works before suing or before the whitewash because "when we initiated this, it was to give us some leverage, give us time to move forward."[92]

---

[87] *Cohen I*, 988 F. Supp. 2d at 227.
[88] Declaration of Mioko C. Tajika dated March 15, 2018, Ex. A (11/7/13 Tr. 14:10-17) (emphasis added).
[89] 10/31/17 Tr. 1554:24-1556:11.
[90] 10/31/17 Tr. 1540:15-17.
[91] 10/31/17 Tr. 1554:3-1556:11
[92] 10/31/17 Tr. 1540:15-1541:15.

The Court issued its short form order denying the injunction and advising that a written decision would follow on November 12, 2013.  The whitewash occurred on November 19, 2013.  The Court's written opinion arrived on November 20, 2013.  Thus, as far as Wolkoff was concerned, on November 19, he was not violating VARA by whitewashing works the Court gave him permission to destroy on November 12.  It was not until *after* the whitewashing commenced, on November 20, that the Court in its written decision stated that "at least some of the [then] 24 works . . . such as Lady Pink's 'Green Mother Earth,' present 'sufficiently serious questions going to the merits to make them a fair ground for litigation" and that "defendants are exposed to potentially significant monetary damages if it is ultimately determined after trial that the plaintiffs' works were of 'recognized stature.'"[93]  These facts do not support a finding of willfulness.

Additionally, the Court found that "[a]fter the whitewash, [Wolkoff] refused to let them onto his property to recover what had survived and even attempted to have them arrested when they tried to do so."[94]  But what Wolkoff may have done after the whitewashing is irrelevant to whether he knew the whitewashing constituted a violation of VARA, and cannot support a finding of willfulness as a matter of law.  The finding, moreover, is belied by the proof adduced and the Court's statement elsewhere in its opinion that Cohen "was able to recover [a] portion of [*Halloween Pumpkins*]."[95]  Cohen similarly admitted on cross-examination that after the whitewash, Wolkoff, in fact, gave him permission to remove one of his works.[96]

The Court further states that "Wolkoff could have given the plaintiffs 90 days' notice to allow them the opportunity to salvage their works."[97]  But nothing in the record provides any reason to believe that the plaintiffs—who did not even bother to photograph the art—intended to

---

[93] *Cohen I,* 988 F. Supp. 2d at 226, 227.
[94] *Cohen II,* 2018 U.S. Dist. LEXIS 22662, at *42-43.
[95] *Id.* at *37; *see also* 10/30/17 Tr. 1425:23-1426:5 (Cohen).
[96] 10/30/17 Tr. 1489:21-1490:12; 10/31/17 Tr. 1526:2-21.
[97] *Cohen II,* 2018 U.S. Dist. LEXIS 22662, at *41.

30

undertake the laborious and expensive (and likely futile) process of trying to remove it.  And there is even less reason to think that Wolkoff had any expectation that they might do so.

Moreover, as defendants repeatedly explained before and throughout the trial, the notice only applies if a work of visual art incorporated into a building "can be removed from the building without the destruction, distortion, mutilation, or other modification of the work as described in section 106A(a)(3)[.]"[98]  The Court credits defendants' expert Harriet Alden's testimony that the works could have been removed, but overlooks her testimony that such removal may inevitably cause the destruction of the works (thereby negating the 90-day notice requirement).[99]  Cohen admitted on cross-examination, as he had previously sworn in an affidavit, that his works "'have been incorporated in and made part of 5Pointz in such a way that removing them or any part thereof from 5Pointz would cause their destruction, distortion, mutilation or modification.'"[100]  This statement precisely tracks the statute's directive regarding circumstances under which 90-day notice would ***not*** be required.  To the extent that the absence of the 90-day notice that Wolkoff was not obligated to send contributed to the Court's finding of willfulness, it is also clearly erroneous.

## IV.   The Court's Factual Findings on the Statutory Damages Factors Were Clearly Erroneous, and Constitutes an Abuse of Discretion

The Second Circuit "review[s] for clear error the District Court's factual findings supporting its determination of the appropriate level of statutory damages, and [it] review[s] an award of those damages for abuse of discretion."[101]

<u>The Infringer's State of Mind</u>.  As discussed above, the Court's finding of willfulness was clearly erroneous.

---

[98] 17 U.S.C. § 113(d)(2).
[99] 11/2/17 Tr. 1987:14-1988:9, 1983:9-17, 1984:3-11.  Alden further opined that all or a portion of 39 of the works could only be removed by professionals.  (Plaintiffs' Trial Exhibit 1270.)
[100] 10/31/17 Tr. 1537:6-14 quoting Cohen's previously-submitted declaration.
[101] *Bryant Media*, 603 F.3d at 143.

31

The Expenses Saved, and Profits Earned, by the Infringer.  The Court stated that 5Pointz increased in value from $40 million to $200 million when the variance was obtained.  There is no evidence to support this contention (other than Cohen's say-so[102]).  Wolkoff testified that any increase in value "[w]as not because of [the] art" but because Citicorp moved into the area[103]— surely, a subject that Wolkoff, as the developer, would know more about than Cohen.

In any event, the only relevant profits here relate to any profits gained *from the infringing act*— i.e., from the whitewashing.  There is absolutely no basis for any conclusion that the defendants profited from the whitewashing.

Revenue Lost by the Copyright Holder.  There is no evidence that any of the plaintiffs lost any revenue.  In fact, the Court found that not a single plaintiff suffered any actual damages.  The Court nonetheless quoted Takabayashi's testimony that he "probably" lost business, and testimony by Del Valle that the whitewash "definitely took away a lot of opportunities that I would have had," when he later admitted on cross that he had no difficulty getting work because of the whitewash.[104]

Each plaintiff testified that he or she neither intended to sell their works, and none of them identified any potential buyers.  And while the Court wrote that the works could have "adorned a museum," Alden testified that the cost to remove a work could be hundreds of thousands of dollars,[105] which would have greatly exceeded any revenue earned.  As a practical matter, it is more than unlikely that a museum would be interested in expending the vast sums that would be required to pay to extract and transport, and then exhibit, massive portions of a concrete building—which could not have been done without Wolkoff's permission in any event.

---

[102] 10/30/17 Tr. 1458:1-12.
[103] 11/3/17 Tr. 2015:6-25.
[104] 10/17/17 Tr. 158:22-159:23.
[105] 11/2/17 Tr. 1978:22-1979:1980:1.

Based on the Court's finding that the plaintiffs suffered no damages, and the other considerations discussed, the Court abused its discretion in finding this factor in plaintiffs' favor.

The Deterrent Effect on the Infringer and Third Parties. The Court found this to be "the most important factor in this case" and fixed the highest damages award according to its belief that Wolkoff was unrepentant about the whitewash. In reaching this conclusion, however, the Court fails to consider that artists came to paint at 5Pointz well knowing that their works would be covered over by another artist's work or come down with the building, and were therefore temporary. Still, although the Court noted in its decision that "[d]amages under VARA could, of course, vary depending on whether the works were permanent or temporary," the Court awarded the maximum damages possible, notwithstanding that the majority of the works, by Cohen's own admission, would have been covered over by another work had 5Pointz continued.

The only deterrent the Court's decision will have will be to discourage property owners from granting permission to artists to paint on their walls, even with a written waiver, which, as with any waiver or other writing, are often subject to attacks about scope, enforceability, and authenticity. It would be foolish for any property owner to risk being placed in Wolkoff's current position, particularly given His Honor's statement in the opinion that, on a fuller record, he may have been inclined to *permanently* enjoin Wolkoff from disturbing the artwork or reclaiming his property.[106]

The Conduct and Attitude of the Parties. The Court found that Wolkoff's "problematic conduct . . . during the whitewashing and on the witness stand . . . cuts heavily in favor of a high statutory damages award."[107] While the Court was obviously displeased with its interactions with Wolkoff on the stand, it ultimately concluded that he "had in the main testified truthfully,"[108] which is the "bottom line" of a sworn witness's duty and should be the focus of the inquiry.

---

[106] *Cohen II*, 2018 U.S. Dist. LEXIS 22662, at *44 n.20.

[107] *Id.* at *48.

[108] *Id.* at *14.

In making this determination, the Court failed to recognize any of the "good deeds" underlying the Court's "no good deed goes unpunished" remark. It failed to take into account that 5Pointz would never have existed were it not for Wolkoff's largess in permitting these artists to paint. It failed to take into account that Cohen and the plaintiffs knew from the outset that they had to stop painting and that works would be destroyed when the time came for Wolkoff to develop the property. It failed to consider the artists' failure to take pictures of the works despite this Court's exhortation, even after the denial of the preliminary injunction, and even though Cohen swore he knew Wolkoff would whitewash the property "'as soon as the temporary restraining order is lifted.'"[109] It failed to recognize that Wolkoff allowed the artists to stay and paint on the property even after they filed the lawsuit[110] (as demonstrated by the fact that several of the works were completed as late as November 2013). It failed to take into account Wolkoff's enormous contribution to the artists' careers and to the acceptance of aerosol art as an art form. In short, the Court abused its discretion by discrediting these facts and placing a disproportionate weight to the act of whitewashing. The case should be retried for a proper weighting of all factors.

## V.   The Court Should Remit the Statutory Damages Award[111]

"Remittitur is the process by which a court compels a plaintiff to choose between a reduction of an excessive verdict and a new trial."[112] "The practice has come to be employed in two distinct kinds of cases: (1) where the court can identify an error that caused the jury to include in the verdict a quantifiable amount that should be stricken, and (2) more generally, where the award is

---

[109] 10/31/17 Tr. 1557:9-1558:2.

[110] 11/3/17 Tr. 2082:22-2083:10.

[111] Since the judgment was decided by this Court, it is unclear whether remittitur is appropriate. Nevertheless, defendants make this motion for a remittitur because there is some authority for filing one even after a bench trial. *See FTC v. Chapman*, 714 F.3d 1211 (10th Cir. 2013) (post-judgment motion to alter or amend judgment, or alternatively, for remittitur, filed after a bench trial); *Dweck Law Firm, LLP v. Mann*, 03 Civ. 8967 (SAS), 2004 U.S. Dist. LEXIS 19601, at *14 n.30 (S.D.N.Y. Sept. 30, 2004) (treating a motion filed after a bench trial verdict "as analogous to a motion for remittitur").

[112] *Shu-Tao Lin v. McDonnell Douglas Corp.*, 742 F.2d 45, 49 (2d Cir. 1984).

34

'intrinsically excessive' in the sense of being greater than the amount a reasonable jury could have awarded, although the surplus cannot be ascribed to a particular, quantifiable error."[113]

Defendants' position is that none of the works possess recognized stature so they should not have to pay any damages because they are not liable under VARA.  But even if they were somehow liable, the Court should remit the excessive statutory damages award because of its clearly erroneous findings of facts as discussed above.  In prior copyright cases, courts have awarded "the . . . statutory minimum where the defendant's defense was based on a non-frivolous but ultimately unsuccessful legal argument."[114]  Indeed, the statutory damages award of $6.75 million here "is so severe and oppressive as to be wholly disproportioned to the offense and obviously unreasonable" that it violates the defendants' constitutional due process rights.[115]

Accordingly, the Court should require plaintiffs to accept a statutory minimum of $750 each for the 45 works, and grant a new trial if they reject this amount.

## CONCLUSION

For the foregoing reasons, defendants respectfully request that this Court grant this motion and the reliefs requested.

---

[113] *Id.* (citations omitted).
[114] *NFL v. Primetime 24 Joint Venture*, 131 F. Supp. 2d 458, 478 (S.D.N.Y. 2001).
[115] *St. Louis, I.M. & S. Ry. Co. v. Williams*, 251 U.S. 63, 66-67 (1919); *see also Bridgeport Music, Inc. v. Justin Combs Publishing, Inc.*, 507 F. 3d 470, 486-487 (6th Cir. 2007) (deeming $3.5 million punitive damage award in copyright to be "unconstitutionally excessive" and to violate defendant's due process where, like here, "the harm in this case (copyright infringement) was purely economic and did not threaten the health or safety of others," defendant's copyright violation was an isolated incident, and plaintiff was not a "financially vulnerable" victim).

35

Dated:  New York, New York
       March 15, 2018

Respectfully Submitted,

s/ Meir Feder
Meir Feder
JONES DAY
250 Vesey Street
New York, NY 10281
Tel: (212) 326-7870
Fax: (212) 755-7306
mfeder@jonesday.com

            and

David G. Ebert
Mioko C. Tajika
INGRAM YUZEK GAINEN CARROLL &
BERTOLOTTI, LLP
250 Park Avenue
New York, New York 10177
Tel.: (212) 907-9600
Fax: (212) 907-9681
debert@ingramllp.com
mtajika@ingramllp.com

*Attorneys for Defendants*

36