1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - -X
                                    :
COHEN, ET AL.,                      : 13cv05612
                                    :
            Plaintiffs,             :
                                    :
                                    :
            V.                      : United States Courthouse
                                    : Brooklyn, New York
                                    :
G & M REALTY L.P., ET AL.,          : THURSDAY, NOVEMBER 7, 2013
                                    :
            Defendants.             :
- - - - - - - - - - - - - - -X

            TRANSCRIPT OF CIVIL CAUSE FOR CIVIL HEARING
            BEFORE THE HONORABLE FREDERIC BLOCK
                UNITED STATES DISTRICT JUDGE

                    A P P E A R A N C E S

FOR THE PLAINTIFF:    LAW OFFICES OF JEANNINE CHANES, P.C.
                      BY:  JEANNINE CHANES, ESQ.
                      27 Whitehall Street, Fourth Floor
                      New York, NY 10004

FOR THE DEFENDANT:    INGRAM YUZEK GAINEN
                      CARROLL & BERTOLOTTI, LLP
                      BY:  DAVID G. EBERT, ESQ.
                      250 Park Avenue, Sixth Floor
                      New York, New York 10177

COURT REPORTER:       NICOLE CANALES, RPR, CSR
                      225 Cadman Plaza East
                      Brooklyn, New York 11201
                      CNLSNIC@AOL.COM

Proceedings recorded by mechanical stenography, transcript
produced by computer-assisted transcript.

1      THE CLERK:  Civil cause for a hearing on preliminary

2  injunction, Cohen versus G & M Realty.  I ask all the parties

3  to state their appearances.

4          MS. CHANES:  Jeannine Chanes, Law Offices of

5  Jeannine Chanes P.C., for plaintiffs.

6          MR. EBERT:  David Ebert of Ingram Yuzek for the

7  defendants, and my colleague Mioko Tajika.

8          THE COURT:  So we're ready to have Mr. Simmons

9  testify now?

10          MS. CHANES:  Actually, your Honor, two things.  One,

11  housekeeping.  I have some additional exhibits to add to the

12  binder that you already have and a supplemental binder.  We

13  haven't killed too many trees with this address.  It's some of

14  the issues your Honor raised yesterday.

15          THE COURT:  What are the additional exhibits?

16          MS. CHANES:  The additional exhibits, one of them is

17  copies of the exhibits to the complaint, which have individual

18  biographies for the individual artists.

19          THE COURT:  Mr. Ebert knows what that is?

20          MS. CHANES:  Yes.

21          MR. EBERT:  I'm just looking at them, your Honor.  I

22  just received them.

23          MS. CHANES:  And the others are -- there are some

24  Internet printouts of articles specifically about the works of

25  visual art at issue here, in response to some of the questions

1    that Mr. Ebert raised yesterday.

2         THE COURT:  You know, this is kind of an informal

3    type of proceeding, and it may be that those come under the

4    scriptures of rules of evidence, but maybe for the purpose of

5    this hearing, I can accept that.

6         What do you think about that, Mr. Ebert?

7         MR. EBERT:  This is all hearsay, and this is not

8    even about the works.  They picture the works -- they feature

9    the works or have a picture of the works.  These are not

10   criticism --

11        THE COURT:  I don't know what they are, but it

12   sounds like hearsay to me.

13        MR. EBERT:  And I just got it this morning,

14   your Honor.

15        THE COURT:  So we're not going to accept that.  If

16   you want to lay a foundation for it -- somebody wants to

17   testify and say that, you know, well, maybe if there's been a

18   lot of articles in newspapers, etcetera, that might be

19   something that, you know, an expert can say, that that's

20   something to consider in terms of deciding what is recognized

21   statute.  What I'm trying to do here, quite frankly, in cases,

22   you know, you can't read between the lines, is I'm going to

23   probably decide whether or not so-called aerosol art, in

24   general, in these particular examples of aerosol art, should

25   be considered as recognized stature.  That might be something

1   of value to the public, to the artistic community and to the

2   general benefit of decorating the city, you might say;

3   encouraging that, so I'm just anxious to hear from the experts

4   whether this type of work constitutes recognized stature and

5   what is it.  Do you know what recognized stature means?

6           MS. CHANES:  I don't think anyone does, your Honor.

7           THE COURT:  Well, maybe this will be the case that

8   will give some substance to it, possibly.  I think it's

9   important, perhaps, to put some meat to the bones.  That

10  statute came into existence, I think, in 1990.  I don't think

11  there are many cases out there that really inform the public

12  in how do you determine whether a work is of recognized

13  stature.  I'm going to ask the experts those questions.  I

14  think it's important to try to understand that.  So they can

15  refer to these articles.  Maybe it would be relevant if it

16  comes from the testimony of an expert, and is this one of the

17  factors that's considered, then I'm anxious to hear about

18  that.

19          MS. CHANES:  So would you like these in your binder?

20  I'm not saying that they're admitted or deemed admitted.

21          THE COURT:  Put them all in the binder.

22          MS. CHANES:  This can go to the binder you already

23  have.  And speaking of experts, your Honor, I am here to ask

24  the Court's indulgence.  Mr. Simmons could not make it today.

25  He has a film crew with a commercial endeavor that he's doing

Proceedings                                              5

1   that carried over from yesterday.  He can't get out of it.

2   It's part of the way he earns his living.

3            THE COURT:  Plaintiff has the burden.  I can't

4   accommodate this person indefinitely.  What are you trying to

5   do here?

6            MS. CHANES:  He can make it tomorrow morning.  I see

7   we're on calendar for tomorrow.

8            THE COURT:  What do we have on for tomorrow?

9            THE CLERK:  We only have two criminal conferences at

10  2:30.  We're free in the morning.

11           THE COURT:  We'll accommodate him.

12           MS. CHANES:  Thank you very much.

13           THE COURT:  What else do you have to do today?

14           MS. CHANES:  I have two rebuttal witnesses who are

15  both plaintiffs, and one of the rebuttal witnesses can also

16  speak to some of the issues that the Court raises.

17           THE COURT:  Rebuttal witnesses, meaning, what?

18  You're going to now -- subject to having Mr. Simmons testify,

19  are there any other witnesses you want to produce?

20           MS. CHANES:  Other than Mr. Simmons, there are two

21  plaintiffs that we would like to have testify.

22           THE COURT:  They're not rebuttal witnesses, so I'll

23  certainly allow you to have the plaintiffs testify.  Okay.

24  And so we'll do that now.

25           MS. CHANES:  Okay.

```
                    Proceedings                        6
```

1           THE COURT:  And, then, you'll be prepared -- is it

2    Ebert?

3           MR. EBERT:  It's Ebert, your Honor.

4           THE COURT:  You'll be prepared to have the Court

5    listen to your experts today?

6           MR. EBERT:  Yes.

7           THE COURT:  All right.  Okay.  Let's hear from the

8    other witness.

9           MS. CHANES:  Thank you, your Honor.  Plaintiffs call

10   Danielle Mastrion.

11          THE CLERK:  Good morning.  Remain standing and raise

12   your right hand.  Do you affirm the testimony you're about to

13   give to the Court in this proceeding will be the truth, the

14   whole truth and nothing but the whole truth?

15          THE WITNESS:  Yes.

16          THE CLERK:  Thank you.  Please have a seat.  Please

17   state and spell your name.

18          THE WITNESS:  Danielle Mastrion, D-a-n-i-e-l-l-e,

19   M-a-s-t-r-i-o-n.

20          THE COURT:  I can hear you okay.

21          Mr. Ebert, can you hear?

22          MR. EBERT:  I'm fine, your Honor.  Thank you.

23          MS. CHANES:  I'm having a little trouble.  I guess

24   too much loud music.  Permission to approach to give her

25   copies of our binders?

```
                         Proceedings                      7
```

1          THE WITNESS:  Good morning, your Honor.

2          THE COURT:  How are you today?

3          THE WITNESS:  Good.

4          THE COURT:  You're one of the plaintiffs?

5          THE WITNESS:  Yes, I am.

6          THE COURT:  Do you have any of your work here in

7   these 24 pictures?

8          THE WITNESS:  Yes, I do.

9          THE COURT:  Which ones are yours?

10          THE WITNESS:  It is the portrait of -- the

11   black-and-white portrait.

12          THE COURT:  Which number is that?  Let me find it.

13          Do you know what number that is, Ms. Chanes?  Is

14   that 14?

15          MS. CHANES:  No.

16          THE WITNESS:  I don't have that.

17          MS. CHANES:  Twelve, your Honor.

18          THE COURT:  Twelve.

19          THE WITNESS:  I don't have the images.

20          THE COURT:  Twelve is yours, "Kool Herc"?

21          THE WITNESS:  "Kool Herc," yes.

22          MS. CHANES:  Exhibit A, page 12.

23          THE COURT:  That's yours.  A12 is yours; correct?

24          THE WITNESS:  I don't have it in front of me.

25          MS. CHANES:  Exhibit A.

Proceedings                                          8

1          THE COURT:  Look in the green binder.  That's yours?

2          THE WITNESS:  Yes.

3          THE COURT:  And that's the work of aerosol arts?

4          THE WITNESS:  Yes, all aerosol, uh-huh.

5          THE COURT:  I haven't seen the original but it seems

6    to be extraordinary.

7          THE WITNESS:  Thank you.

8          THE COURT:  All right.  Go ahead.

9                      DIRECT EXAMINATION

10   BY MS. CHANES:

11   Q    Ms. Mastrion, could you tell the Court a little bit about

12   your educational background.

13   A    I have a BFA, Bachelor of Fine Arts, from Parsons School

14   of Design, and my major was illustration.

15   Q    And are you a professional artist?

16   A    Yes.

17   Q    What kind of artist are you?

18   A    A painter and a muralist.

19          THE COURT:  Painter and what?

20          THE WITNESS:  A painter on canvas.  I do canvas

21   work.  I do commissions.  I do gallery work, but I also do

22   murals.

23   Q    (BY MS. CHANES)  What media do you use?

24   A    I use all kinds of painting medium, but I use oil paint.

25   I use acrylic paint for my canvas work, and for all these,

Proceedings                                      9

1   aerosol.

2   Q    You do primarily canvas work or primarily mural work?

3   A    I do both, but recently more mural work.

4   Q    Why are you switching to mural work?

5   A    I've been a painter my whole life, and my work just got

6   larger, and larger and larger until it couldn't fit on a

7   canvas anymore, and I naturally moved on to walls.  Also, I

8   wanted to work a little bit more with the community, and more

9   people can see works on walls than they can in a gallery or on

10  a canvas, so that was a big motivating factor.

11          THE COURT:  Also helpful for judges with failing

12  eyesight.

13          THE WITNESS:  Yes, larger works you can see better

14  from far away.

15  Q    (BY MS. CHANES)  Or passengers on the Number 7 train?

16  A    Exactly.

17  Q    Do you show your work in galleries?

18  A    Yes, I do.

19  Q    Is your work collected privately?

20  A    It is.

21  Q    About how many gallery shows have you had in the last

22  year?

23  A    In the last year, probably between 15 to 20, between

24  group shows.  I had one solo show.  I have a couple more --

25          THE COURT:  Can you keep your voice up.  All through

NICOLE CANALES, CSR, RPR

1  New York or are they spread out throughout the country and the

2  world?

3            THE WITNESS:  They're in New York.  I have shown and

4  displayed in other countries.  This year I have not, but last

5  year I was shown internationally, yes.

6            THE COURT:  Where?  In France?

7            THE WITNESS:  In Paris, in Poland, in Germany.  This

8  year I did a mural in Belize, so, yes --

9            THE COURT:  I assume you are paid for these works.

10           THE WITNESS:  Yes.  Most of them I am paid for or

11  the trips are compensated for.

12           THE COURT:  You make a living through your art?

13           THE WITNESS:  Yes, I do.

14  Q    (BY MS. CHANES)  And, Ms. Mastrion, have you painted at

15  5Pointz?

16  A    Yes, I have.

17  Q    And about how many times have you painted at 5Pointz?

18  A    Five times.

19  Q    You had five different works up at 5Pointz?

20  A    Uh-huh.

21  Q    When you painted at 5Pointz, do you have any particular

22  intent about how long the work will last?

23  A    Normally, I know that the piece is going to be up for a

24  significant amount of time, if not permanently, but if it's

25  not going to be up permanently, there's a discussion

1   beforehand.

2   BY THE COURT:

3   Q    It's not going to be what?

4   A    If it's not going to be up permanently, if it's going to

5   be covered over, they let me know beforehand.

6   Q    You know the nature of what you do when you paint on

7   walls --

8   A    Yeah.

9   Q    -- that it's really very likely not to be there forever.

10  I mean, I think we're not fooling each other; right?

11  A    Yeah.

12  Q    So when you do these, you know -- I'm not the standard

13  here.  I just happen to like what you do, but when you put

14  "Kool Herc" up, you can't be assured that if you come back

15  five years later it's going to be there, can you?

16  A    Weather permitting and quality of the paint, it could.

17  Q    It may be, it may not.  But, you see, one of the things

18  I'm concerned about -- we're having a different type of

19  hearing here.  Mr. Wolkoff is here.  I don't think you would

20  want me to render a decision that would have a chilling affect

21  upon the Wolkoffs of the world, so that you'll never have a

22  vehicle to do this type of thing again.  That would be

23  counterproductive, wouldn't it?  How can I render a decision

24  that would encourage you and others like you to continue to do

25  these things and to encourage the owners of buildings to allow

1   you to do it?  That seems to be like a win-win situation,

2   doesn't it?  What does a wise judge do?

3   A    Allow for the spaces that are in place already to be

4   there for artists to work because there's not many.  There's

5   hardly any left in New York, so they're very hard to come by.

6   Q    But if I penalize Mr. Wolkoff for being supportive of

7   this, what impact will that have on the rest of the aerosol

8   world?

9   A    I mean --

10  Q    I don't want to do that, you see.  I don't think you want

11  me to do that either.

12  A    No, the thing is, though, if you go to other countries,

13  you know, aerosol art is -- it's accepted everywhere.  It's

14  common practice for building owners, developers.

15  Q    I'm sensitized.  If I find a lawful means of being able

16  to support aerosol art as -- as a -- that phrase under the

17  statute, "recognized stature," I would like to do that.  I

18  mean, I'm impressed with what you're all about.  Whether I'll

19  be able to do that or not remains to be seen.  I want to hear

20  the rest of the experts talk to me.  At the same time, I don't

21  want to, you know, write something that would have a chilling

22  effect so that you never have an opportunity to -- you know,

23  to contribute to the urban world that we live in by having

24  things of this nature on the walls.  I'm trying to balance

25  those factors out.  So whatever help you can give to the Court

Proceedings                              13

1   to come out with a positive type of decision here that may be

2   of value to you and the Wolkoffs of the world, you can let me

3   know what you think I should do.  We're on the same page?

4   A    Yes.

5               THE COURT:  All right.  Go ahead.

6   Q    (BY MS. CHANES)  Ms. Mastrion, when you painted the --

7   your "Kool Herc" portrait at 5Pointz, did you paint over a

8   previous work of yours?

9   A    Yes, I did.

10  Q    What was that?

11  A    It was an MCA -- a portrait of MCA, the lead singer of

12  the Beastie Boys, a pretty famous Hip Hop group from New York

13  who had recently passed away.

14              THE COURT:  You realize the judge is actively

15  involved.  It's no jury, and you may read about it in the

16  newspaper.  Have you taken photographs of this just in case,

17  whether it's going to be the weather that's going to destroy

18  it, or whether the building is going to be taken down because

19  Mr. Wolkoff may have the right to go forward with this

20  project?  Have you taken an effort to preserve these

21  photographs, or fine prints or anything else?

22              THE WITNESS:  Photographs, yes, I have taken

23  photographs, but the quality of the photograph can never

24  reproduce the texture of the wall.

25              THE COURT:  Did you do the best you can based upon

Proceedings                              14

1    what photographic methods we have to preserve these works?

2              THE WITNESS:  Yes.

3              THE COURT:  Because you can make nice prints out of

4    these things, I take it?

5              THE WITNESS:  Nice is subjective.

6              THE COURT:  I know fine photographers who would be

7    able to make wonderful reproductions.  Have you talked to

8    those people?

9              THE WITNESS:  I do have photos taken of the piece.

10             THE COURT:  I'm going to tell this to you and

11   everybody else here:  I'm going to give you that opportunity,

12   and if you really really want to preserve this in the best

13   vehicle you can, short of having them on the wall, I think you

14   should do that between now and the time I'm going to render my

15   decision; because the likelihood is I'm going to allow

16   Mr. Wolkoff to go forward, I'm just not pulling any punches

17   here.  I would like this to be preserved.  I'm going to tell

18   you that all the artists, and everybody else, they have an

19   opportunity to do it now.  It's up to them whether they want

20   to do it.  If they don't care, that would be something

21   different, too; right?  If they do care, then we get the

22   photographers as best they can over the next few days.

23             MS. CHANES:  I can tell them that, but the

24   photograph is not the equivalent of an original work of art.

25             THE COURT:  It's up to them.  I'm just giving them

NICOLE CANALES, CSR, RPR

Proceedings                                         15

1   the opportunity, so we have a clear record that today they are

2   being given some notice that they should take advantage of

3   this time to make sure they preserve their works which you

4   feel very strongly about.  And I may well like to go to a

5   gallery and buy this someday.  You're not going to deprive me

6   of the opportunity of doing that, are you?

7           THE WITNESS:  No, but unless each photographic print

8   was two stories high --

9           THE COURT:  I don't know.  I just want to give you

10  the opportunity.

11          THE WITNESS:  You lose quality in a photograph

12  versus a wall.

13          THE COURT:  But you do want to preserve it; right?

14          THE WITNESS:  Yes.

15          THE COURT:  Go ahead.

16  Q    (BY MS. CHANES)  Ms. Mastrion, I'm sorry, you said you

17  painted this portrait of "Kool Herc" in about June 2013?

18  A    Yes.

19  Q    And you painted over an existing Beastie Boys mural; is

20  that correct?

21  A    Yes.

22  Q    And you heard testimony yesterday about a Beastie Boys

23  mural that you had that was painted over earlier; is that

24  correct?

25  A    Yes.

```
                         Proceedings                    16
```

1  Q    Was -- strike that.  Mr. Ebert left the court, I believe,

2  with the impression that you did not paint this "Kool Herc"

3  portrait directly over your own work; is that correct?

4           MR. EBERT:  Is it correct that I left that

5  impression?

6           MS. CHANES:  Yes.

7           THE COURT:  I don't know.  The question is not the

8  best question, but, you know --

9           MS. CHANES:  I'm sorry.

10           THE COURT:  It doesn't matter much here.

11           You painted over other work; right?

12           THE WITNESS:  Yes.

13           THE COURT:  Was it your work that you painted over

14  or somebody else's work?

15           THE WITNESS:  Mine.

16           THE COURT:  Your work?

17           THE WITNESS:  Uh-huh.

18           THE COURT:  That's gone?

19           THE WITNESS:  Yes.

20           THE COURT:  So that's not permanent, is it?  You

21  decided to just paint over it?

22           THE WITNESS:  It was up for a very long time.

23           THE COURT:  Pardon me?

24           THE WITNESS:  It was up for a very long time.

25           THE COURT:  Did you take any pictures of it?  Can I

1  see it?

2          THE WITNESS:  In some of the article printouts, we

3  have images of --

4          THE COURT:  Images from newspapers?

5          THE WITNESS:  Yes.

6          THE COURT:  So you're not terribly concerned about

7  preserving your prior work, are you?

8          THE WITNESS:  I would have loved for it to be

9  preserved, but I felt that this one going over it was even

10  more important.

11          THE COURT:  I just wanted a feel for it.

12          THE WITNESS:  This was more important at the time

13  for what I was painting.

14          THE COURT:  That you can paint over this next year,

15  if you wanted to?  It's your work, so to speak?

16          THE WITNESS:  Yes, if the piece was even more

17  important and more relevant at the time, yes.

18  Q    (BY MS. CHANES)  Ms. Mastrion, do you ever reproduce work

19  that you've done and paint the same painting again somewhere

20  else?

21  A    No.

22          THE COURT:  So -- tell me, as an artist, you have

23  this work here, you want it to be permanent?  What do you

24  think Mr. Wolkoff should do?  What would you like him to do?

25          THE WITNESS:  I would love for the building to stay.

```
                     Proceedings                    18
```

1           THE COURT:  To stay like that?

2           THE WITNESS:  To stay like that.

3           THE COURT:  It's a million dollars' worth of

4    property; it's going to stay this way because you painted

5    these paintings on the wall?  You think that's really fair to

6    him?  If I do that, it's going to destroy the aerosol art

7    world.

8           THE WITNESS:  Not even in New York, internationally

9    it is going to be a huge blow.

10          THE COURT:  It will destroy it?

11          THE WITNESS:  Yes.

12          THE COURT:  If I make that decision, if I do what

13   you want me to do and what counsel wants me to do, it's going

14   to be the end of the aerosol --

15          THE WITNESS:  Not the end of it, but --

16          THE COURT:  A damaging blow?

17          THE WITNESS:  In New York, yes.

18          THE COURT:  And not elsewhere?

19          THE WITNESS:  Internationally, it will have -- I

20   mean, there are spaces all over the world that allow walls to

21   be painted, so it's not like an -- artists are not going to be

22   able to paint anywhere else again in the world, but in

23   New York --

24          THE COURT:  It would be a crippling blow to

25   New York?

Proceedings                                    19

1          THE WITNESS:  Yes, it will be.

2          THE COURT:  I like walking down the streets and

3    seeing these things.  I'll never see it again.  We don't want

4    to do that, do we?

5          THE WITNESS:  Uh-huh.

6          THE COURT:  You tell me.

7          MS. CHANES:  If I may jump in here, I'm not sure

8    that Ms. Mastrion is responding to your question.

9    Q    (BY MS. CHANES)  Were -- when you said it would be a

10   terrible blow to the aerosol arts community, were you talking

11   about the destruction of 5Pointz, or were you talking about

12   the preservation of the building in some form going forward?

13   Which of those things would be --

14         THE COURT:  I'm telling you that no other builder is

15   going to allow aerosol art on their building if I come down

16   hard against Mr. Wolkoff; you agree with that, don't you?

17         THE WITNESS:  Yes.

18         THE COURT:  Next question.

19         MS. CHANES:  If I may, with all do respect,

20   your Honor, no other builder is going to let them do it

21   without a VARA waiver.

22         THE COURT:  What?

23         MS. CHANES:  A VARA waiver, a waiver of VARA rights,

24   which is -- the law's been in place since 1990, and that's

25   what should have been done here.  It's very simple.  You get

Proceedings                                    20

1   the forms online.  It's very easy to do.

2          THE COURT:  I understand.

3   Q   (BY MS. CHANES)  Ms. Mastrion, based on your classical

4   art background, how do you personally analyze the merit or the

5   stature of a work of art?

6   A   There's a couple of factors that come into play;

7   technical ability, composition, color, line work, detail and

8   also the artist's credentials.

9          THE COURT:  That's what I should consider in

10  determining whether something is a so-called work of

11  recognized stature that you just told me?

12         THE WITNESS:  It's what I consider a recognized

13  stature, and other artists as well, why works become as

14  important or as prominent as they come --

15         THE COURT:  Go through the factors again for me that

16  you think qualifies as a work of recognized stature.

17         THE WITNESS:  Technical ability.  Aerosol art is --

18         THE COURT:  Technical ability.

19         THE WITNESS:  Technical ability.  Aerosol is an

20  extremely different medium to master.

21         THE COURT:  Even more so than the other mediums.

22         THE WITNESS:  Yes, because a lot of things come into

23  play.  It's not just the medium and the canvas.  It's texture

24  of the wall.  It's wind.  It's weather.

25         THE COURT:  Degree of difficulty?

NICOLE CANALES, CSR, RPR

Proceedings                                    21

1          THE WITNESS:  It's extremely difficult, yeah.

2    Besides all the other elements that have to come into play;

3    physically using a spray can, and getting the line work and

4    getting the detail.  It's extremely difficult to master.

5          THE COURT:  So the degree of difficulty?

6          THE WITNESS:  Yes.

7          THE COURT:  What were the other things you

8    mentioned?

9          THE WITNESS:  Composition, color, use of color, line

10   work, detail in an a piece, and also the artist's credentials.

11   You know, who the artist is plays a very important part in the

12   merit of the work.

13         THE COURT:  Public recognition?

14         THE WITNESS:  Uh-huh.

15         MS. CHANES:  Such as Bansky?

16         THE COURT:  Is that a factor?

17         THE WITNESS:  I mean, Picasso can put a squiggle on

18   a canvas and it will still sell for millions just because it's

19   a Picasso.

20         THE COURT:  That would be considered a work of

21   recognized stature?

22         THE WITNESS:  Yes, if his hand --

23         THE COURT:  Just because it's done by Picasso?

24         THE WITNESS:  If his hand touched it, boom.

25         THE COURT:  So now we have a gallery downstairs.

Proceedings                                      22

1    Have you had the chance to look at the court's gallery?

2              THE WITNESS:  I saw some paintings as I was walking

3    through, but I didn't get to --

4              THE COURT:  Take a look again, if you have a chance.

5    Tell me whether you think that the fact that those paintings

6    are hung up in the court gallery, would that mean that they

7    are works of recognized stature?

8              THE WITNESS:  I would have to look at each

9    individual piece.

10             THE COURT:  The fact that it has a public

11   exposure --

12             THE WITNESS:  Uh-huh.

13             THE COURT:  -- that in itself would not be the

14   determining factor as to whether it should be considered a

15   work of recognized stature?  You need to do more than that?

16             THE WITNESS:  It depends who's looking at it, and

17   when you say --

18             THE COURT:  Just saying the fact that it's in a

19   public facility here, whatever that work may be downstairs,

20   you're looking at, does it make any difference what you

21   believe the quality is, or the lines, or the texture, the

22   degree of difficulty or is it just sufficient the fact that

23   it's recognized by the court gallery?

24             THE WITNESS:  That is pretty significant.  If the

25   courts deem that this artwork is good enough to put up --

NICOLE CANALES, CSR, RPR

Proceedings                                                    23

1          THE COURT:  Would I need to go beyond that?  Would
2     you have to look at the quality of the work also or who the
3     artist was?
4          THE WITNESS:  I think you have to take it all into
5     consideration, all of it.
6          THE COURT:  So you can -- maybe if the court gallery
7     just contained silly stuff, just blank canvas, you might say
8     that it's not a work of recognized stature, even if it's
9     recognized by the court?
10         THE WITNESS:  It could be.  I can tell you many
11    blank-looking canvases that sell for millions of dollars.
12         THE COURT:  You saw the play "Art" years ago?
13         THE WITNESS:  No.
14         THE COURT:  It was before you -- I don't think it
15    was before you were born.
16         MS. CHANES:  I never saw it.
17         THE COURT:  Anybody know that play, "Art" by
18    Ressa (phonetic) who did that?
19         MS. CHANES:  A few people in the back.
20         THE COURT:  That's one that's old.  It was basically
21    a white canvas, and before your time, I guess.  And it was,
22    you know, a very successful Broadway play.  Really brought
23    people who are art experts to enter into a dialogue as to
24    whether or not that qualified as a work of art.  It was pretty
25    good stuff.  Anyway -- and when it comes back again, you'll

Proceedings                                    24

1  see it next time around; right?

2          THE WITNESS:  Uh-huh.

3          MS. CHANES:  Is it going to be revived soon?

4          THE COURT:  Take a look at what's in the court

5  gallery.  I'm interested in your reaction to it, whether we

6  made a wise decision or an unwise decision.

7          MS. CHANES:  Did the court buy these pieces?

8          THE COURT:  We have a gallery and have exhibits all

9  the time.  We have a committee that selects the work, so I

10 don't know whether or not that constitutes -- you'll let me

11 know what you think of it.  I'll ask the other experts the

12 same question.  Maybe they can use that as a basis to tell me

13 whether that would qualify as a work of recognized art.

14         Have your experts look at it also, Mr. Ebert.

15         MR. EBERT:  Will do, your Honor.

16 Q    (BY MS. CHANES)  Ms. Mastrion, yesterday when you were in

17 court, you heard Judge Block ask questions about the

18 professional careers of some of the plaintiffs in this case;

19 correct?

20 A    Yes.

21 Q    Can you help the Court out a little bit with some of that

22 information?

23 A    I can, uh-huh.

24 Q    Would you do that?

25 A    I know a lot of the artists, and I know the work that's

```
                         Proceedings                    25
```

1    on display.

2    Q    Exhibit A, page 1?

3    A    Sure.  Okay.

4    Q    Would you talk to the Court a little bit about that

5    piece.

6              THE COURT:  Can you put it up on the screen also?

7    We may have some people in the audience that would like to

8    follow along.  Is it possible?

9              MS. CHANES:  Jeannine seems to have a habit of

10   losing exhibits.

11             THE COURT:  How could we do that?

12             THE CLERK:  If they have it.

13             THE COURT:  Do you have the exhibits?  Maybe you can

14   use the ELMO there, so we all can look at the pictures.

15             MS. CHANES:  Ms. Ebert, may I borrow your binder for

16   this purpose?

17             MR. EBERT:  Which binder?

18             MS. CHANES:  The green binder -- or just the first

19   tab, A.

20             MR. EBERT:  Actually, no, because I have written on

21   it.

22             THE COURT:  You want to use mine?

23             MS. CHANES:  That would be greet.

24             THE COURT:  Just put it on the ELMO.  Dim the lights

25   so we can all see it.  That would make easier than just saying

 1    turn the page, so to speak.  That's the first one; right?

 2              MS. CHANES:  Yes.

 3              THE COURT:  What's your question?

 4    Q    (BY MS. CHANES)  Ms. Mastrion, could you discuss this

 5    work based on the criteria that you establish?  I think you

 6    said there were two, four, six criteria?

 7    A    Yes.

 8              THE COURT:  Can everybody hear?  You want to put the

 9    microphone on.  Just test it out so we're not blown away.

10              MS. CHANES:  Does this work?  I feel like I'm in

11    France.

12    Q    (BY MS. CHANES)  Ms. Mastrion, could you talk to

13    the Court a little bit about this first piece based on the

14    criteria that you identified for evaluating works of art?

15    A    Sure.  I mean, even on first glance, the technical

16    ability of this, the fact that, you know, Mr. Cohen used the

17    wall.  He had windows that he had to incorporate into the

18    piece, his ability to use the physical space in front of him

19    and still create a piece that compositionally is so sound,

20    flows; your eye travels around the whole piece.  It looks like

21    a simple piece but it's not simple.  The line work on this is

22    so thin.  It is extremely detailed.  It takes a very very high

23    level of skill even to do these little simple characters that

24    he has.  It's very very difficult to do this, so even just on

25    the technical ability alone, it's -- it's up there with, like,

Proceedings                                                      27

1   a high value.

2   Q     And can you discuss the composition?

3   A     It flows.  The colors pop off each other.  Your eye goes

4   around the entire piece, and also this -- it's -- I know that

5   it's members of the neighborhood.  It's members of the

6   community.  There's a story behind it as well.  It's the story

7   and the impact on the people it represents in the community

8   that also makes the piece extremely important.

9   Q     And, also, a comment about the artist.  Just briefly.  I

10  know Mr. Cohen was on yesterday.

11  A     I mean, Meres in the New York art community, the world

12  community, he's one of the best, technically, graffiti artists

13  out there.  His reputation as an artist in general goes

14  unprecedented.  He's extremely well known.

15            THE COURT:  You use the word "graffiti art."

16            THE WITNESS:  Uh-huh.

17            THE COURT:  Maybe have a sense of that, an aerosol

18  artist?  What's the right nomenclature that I should use?

19  Should I call it graffiti art or aerosol?

20            THE WITNESS:  It has a lot of nicknames.  You can

21  call it aerosol art because aerosol encompasses the whole

22  medium.

23            THE COURT:  Which consists of using aerosol; is that

24  what we're talking about?

25            THE WITNESS:  Yes.

Proceedings                                      28

1        THE COURT:  That's what you mean by aerosol

2   graffiti?  Other than criminally, graffiti artists, just --

3        THE WITNESS:  It doesn't have to do with the

4   aerosol, it would be like throwing soda on --

5        THE COURT:  You're calling it aerosol.  Speaking in

6   general, graffiti?

7        THE WITNESS:  Yeah.

8        THE COURT:  Okay.

9   Q   (BY MS. CHANES)  Going back to Exhibit A, page 1, as a

10  member of the aerosol arts community, do you consider this to

11  be a significant piece?

12  A   Yes.

13  Q   Let's go to page 2.

14       THE COURT:  Are we going through all 24 or --

15       MS. CHANES:  I was going to.  Although it's possible

16  that Ms. Mastrion cannot -- is not comfortable or is not --

17       THE COURT:  We'll go through.

18       If you say your answer to number two would be the

19  same as number one, you could say that, in addition to you

20  want to add because that's what you're telling me.

21       THE WITNESS:  Okay.

22  Q   (BY MS. CHANES)  So with respect to page 2, would you

23  comment on the six elements you previously identified with

24  respect to this piece.

25  A   Well, first of all, it's a collaboration between Meres

NICOLE CANALES, CSR, RPR

Proceedings                                                  29

1    and TooFly.

2           THE COURT:  Can you spell TooFly?

3           THE WITNESS:  T-o-o-F-l-y.  She is probably the most

4    famous graffiti artist working in New York right now, and

5    she's also one of the most famous graffiti artists all over

6    the world.  She paints all over the world.  She exhibits all

7    over the world.

8           THE COURT:  How does she make a living?

9           THE WITNESS:  She sells canvas.  She does T-shirts,

10   clothing.  She sells -- like I said, she sells canvases.

11   She's a teacher.

12          THE COURT:  She can make T-shirts out of this.

13          THE WITNESS:  I have seen her put her artwork on a

14   lot of different things, so she is recognized in the

15   international art world as well.  She's one of the most famous

16   female graffiti artists out there.

17          THE COURT:  You keep using the word "graffiti"

18   artists.

19          THE WITNESS:  Graffiti aerosol artist.

20          THE COURT:  This is aerosol work?

21          THE WITNESS:  Uh-huh.

22   Q    (BY MS. CHANES)  Very briefly, could you address

23   composition and technical ability, color details, subject

24   matter?

25   A    The fact that Meres' piece -- it's called "Wild Style."

Proceedings                                    30

1   That -- if -- people don't understand what it is.  If you

2   think of an abstract expressionist like Jackson Pollock, any

3   of the abstract expressionists, that is the equivalent of a

4   "Wild Style" piece; continues line work, speed, flows

5   together.  And TooFly did --

6   Q    If I may interrupt, "Wild Style" starts with letters but

7   then uses letters and makes them abstracts; is that correct?

8   A    Yes.  And there's a lot of movement in the lettering

9   piece, just like with abstract expressionism; tons of movement

10  in the piece, so technical ability and composition.  And "Wild

11  Style" pieces in general, that's what you talk about when you

12  see a "Wild Style" piece.  And the fact that he was able to

13  collaborate that with a TooFly character, this is more

14  illustration.  It's more painterly.  The fact that they were

15  able to combine the work together to make a unified piece

16  makes this a very very strong work.

17  Q    And in your impression as -- strike that.  In your

18  opinion as a member of the aerosol arts movement, is this a

19  significant piece?

20  A    Yes, because also the technical ability, the line work,

21  the -- how thin the lines are, how much they flow.  I remember

22  the day this piece was painted, and it was extremely windy out

23  that day, extremely.  The fact that they were even able to get

24  that level of detail line work on that day when this was

25  painted -- I mean, technical ability wise, it's a great piece.

Proceedings                    31

1        THE COURT:  Since you were there, how long did it

2   take the artist to do that?

3        THE WITNESS:  I wasn't there that day, but I

4   remember the day it was painted, because I saw photos of it

5   when it was coming up, and I remember the weather was very bad

6   that day.

7        THE COURT:  You don't know how long it took them to

8   do it?

9        THE WITNESS:  No, I don't know how long it took.

10  Q    (BY MS. CHANES)  It was painted over uneven surfaces;

11  correct?

12  A    Correct.

13  Q    Using various elements of the building?

14  A    Uh-huh.

15  Q    Page 3, again, the six criteria?

16  A    Well, we spoke about Meres.  But also Shiro -- I have

17  painted with Shiro before.  I've done collaborative pieces

18  with her.  She's an artist from Japan.  Her reputation

19  internationally and in the United States is -- she has a huge

20  reputation.  She shows in galleries all over the world.  She

21  paints.  She gets flown to paint all over the world, so Shiro

22  pieces and her signature style -- like, her characters, which

23  you can see all the way on the right, if you see that piece

24  anywhere, you will recognize it as a Shiro piece in any

25  country, and people come to see her work because of how famous

Proceedings                                              32

1   she is.

2   Q    To the best of your knowledge, she makes her living as a

3   professional artist?

4   A    Yes.  And, again, this is another collaboration piece, so

5   the fact that two artists were able to creatively,

6   compositionally -- the piece flows all the way together,

7   bouncing off each other back and forth; the use of color, how

8   bright it is, and also the level of detail.  You can see in

9   that pirate ship up there, the fact that you were able to make

10  that pirate ship with aerosol.  The level of technical ability

11  is very very high, all the details in the background.  The

12  "Wild Style" piece is incorporated with the painterly pieces

13  with the illustrative pieces.  There's so many elements of

14  art.

15              THE COURT:  So the aerosol is sprayed; right?

16              THE WITNESS:  Uh-huh, aerosol spray.

17              THE COURT:  How do you control the spray so it's not

18  like a big blotch?  I think it's a fine line.

19              THE WITNESS:  Practice.  Practice.  Practice.  It --

20  you have to -- you paint with your ears; you hear how the

21  paint is coming out of the can, how much pressure you put on

22  the can, like how difficult -- it's not just like a brush

23  where you can go like this and you know what kind of line is

24  going to come out.

25              THE COURT:  Easy to use a brush?

NICOLE CANALES, CSR, RPR

```
                        Proceedings                    33
```

1           THE WITNESS:  Yes.  You have to listen to the can.

2    You have to listen to if the paint is running out.  That's why

3    you hear the rattle when you shake a spray can.  There's a lot

4    of physical things that come into using aerosol art.  Also

5    they have fat caps, which is like a fat paint brush.  You have

6    skinny caps, which is like a thin paint brush.  You have to

7    know which caps to use.  There's hundreds of different-sized

8    caps to use, so there's a lot that goes into being able to do

9    this.

10   Q    (BY MS. CHANES)  Ms. Mastrion, are those paints

11   oil-based?

12   A    No, they're not.

13   Q    Okay.  But they're permanent once they dry; correct?

14           MR. EBERT:  Objection, your Honor.  Could we not

15   have the witness testify, please.

16           THE COURT:  She wants to testify.  She's interested

17   in the arts.

18           So the difference between painting this vehicle, I

19   guess -- I guess paint is more permanent and this is less

20   permanent; I think that's what she's trying to drive out.

21           THE WITNESS:  Uh-huh.

22           THE COURT:  Is there a difference between the two?

23           MR. EBERT:  Your Honor, I'm having trouble hearing.

24           THE COURT:  You're talking about aerosol; you're

25   talking about some type of paint.  What is the difference

Proceedings                                    34

1    between that and the paint that you use on a canvas with a

2    brush?

3              THE WITNESS:  One is the speed, how fast and how big

4    you can do it.  You can get very very huge lines that you

5    can't get unless you have a paint bush that's this fat.

6              THE COURT:  Which is more fragile?  Which is more

7    likely to disappear with time?  The aerosol paint?  Or is it a

8    certain type of paint we're talking about?

9              THE WITNESS:  Again, it depends on the conditions.

10   If it's not exposed to direct sunlight it could last longer,

11   the quality of the paint.  Just like with oils or acrylics, if

12   you have more expensive, better paint --

13             THE COURT:  So you can have aerosol paint, so to

14   speak, that's a better quality than --

15             THE WITNESS:  You could.

16             THE COURT:  How about what you did?  What's the

17   quality of that paint?

18             THE WITNESS:  I try to buy the best quality paint

19   that I can.

20             THE COURT:  Would you say it's as good as what would

21   be done if you painted on a canvas with oils?

22             THE WITNESS:  It's different.  You get a different

23   effect.  That's why it's a different medium.

24             THE COURT:  But in terms of, you know, its

25   fragility, its vulnerability to disappear -- I guess I'm not

Proceedings                                35

1    an artist so I don't know what words to use, but which is more

2    likely to be permanent, I guess?

3              THE WITNESS:  It's really hard for me to say,

4    because when --

5              THE COURT:  It depends on what you use?  "So this

6    aerosol paint," is that the right phrase to use?

7              THE WITNESS:  Yeah.

8              THE COURT:  That may be of more substance or more

9    durable than maybe oils?  Depends on the quality of each;

10   right?

11             THE WITNESS:  Also it depends on the -- if you're

12   painting with oils, the quality of the canvas, the type of

13   canvas; if you prime your canvas first, what you prime the

14   canvas with, if you sealed it -- I mean, there's so many --

15             THE COURT:  All right.  Okay.  You answered the

16   question.  Go ahead.

17   Q    (BY MS. CHANES)  Page 4.  Could you comment on this work,

18   based on the six criteria you've identified?

19   A    "Eleanor RIP."

20   Q    Yes.

21   A    Well, one technical ability and composition, like I said,

22   like the abstract expressionist piece, the way the piece

23   flows, the expression, the emotion behind it.  I know the

24   personal story behind this piece, so it does tell a story as

25   well.  The use of color, I mean, it's muted, but the colors

1  are also bright, also the line work and the detail.  If you

2  look in this, there's a lot of very very fine line work in

3  this.

4          THE COURT:  So move it along.  You looked at all

5  these 24 before, obviously.  Your answer with respect to each

6  of them -- so we don't have to spend the next two hours here,

7  they're pretty much the same as what you've testified to,

8  these two, three or four?

9          THE WITNESS:  Yes.  And also -- I mean, for the work

10 that's up at 5Points that's here today, the reputation of the

11 artist.  I know a lot of people might not be so familiar with

12 them, but almost all of the artists that are shown here today

13 have collect -- they're shown internationally.  Their works

14 sell for thousands of dollars.  Like, when we say people come

15 to 5Pointz to see this work, maybe to meet the artists, that

16 is why, so you might not be so familiar with a lot of the

17 backgrounds but all of the artists have a huge outline.

18         THE COURT:  You're the one representing the 24

19 photos?

20         THE WITNESS:  Yes.

21         THE COURT:  Anything else you want to add to that?

22         MS. CHANES:  Actually -- and I understand we want to

23 move this along, your Honor.  I would like her to comment on

24 the Lady Pink piece on page 7.

25         THE COURT:  I'm trying to avoid having to go through

Proceedings                                                    37

1   the next 17.  If you want to call attention to any one in

2   particular, otherwise her answers that she gave me, I think,

3   apply to all of these 24; correct?

4          Yes, that's what you're telling me.  Basically that

5   same criteria is manifested and reflected in the others as

6   well; right?

7          THE WITNESS:  Yes.

8          THE COURT:  Okay.

9   Q   (BY MS. CHANES)  Do you have anything in particular,

10  Ms. Mastrion, that you would like to add with respect to page

11  7 and Lady Pink, who is the artist that painted that?

12  A   Lady Pink is one of those artist, like I said, with

13  Picasso.  She can put a dot on the wall and people will come

14  from everywhere to see it.  She is the first female graffiti

15  artist to ever come out of New York City.

16         THE COURT:  You mean aerosol artist?

17         THE WITNESS:  Aerosol artist, graffiti artist, to

18  come out of the New York City.  She's now a teacher.  She

19  shows all over the word.  Any female artist that paints today

20  that comes from New York City will say -- or even -- not even

21  from New York will say Lady Pink is one of their biggest

22  influences, and I know this piece.  It's up very very high.

23  It's one of the permanent pieces.

24         THE COURT:  So you're telling me that even if she

25  came and put a dot on the wall, because it's Lady Pink, you

NICOLE CANALES, CSR, RPR

Proceedings                                                  38

1    would say that's recognized stature?

2              THE WITNESS:  Yes, I would.

3              THE COURT:  Just solely based upon the artist's

4    reputation?

5              THE WITNESS:  Yes.  Yes, people come from everywhere

6    if they know that Lady Pink is painting.

7              THE COURT:  Doesn't matter what -- the quality of

8    what she does, it's her name that, in your opinion, satisfied

9    the standard of recognized stature?

10             THE WITNESS:  Her name alone, amongst the other

11   things as well.

12             THE COURT:  So you have somebody who is so prominent

13   like Lady Pink, or Picasso or maybe you, it doesn't matter

14   what they put on the wall, that would be recognized stature;

15   right?

16             THE WITNESS:  At this -- at this point in her

17   career, yes.  I'm sure if Picasso put a squiggly line the

18   second day he started painting, people might not recognize it,

19   but the fact that he is now Picasso, they will recognize that

20   now, so --

21             THE COURT:  Go ahead.

22             MS. CHANES:  I think that's all, your Honor, since

23   you're not going through all the pieces of art.

24             THE COURT:  I don't want to curtail you.  I want to

25   see whether we can move it along without inhibiting you.  If

NICOLE CANALES, CSR, RPR

Proceedings                                              39

1   you want to show any one particular work of art or a few more,

2   go ahead.  It's up to you.  I enjoy looking at them myself.

3   Q    (BY MS. CHANES)  I would ask Ms. Mastrion to look at

4   Exhibit A, page 24.

5   A    Yes.  Dasic's piece.

6   Q    Could you comment on this based on your criteria?

7   A    Technical ability alone, this piece, when you see it in

8   person, blows your mind away.  You literally feel like you can

9   walk into this piece.  Color work, detail, the story behind it

10  and I know that this was based on a famous old French poem, so

11  there's a big story behind it, too.  So technical ability

12  wise, the way it looks, the way it feels when you see it, it's

13  one of the best pieces that you see in the permanent

14  collection up top on 5Pointz.  But also Dasic, I know he's an

15  artist from South America, and he's actually here right now on

16  a work visa.  The government granted him a work visa to do

17  murals in Upstate New York in some of the, like, badder (sic)

18  neighbors, to kind of --

19            THE COURT:  Outdoors or in doors?

20            THE WITNESS:  Outdoors.

21            THE COURT:  The factory (sic) has asked him to do

22  this on certain outside surfaces?

23            THE WITNESS:  He's here on a work visa, working to

24  paint murals in Newburgh and in a couple of other neighbors.

25            THE COURT:  Government buildings?

Proceedings                              40

1          THE WITNESS:  They're city buildings.

2          THE COURT:  City buildings?

3          THE WITNESS:  Yeah, city buildings.

4          THE COURT:  So the city wants that work to be on the

5    outside of its buildings?

6          THE WITNESS:  And he's painting walls and also

7    responsible for curating other artists to come and paint on

8    the walls.

9          THE COURT:  You think we should hire him to paint on

10   the exterior of the courthouse?  Maybe not a bad idea.

11         THE WITNESS:  But he -- so he's here -- he does a

12   lot of community outreach, so he's known in the art community

13   for doing that.  The reason he's here now on the work visa is

14   to improve the bad neighbors Upstate.  That's one of the

15   reasons.  Technically wise also --

16         THE COURT:  So this is a variable-type contribution,

17   brighter neighbors and --

18         THE WITNESS:  Yes.

19         THE COURT:  -- add a little bit of color, but sort

20   of a cultural outreach to the communities.

21         THE WITNESS:  Yes, that's what murals do, and that's

22   what outdoor art does.  That's why in New York City the

23   neighborhoods with the highest amount of murals are --

24         THE COURT:  All these aerosol works -- when you say

25   "outdoor art," they're all aerosol?

NICOLE CANALES, CSR, RPR

```
                        Proceedings                    41
```

1           THE WITNESS:  For the most part, yes.

2           THE COURT:  Is there another way of doing this?

3           THE WITNESS:  I mean, you can do it with a brush,

4    and maybe with a bucket of paint and with rollers, but it

5    doesn't have the same effect.  It's not as long lasting.

6           THE COURT:  What's his name again?

7           THE WITNESS:  Dasic.

8           THE COURT:  So he's going to do the work up in

9    the -- that the government's asked to do by aerosol?

10          THE WITNESS:  I know that he works primarily in

11   aerosol.

12          THE COURT:  Go ahead.

13   Q    (BY MS. CHANES)  Ms. Mastrion, could you also address

14   Exhibit A, page 10, which is "Beauty and the Beast" by Esteban

15   del Valle.

16          MR. EBERT:  We just heard that she has the same

17   testimony for each of these images.

18          THE COURT:  I can give her a little bit of

19   flexibility.  You may not disagree with any of this.  I don't

20   know.

21          MR. EBERT:  It's completely -- it's completely

22   irrelevant.  We don't have to hear it twice.

23          THE COURT:  Well, you know, I don't mind looking at

24   the paintings.

25          Go ahead.

```
                        Proceedings                    42
```

1              MS. CHANES:  That's Esteban?

2    A    Uh-huh.

3    Q    Could you comment on this work based on the six criteria

4    you identified?

5    A    I mean, if you know your art history --

6              THE COURT:  Is there anything about this that's a

7    little different that you want to add to the testimony you

8    gave me about the artist?

9              THE WITNESS:  This piece, I think, is one of the

10   most painterly pieces done at 5Pointz, and also there's a lot

11   of history and art history references to it, so I know for a

12   fact that when they bring the school groups to come to

13   5Pointz -- I know there's a lot of busses of school groups --

14   they focus on this painting a lot because it represents

15   Van Gogh.  It represents "Beauty and the Beast."  There's a

16   lot of history and references speaking of art history in this

17   piece, so --

18             THE COURT:  So that makes it a little bit more

19   special, and it's because it draws a lot of people?

20             THE WITNESS:  Uh-huh.  And I was here the day after

21   this was painted, and I stood in front of it for 20 minutes,

22   unable to even, like, speak or move because I had never seen a

23   piece of this caliber.

24             THE COURT:  Who's the artist?

25             THE WITNESS:  Esteban del Valle.

Proceedings                                        43

1              THE COURT:  What about him?

2              THE WITNESS:  I know he's from -- I believe he's

3     from either South America or Spain.  I know that he's an

4     international artist, and he paints -- same thing, he paints

5     all over the world, and all his pieces look like -- you know,

6     they look like, you know, a Picasso or that painterly quality

7     that you maybe sometimes don't attribute to outdoor artwork.

8     And also, size wise, the fact that he was able to do this on

9     such a large scale -- you know, that wall is maybe the size of

10    the wall that the flag is on, so technically wise that's

11    another reason.  But the history, and the art history and the

12    idea behind it is very significant of 5Pointz.

13             THE COURT:  Don't me let me put words in your worth,

14    but it's more difficult to do it on the wall than on a regular

15    canvas?

16             THE WITNESS:  It is.

17             THE COURT:  Go ahead.

18    Q    (BY MS CHANES)  Taking a page from the judge,

19    Ms. Mastrion, just flipping through these exhibits, is

20    there -- are there any ones in particular that you have

21    something to say about, other than the general comments

22    Mr. Ebert was referring to?

23             THE COURT:  Want to say anything more about yours?

24             THE WITNESS:  I mean, I do --

25             THE COURT:  Here's a good opportunity for you to put

Proceedings                                              44

1   a plug in.

2        THE WITNESS:  I do mostly portrait work and portrait

3   commission work, so when I was approached to do the "Kool

4   Herc" portrait --

5        THE COURT:  This is A12 we're talking about?

6        THE WITNESS:  Uh-huh -- for the 40th anniversary of

7   Hip Hop, he -- I mean, if you're from New York, and you're

8   familiar with the movement and the music, even if you're not,

9   you know that Kool Herc is considered, like, the godfather of

10  that.  So for me, one, it was an honor to paint him.  Two, I

11  love doing portraits, and the biggest portrait I could do, I

12  was very very happy to do.  And I wanted to make sure that it

13  was almost an exact replica of him.  And the day of the event,

14  he actually showed up, and I have a lot of photos.  And I

15  believe there was an article we brought of him standing next

16  to the piece.

17       THE COURT:  I wonder how many of my colleagues on

18  the bench have never heard of him?

19       THE WITNESS:  You have to be immersed in the

20  community, and the movement and the art community to know

21  these people, but this is a multibillion-dollar industry we're

22  talking about so, you know, these people are very important.

23       THE COURT:  You think we should arrange a field trip

24  for all the judges to go out there to look at this?

25  A    I do.

Proceedings                                    45

1   Q    They'll render a better decision --

2            THE WITNESS:  Yes, seeing it in person will have a

3   big impact.

4            MS. CHANES:  I think plaintiffs and defendants, too,

5   would appreciate the Court actually going out to actually see

6   the building --

7            MR. EBERT:  Why are you speaking for defense?

8            MS. CHANES:  I did say --

9            MR. EBERT:  Your Honor --

10           THE COURT:  Let's stop this.  If this was a more

11  traditional type of proceeding, we wouldn't be having this

12  type of back and forth.  Obviously I'm interested in what this

13  is all about, so I'm a little bit more flexible.

14           Go ahead.  Let's go.

15  Q    (BY MS. CHANES)  Anything else?  Any of the other

16  exhibits, Ms. Mastrion?

17  A    I mean, I think that applies for almost all of the

18  pieces.

19  Q    So no other specific different comments?

20           THE COURT:  I think we covered it.  Go ahead.

21  Anything else you want of this witness?

22           MS. CHANES:  No, other than her comments about the

23  art downstairs at the break.

24           THE COURT:  I want to hear about that.

25           MS. CHANES:  I know you do.

NICOLE CANALES, CSR, RPR

```
                        Proceedings                    46
```

1           THE COURT:  I want to know whether the court made an

2    improper decision in allowing that art to be shown in our

3    gallery.

4           THE WITNESS:  Is there a curator for the court?

5           THE COURT:  Not really, but it's kind of interesting

6    work.

7           Mr. Ebert, you want to ask any questions of this

8    fine artist?

9           MR. EBERT:  Yes, your Honor.

10          THE COURT:  You you want to still use the screen or

11   put the lights back on?

12          MR. EBERT:  I'm not going to use the screen,

13   your Honor.

14          THE COURT:  Somebody put the lights back on.

15          MR. EBERT:  May I?

16          THE COURT:  Go ahead.

17                       CROSS-EXAMINATION

18   BY MR. EBERT:

19   Q    Are you an expert in graffiti art?

20   A    Yes.

21   Q    What makes an expert in graffiti art?  Have you done

22   research?

23          THE COURT:  I think graffiti, as I understand it as

24   it's in criminal law, that would be any marking on a building

25   without the owner's permission.  I think that's what graffiti

Proceedings                                47

1   is under the criminal law, but I think here we're talking

2   about something that's called "aerosol art."  I know that's

3   the phrase I'm going to use.

4   Q     (BY MR. EBERT)  Okay.  You're an expert in aerosol art?

5   A     Yes.

6   Q     When did you become an expert in aerosol art?  What year?

7   A     My whole life.

8   Q     Starting when?

9   A     I've been looking at graffiti in New York City since I

10  was -- literally since I was born.

11  Q     And when you were born, you were an expert in aerosol

12  art?

13  A     No, I've become an expert.

14  Q     Please tell me when you became an expert in aerosol art.

15  A     I started painting with aerosol about two years ago, but

16  I've been immersed in the community for well over ten years.

17  Q     And to come here and give this testimony as an expert,

18  did you research whether any of these works appear in any

19  books?  Did you do that research?

20  A     I mean --

21  Q     Did you do the research whether any of these pieces are

22  in any books about graffiti or anything else?

23        THE COURT:  The question is do you know?  You're an

24  expert, I guess, because the way you've testified here, but as

25  a practical matter, have you found out whether any of these

Proceedings                                                        48

1   works appear in any books or publications?  That's the

2   question.

3            THE WITNESS:  I know they do.

4            THE COURT:  You know any specifics?

5            THE WITNESS:  Street Art NYC.  There's a blog.

6            THE COURT:  Blog?

7            THE WITNESS:  Yeah, a blog.  Street Art NYC.  I know

8   a lot of these artists have been approached to have their work

9   in numerous, you know, public art books.  Whether it's these

10  pieces or not, the artists themselves I know do appear in a

11  lot of --

12           THE COURT:  You don't know which ones specifically?

13           THE WITNESS:  No.

14  Q    (BY MR. EBERT)  That's what I'm asking.  These pieces at

15  issue, do you know if any of them have been the subject of an

16  article, a news story, anything in a book, any documentary,

17  any of these particular 24 works?

18  A    Yes.

19  Q    Which one?

20           THE COURT:  Hold on.  Let her answer the question.

21  What's wrong with that?

22           MS. CHANES:  I wish he would stop badgering the

23  witness.

24           THE COURT:  He's not badgering the witness, he's

25  just a little hyperventilating.

NICOLE CANALES, CSR, RPR

Proceedings                                   49

1          MS. CHANES:  Then I would ask him to take a breath.

2          THE WITNESS:  Yes.

3     Q    (BY MR. EBERT)  Which one?

4     A    I know my piece.  I can speak about where my piece --

5     Q    What article has this appeared that's about your piece?

6     Not that appeared in an article --

7          THE COURT:  This is not a murder trial.  This is not

8     a terrorist trial.  Relax.

9          MR. EBERT:  I understand, your Honor.

10    Q    (BY MR. EBERT)  About your piece?

11    A    I know that it was featured in LargeUp.com, which is a

12    huge music blog and publication recording studio.  They spoke

13    about the piece and they spoke about the event.

14    Q    Did they critique the piece?

15    A    I know that they really liked -- I would have to see the

16    articles, which I know we have here.

17    Q    This is the article about your piece, and you don't

18    remember whether it critiques your piece?

19    A    I mean, it came out about four months ago.  I haven't

20    read it in four months, but they featured it because they

21    thought it was a great piece and, therefore, they covered the

22    event.

23         THE COURT:  He wants to know whether they made any

24    comments about whether they thought it was of value.  You read

25    the article; right?

NICOLE CANALES, CSR, RPR

```
                        Proceedings                      50
```

 1            THE WITNESS:  I did.

 2            THE COURT:  He wants to know what did the article

 3    say?

 4            THE WITNESS:  I don't remember specifically about

 5    that.

 6    Q    (BY MR. EBERT)  Did Mr. Cohen ever tell you that he knew

 7    all along that my client, when the time was right, was going

 8    to knock down these buildings?  Did he ever tell you that?

 9    A    No, he never said that.

10    Q    Were you here yesterday?

11    A    Yes.

12    Q    You saw the video?

13    A    Yes.

14    Q    You saw him say that on the video; correct?

15    A    Not to me.

16    Q    You saw him say it on the video; correct?

17    A    Yes.

18    Q    But he never told you that?

19    A    No.

20    Q    Okay.

21    A    We never had a discussion about it.

22    Q    You put this up in September of 2013, your piece?

23    A    The piece that's here?

24    Q    The piece in the lawsuit.

25    A    That was in July.

```
                      Proceedings                    51
```

1   Q     July 2013?

2   A     Uh-huh.

3   Q     And before July 2013, had you heard any stories, had you

4   read anything that my client was planning on demolishing this

5   building?

6   A     Yes.

7   Q     So when you put up that piece that you intended to be

8   permanent, you knew that my client's plan was to knock down

9   that building within a matter of weeks; correct?

10  A     No.

11            MS. CHANES:  Objection.

12            THE COURT:  What did you know about -- what did you

13  understand at the time was going to happen to the building?

14            THE WITNESS:  We'd been hearing for years that

15  there's always a chance that the building can come down.

16            THE COURT:  So you -- when you do this, you know the

17  building could come down?

18            THE WITNESS:  But it was -- to speak bluntly, it was

19  a-boy-who-cried-wolf scenario.

20            THE COURT:  I understand.  Next question.

21            MR. EBERT:  Were you aware that they were obtaining

22  approval to knock down the building at the time you put the

23  piece on the building?

24            THE WITNESS:  Yes.

25            THE COURT:  You knew that they were seeking

Proceedings                                              52

1    approval?

2              THE WITNESS:  Yes.

3    Q    (BY MR. EBERT)  Do you know what approvals they had

4    obtained by the time you put your piece on the building?

5    A    No.

6    Q    Did you do any research to find out?

7    A    No.

8              THE COURT:  Would it have made any difference -- if

9    you found out they got approval to tear the building down

10   within two or three months, would you still have done this?

11             THE WITNESS:  Yes, of course.

12             THE COURT:  Even if you knew the building was going

13   to come down?

14             THE WITNESS:  Yes.

15             THE COURT:  Why would you do that?

16             THE WITNESS:  For the love of the art.

17             THE COURT:  Even if it lasted for one week, or

18   two weeks or one month?

19             THE WITNESS:  Hundreds of people come to 5Pointz

20   every single week.

21             THE COURT:  There was knowledge out there in the

22   community that there were approvals that were being sought and

23   that -- we'll gain more about that from Mr. Wolkoff.  But you

24   knew what was about to happen?  You knew this was likely to

25   come down?

NICOLE CANALES, CSR, RPR

```
                       Proceedings                        53
```

1           THE WITNESS:  Loosely.

2           THE COURT:  What?

3           THE WITNESS:  I knew loosely about it.  Like I said,

4   we'd been hearing about it.

5           THE COURT:  Go ahead.  Anything else?

6           MR. EBERT:  I'm sorry?

7           THE COURT:  Anything else?

8           MR. EBERT:  Yes, your Honor.

9   Q   (BY MR. EBERT)  Your real goal is to save 5Pointz as an

10  institution; correct?

11  A   Uh-huh.

12  Q   That's why you're here today; correct?

13  A   Uh-huh.

14  Q   I need a verbal yes or no.

15  A   Yes.

16  Q   So couldn't 5Pointz be done at another building in

17  Long Island City?  Isn't it possible that somebody could say,

18  "I'm going to buy this building.  I'm going to contribute it

19  to the 5Pointz people.  Go put graffiti on the wall"?  Is that

20  possible?

21          THE COURT:  Everything's possible.  That's always a

22  bad choice of words.

23  Q   (BY MR. EBERT)  But if that were done, you'd have artists

24  putting up graffiti on that building, and you could have

25  5Pointz at that building; correct?

```
                          Proceedings                    54

 1            MS. CHANES:  Objection.

 2            THE COURT:  The question is not appropriate.  Next

 3     question.  It's argumentative.  Let's go.

 4     Q    (BY MR. EBERT)  Okay.  All you need to put up graffiti is

 5     a wall; correct?

 6            THE COURT:  I think we understand that.

 7            MR. EBERT:  Okay.  Your Honor.

 8     Q    (BY MR. EBERT)  Are you aware that at times artists at

 9     5Pointz paint over other artists' work?

10     A    Yes.

11            THE COURT:  She's aware of that.

12     Q    (BY MR. EBERT)  If you took the same image and you did it

13     on the same wall, and you did it with the best quality oil

14     paint and the best quality aerosol paint, which would you

15     expect to last longer?

16     A    On a wall, aerosol.

17     Q    Would last longer than oil?

18     A    Yes.

19     Q    But you used aerosol for this art?

20     A    Yes.

21            THE COURT:  If you had another surface, would you be

22     able to reproduce it someplace else?  May not exactly be the

23     same, but you probably could do that?

24            THE WITNESS:  Technical, yes.

25            THE COURT:  So if there was another wall available,
```

1   you know, we could still see "Kool Herc."  I can bring the

2   judges to see it; right?

3           THE WITNESS:  Yes.

4   Q    (BY MR EBERT)  Do you know if any of Lady Pink's works

5   have been covered over at 5Pointz?

6   A    I don't believe they have.  I don't know.  The one that's

7   up has been there for a very long time.

8   Q    But you don't know if any others have been covered?

9   A    I don't, no.

10  Q    Did you go to her website before you came to testify to

11  what's on there?

12  A    No.

13  Q    Do you have any idea if the picture that plaintiffs are

14  trying to protect of hers is on her website?

15  A    I don't know.  No, I don't know that.

16  Q    Did you go to any of the artists' websites, other than

17  your own, to check whether the pictures that they're seeking

18  to protect in this action are actually on their websites?

19  A    No.

20          MR. EBERT:  That's it, your Honor.  Thank you.

21          THE COURT:  Any further questions, Ms. Chanes?

22          MS. CHANES:  I thought you guys had something else

23  at 11:00.

24          THE COURT:  I do.  I just want to know whether you

25  want to ask Ms. Mastrion any other questions.

Proceedings                                56

1          MS. CHANES:  Not that I can think of right now.

2          THE COURT:  Okay.  Anyway, I enjoyed your testimony.

3          THE WITNESS:  Thank you.

4          THE COURT:  And you were very helpful to the Court

5    and I appreciate it.

6          THE WITNESS:  Thank you.  I will check the artwork

7    downstairs in the lobby.

8          THE COURT:  Take a look at it.  I want to know what

9    you say about it.  You'll come back after the break.  Go look

10   at the gallery and let me know what you think about it.

11         MS. CHANES:  When do you want us back?

12         THE COURT:  Our conferences are here?

13         THE CLERK:  I have no idea.

14         THE COURT:  So we're going to take a break.  I have

15   a couple of conferences that should not take more than about

16   20 minutes or a half hour.  Let's reconvene at quarter to

17   12:00.  Go down to the cafeteria.  Have a cup of coffee.  Go

18   look at the artwork in the gallery, if you would like, and

19   we'll see you at quarter to 12:00.  Okay.

20         MR. EBERT:  Thank you, your Honor.

21                    (Recess)

22         THE COURT:  Did you have a chance to look at the

23   court's gallery?

24         THE WITNESS:  Yes, I did.

25         THE COURT:  Come up here and tell me what you think.

Proceedings                                      57

1          THE CLERK:  Is this on the record?

2          THE COURT:  On the record.  As I mentioned, I have

3   to decide what constitutes what is a recognized statute.  The

4   aerosol work described the degree of difficulty, and what you

5   saw down in the court's gallery is not aerosol work, but how

6   do I decide whether that work is one that qualifies as work of

7   recognized stature, and I ask you the fact that the court has

8   it in its gallery, is that in and of itself sufficient or

9   other aspects of your concept of what you think is recognized

10  stature that I should reflect upon?

11         THE WITNESS:  Well, the fact that the judge is a

12  collector --

13         MS. CHANES:  I can't hear you.

14         THE COURT:  It's the court gallery, open to the

15  public.

16         THE WITNESS:  Yes.

17         THE COURT:  Is that all they need to consider,

18  whatever they put up there, even if it's a bunch of dots that

19  would be recognized?

20         THE WITNESS:  Technically speaking, before I saw who

21  the pieces were of and donated from, that the technical

22  ability is amazing on the pieces down there.  I mean, the

23  color work, the detail, the intricacies of them.  I wasn't

24  familiar with the artists, but I was very blown away.

25         THE COURT:  Even if you didn't know the artist,

Proceedings                                                        58

1   whoever else, regardless, even if the artist is unknown, I

2   think you're telling me that that would be considered to be

3   something that would qualify as work of recognized stature?

4             THE WITNESS:  Yes.  It would be a tragedy to see any

5   of that work destroyed.  It's beautiful work down there.

6             THE COURT:  So it meets all those standards that you

7   spoke about before?

8             THE WITNESS:  Composition.  The color use is

9   amazing.  You saw it from before you walked into the gallery.

10            THE COURT:  So if the artist is well known or not,

11  it would just add to it, it would not subtract from it?

12            THE WITNESS:  It would not subtract from it, it

13  would add to it more.  I didn't know the artist, but the

14  quality of the work and the caliber of the work was a very

15  high level down there.

16            THE COURT:  So you think the judges chose well?

17            THE WITNESS:  Yes, one in particular.

18            THE COURT:  Which one?

19            THE WITNESS:  (Inaudible response)

20            THE COURT:  All right.  So we have a committee here

21  that does this.

22            THE WITNESS:  Yes.

23            THE COURT:  And so, you know, you may, maybe not,

24  know that the all the courthouses are required to have some of

25  its work devoted to the arts, the outdoor statues.  Each

Proceedings                                     59

1   courthouse has a work of art outside.  GSA, the government

2   services, commissions artists.  They pay a lot of money.  Some

3   of them I like, some of them I don't like.  And then the

4   interior of the courthouse is also public space, so, you know,

5   we pride ourselves on trying to expose the public to works of

6   art, especially by local artists.  But maybe we should have

7   some of this other work that the judges don't know about in

8   the gallery somehow.

9           THE WITNESS:  Yes.  You can cover the -- you can get

10  all four of those walls, the whole entryway covered in a

11  mural, you know --

12          THE COURT:  So, you know, it's just interesting to

13  have the benefit of having -- I'm going to ask the other

14  experts whether they concur in their assessment.  That's

15  helpful, to give me some guidance.

16          Anybody want to question Ms. Mastrion?  I don't

17  think we have to.

18          MS. CHANES:  I have nothing further.

19          MR. EBERT:  Just one question, your Honor.

20          THE COURT:  Sure.

21                CROSS-EXAMINATION (RESUMES)

22  BY MR. EBERT:

23  Q    If a piece were to meet the six factors that you have

24  spoken about and no one ever saw it, but it met all those six

25  factors, amazing piece, but no one saw it, it was in

Proceedings                        60

1   somebody's attic, would that have recognized stature?
2   A     I believe it would, yes.
3             MR. EBERT:  Thank you.
4             THE COURT:  So just intrinsic quality of the work,
5   even if it's not exposed to the public, would still qualify,
6   in your opinion, as something that should satisfy the
7   statutory standard of the status, so to speak?
8             THE WITNESS:  A beautiful piece of work, is a
9   beautiful piece of work.
10            THE COURT:  So the fact that it's been exposed to
11  the public, you don't think it necessarily is a factor or a
12  consideration?
13            THE WITNESS:  I think it is.  I think it elevates it
14  even more.
15            THE COURT:  Even without that, it would still
16  qualify?
17            THE WITNESS:  Yes.
18            THE COURT:  Interesting.
19            THE WITNESS:  I think it just elevates it even more.
20            THE COURT:  Thanks a lot.
21            THE WITNESS:  Thank you.
22            THE COURT:  So what do we have next?
23            MS. CHANES:  We have another one of the
24  plaintiff's -- Mr. Luis Lamboy.
25            THE CLERK:  Good afternoon, Mr. Lamboy.  Take the

Proceedings                                61

1    witness stand.

2              THE WITNESS:  Good afternoon.

3              THE CLERK:  Remain standing and raise your right

4    hand.  Do you solemnly affirm the testimony you're about to

5    give to the Court in this proceeding will be the truth, the

6    whole truth and nothing but the truth?

7              THE WITNESS:  I do.

8              THE CLERK:  Please have a seat.  Please state and

9    spell your name.

10              THE WITNESS:  Luis Lamboy Jr., L-a-m-b-o-y.  Luis is

11   L-u-i-s.

12              THE COURT:  I just want to make one mention on the

13   record that the work that you were referred to downstairs,

14   the artist's name is Bernard Aptekar, A-p-t-e-k-a-r.  So now

15   you know who he is.

16              MS. CHANES:  How long do these exhibits run,

17   your Honor?

18              THE COURT:  Run about three months, roughly.

19              MS. CHANES:  Permission to approach with famous

20   binders?

21              THE COURT:  Go ahead.

22                        DIRECT EXAMINATION

23   BY MS. CHANES:

24   Q    Mr. Lamboy, you're one of the plaintiffs in this action;

25   correct?

```
                        Proceedings                      62
```

1   A    Yes.

2   Q    Could you tell the Court a little bit about your

3   educational background quickly.

4   A    Full scholarship to FIT in the 80s.  After that, I went

5   into the field textile designing, and then -- that was for

6   three years, and then I was a professional art handler for

7   Sotheby's Auction House for 18 years.

8   Q    And in your job with Sotheby's, did that involve any

9   evaluation or critiquing of artworks?

10  A    No.

11  Q    And are currently a professional artist?

12  A    Yes.

13  Q    That's how you make your living?

14  A    Yes.

15  Q    Do you have any works of visual art at 5Pointz now?

16  A    Yes.

17  Q    Does that include the "Blue Jay Wall"?  Would you look at

18  the exhibit in front of you, the binder, the green binder.

19  A    Uh-huh.

20          THE COURT:  Do you want to put that up on the screen

21  again?

22          THE WITNESS:  Sure, why not.

23          THE COURT:  Go ahead.  Let's take a look at it.

24          MS. CHANES:  I found all my exhibits.

25          THE COURT:  Okay.  You've got it.  And that's A --

Proceedings                                63

1          MS. CHANES:  That's A9.

2          THE COURT:  A9 is your work.

3          THE CLERK:  You want me to dim the lights for you?

4    Q    (BY MS. CHANES)  With respect to this work, when you

5    painted it -- this is to the loading dock area?

6    A    Yes.

7    Q    When you painted it, was there a work of art under that?

8    A    Yes.

9    Q    Whose work was under it?

10   A    It was my work.

11   Q    And were you the one who made the decision to paint over

12   the previous work?

13   A    Yes.

14   Q    Why?

15   A    Because the work was starting to get damaged by the

16   trucks that were going into the loading dock, as well as the

17   trash cans; they would push up against it.

18   Q    So that happened a lot at that location?

19   A    It happens.

20   Q    And the work you painted over, did that also cover a work

21   of visual art?

22   A    Yes.

23   Q    And who painted the work of visual art?

24   A    I did.

25   Q    And, again, did you make the decision to paint over it?

NICOLE CANALES, CSR, RPR

Proceedings                    64

1    A    Yes.

2    Q    Did you make that decision yourself or was that made for

3    you?

4    A    I made that decision.

5    Q    Now, with respect to "Blue Jay Wall," do you have a

6    picture of this in your portfolio?

7    A    Yes.

8    Q    Could you recreate this wall somewhere else if you wanted

9    to?

10   A    No.

11   Q    Why not?

12   A    It wouldn't come out exactly the same way.  You'd have

13   the shapes of the actual building that's actually a part of

14   the wall, and I never duplicate my works.  I like to have my

15   works to be one of a kinds.

16   Q    So if somebody requested you to paint this wall somewhere

17   again, you wouldn't do it?

18   A    I wouldn't do it.

19   Q    Do you have any other works of visual art currently at

20   5Pointz?

21   A    Yes, I do.

22   Q    And are those pictured in the -- this binder?  Are they

23   part of the section?

24   A    They're not part of the section.

25   Q    When you paint -- strike that.  How many other works of

NICOLE CANALES, CSR, RPR

Proceedings                                      65

1   visual art do you have?

2   A    About five or six.

3   Q    Were any of those painted over previously existing

4   artwork?

5   A    No.

6   Q    So they were all painted over blank surfaces?

7   A    Yes.

8   Q    And are they permanent to your way of thinking?

9   A    Yes.

10  Q    Are they on the upper floors of 5Pointz?

11  A    Yes, they are.

12  Q    Now, do you recall -- do you recall participating in

13  an -- participating in an interview around -- a videotape

14  interview, in approximately 2010, regarding your work as an

15  aerosol artist?

16  A    Yes.

17  Q    Do you recall that, as part of that testimony --

18            MR. EBERT:  Objection, your Honor.  We have a

19  witness.

20            THE COURT:  That's an improper type of question.  As

21  a lawyer, you should know that.  What do you want to ask him?

22            MS. CHANES:  I want to ask him whether -- he was not

23  here yesterday, so I cannot ask him about --

24            THE COURT:  Just what do you want to try to illicit

25  from him?

Proceedings                                              66

1    Q    (BY MS. CHANES)  Okay.  Do you currently feel like as

2    long as you have a picture of your artwork, you don't care

3    what happens to the original mural?

4              THE COURT:  That's not a good question.

5              MR. EBERT:  Objection.

6    BY THE COURT:

7    Q    Look, you have this -- this wall may come tumbling down.

8    I think you properly realized there was some risk of that

9    happening.  When you put this up, did you think there was a

10   risk the walls would be come tumbling down?

11   A    No.

12   Q    You thought forever?

13   A    Yes.  When I did this one, it was before I heard that the

14   building was coming down.

15   Q    So at the time you did it, what was your understanding of

16   what was going to happen with the walls?

17   A    With this particular wall, I thought that it would stay

18   up there until I decided that I wanted to go over it again.

19   Q    What is the owner of the property supposed to do?  Not

20   use his property and keep the wall up?

21   A    Well, I did not know that they were going to tear it town

22   at all.

23   Q    You had no knowledge one way or the other?

24   A    No, not until this year.

25   Q    When you paint on walls, you realize it's not the same as

```
                        Proceedings                   67

1    a canvas that's going to be preserved in a museum; right?

2    A    Yes.

3    Q    Okay.  Did you at least try to, you know, take any

4    pictures or to preserve this in some other medium?

5    A    Yes.

6    Q    You have photographs?

7    A    Photographs.

8    Q    Good quality photographs?

9    A    Pretty good.

10   Q    All right.  So then if I decide that the builder has the

11   right to, you know, tear the wall down, which I probably will,

12   I think, will I be able to see maybe this wonderful work of

13   art someplace else?

14   A    Yes, on my website, hopefully books, and --

15   Q    So it's preserved?

16   A    Yeah.

17   Q    And you can do this, I guess, on another wall, if

18   Mr. Wolkoff, let's say, hypothetically, made another space

19   available?  You can't reproduce it exactly, but, in essence,

20   you can have something like this that you can recreate?

21   A    I can do something close but never recreate --

22   Q    Never exactly the same, but the public will still be

23   drawn to it?

24   A    Yeah.

25              THE COURT:  I just want to get a feel for this.
```

NICOLE CANALES, CSR, RPR

Proceedings                                              68

1    Anything else you want to ask?

2              MS. CHANES:  Two more questions.

3    Q    (BY MS. CHANES)  One is will you do that?  Will you

4    recreate this wall or do your best to recreate it somewhere

5    else?

6    A    I would not recreate it.

7              THE COURT:  You would do something else?

8              THE WITNESS:  I would do something else.

9              THE COURT:  And the reason why is you don't want to

10   recreate what you've already done?

11             THE WITNESS:  Yes, I like my works to be one of a

12   kinds.

13             THE COURT:  What if the public wanted to see it?

14   Would you accommodate that?

15             THE WITNESS:  I probably wouldn't.  Because, I say,

16   this wall was done a year ago.  As an artist, I have grown,

17   and I can do something maybe even better.

18             THE COURT:  Okay.  Anything else?

19             MS. CHANES:  One other question.

20   Q    (BY MS. CHANES)  As part of your career as a professional

21   artist, do you also do commission work?

22   A    Yes, I do.

23   Q    Could you give the Court just one or two examples of your

24   commission work?

25   A    I just recently got commissioned by the U.S. Consolute to

Proceedings                                     69

1   go to Ecuador and work with their local artist on some mural

2   projects.

3   BY THE COURT:

4   Q    Outside projects?

5   A    Yeah, exterior.

6   Q    What are they planning to do down there?

7   A    They actually have a big art community, and they wanted

8   to do mural work out there.

9   Q    On government buildings?

10  A    Not government buildings, but buildings that are in the

11  community.  Some were poor areas and some were up-and-coming

12  areas.

13  Q    Do they work our arrangements with the owner to allow

14  that to happen?

15  A    Yes, before I go.

16  Q    And do you know whether or not they're going to be

17  permanent or temporary?

18  A    From what I understand, they're permanent.

19  Q    These buildings will not be taken down?

20  A    Yes.  They're actually -- when I went out there, they

21  were pretty new buildings.

22  Q    You don't know who owns those buildings?

23  A    Never.

24          THE COURT:  Anything else?

25          MS. CHANES:  Nothing further for this witness.

```
                        Proceedings                      70

 1              THE COURT:  You want to inquire at all?

 2              MR. EBERT:  Yes.  Thank you, your Honor.

 3                        CROSS-EXAMINATION

 4     BY MR. EBERT:

 5     Q    Did Mr. Cohen ever tell you that he knew all along that

 6     my client's plan was to demolish the buildings when the time

 7     was right?

 8     A    No.

 9     Q    And when you did "Blue Jay Wall," you said you were

10     unaware that my client was working to get the building

11     demolished to put up a project?

12     A    That's correct.

13     Q    Have you ever participated in any "Save 5Pointz" events?

14     A    No.

15     Q    Have you ever heard the phrase "Save 5Pointz"?

16     A    Yes.

17     Q    When's the first time you heard it?

18     A    December.

19     Q    And when is the first time that you learned that my

20     client intended to demolish the building?

21     A    The first time was at a meeting that happened in PS1.

22     Q    When was that?

23     A    Probably the summertime.  I'm not too sure.

24     Q    Of this year?

25     A    Yes.
```

Proceedings                                71

1   Q    Is it true -- your lawyer was talking about this video.

2   And in that video you say to the interviewer --

3               MR. EBERT:  You know what, can we play that one

4   clip?

5               THE COURT:  We don't have to do that.  I already

6   heard it.

7               MS. CHANES:  Actually, I don't think they played

8   that one, your Honor.

9               MR. EBERT:  I didn't play that one.

10              THE COURT:  Something else you want to offer into

11  evidence?

12              MR. EBERT:  Yes, it's very short.

13              THE COURT:  What is it?

14              MR. EBERT:  It's a video on which the witness says,

15  "If somebody paints over this, his own work, tomorrow, I'm

16  okay as long as I have a photo."

17              THE COURT:  It's a video made by --

18              MR. EBERT:  It's an interview that was done of the

19  witness.

20              THE COURT:  Of this witness.  Mark that as an

21  exhibit.  You have a label?

22              MR. EBERT:  Thirty-three, your Honor.

23              THE COURT:  In evidence, Defendant's Exhibit 33.

24  Let's hear it.

25              MS. CHANES:  Do you have a copy of that?

NICOLE CANALES, CSR, RPR

```
                        Proceedings                      72
```

 1            MR. EBERT:  No.

 2            MS. CHANES:  May I have a copy of that?

 3            MR. EBERT:  No, it's a video.

 4            THE COURT:  Let's listen to it.  Is Mike Innelli

 5    here?

 6            MR. KNAUSS:  He stepped out.

 7            MR. EBERT:  Is he coming back?

 8            THE COURT:  I hope he does.  Ask him some other

 9    questions, in the meantime.  You can try to find Mike.  This

10    is also Mike.  We have two Mikes.

11            MR. KNAUSS:  I'll go find the one who knows what

12    he's doing.

13            THE COURT:  Perfect.

14                         (Video played.)

15    Q    (BY MR. EBERT)  That was obviously you; correct?

16    A    Yes.

17    Q    Did you say you've never painted over someone else's work

18    at 5Pointz?

19    A    I painted over other works.

20    Q    Other artists' works?

21    A    Yes.

22            MR. EBERT:  I think this will be helpful to

23    the Court if we just show the last part of the video, where it

24    shows the witness, how he covers over a work and paints over

25    it with something else.  I think it's pretty brief, but I

```
                          Proceedings                    73
 1   think it illustrates the paint.
 2                        (Video played.)
 3   Q    (BY MR. EBERT)  Is that your work you're about to paint
 4   over?
 5   A    No.
 6              MS. CHANES:  Is that you?
 7              THE WITNESS:  No.
 8              THE COURT:  Well, I know that it was painted over.
 9   I mean, go ahead.  He's not in this, is he?
10              MR. EBERT:  It's the interview where he says he's
11   painting it over.  If he denies it's him, then I'll move over,
12   your Honor.
13              THE WITNESS:  That's not me.
14              MR. EBERT:  It's the same video.
15              THE COURT:  We don't need to do this.
16              MR. EBERT:  Okay.  Thank you.
17              THE COURT:  Let's go.  Anything else of this
18   witness?  We don't need more.
19              MR. EBERT:  That's him on the ladder.
20              THE COURT:  Is that you on the ladder?
21              THE WITNESS:  Yes.
22              THE COURT:  I've seen it before.  It's not going to
23   make a difference.  Go ahead.  Anything else?
24              MS. CHANES:  Nothing further, your Honor.
25              THE COURT:  Thank you very much.  Keep up the good
```

Proceedings                                        74

1    work.

2               THE WITNESS:  Thank you.

3               THE COURT:  Do you have anything else other than

4    your expert?

5               MS. CHANES:  No, we don't, other than Mr. Simmons

6    tomorrow.  We're going to take our lunch break now.

7               And will you have something for us at 2:00 o'clock,

8    perhaps?

9               MR. EBERT:  Yes, your Honor.

10              THE COURT:  Who will we be hearing from?

11              MR. EBERT:  Erin Thompson, our expert.

12              THE COURT:  He was the curator.

13              MR. EBERT:  She.  Well, her background is in art

14   history, and she's an art crimes professor now at John Jay.

15              THE COURT:  Do you have anything else in addition to

16   her?

17              MR. EBERT:  Mr. Wolkoff.

18              THE COURT:  I'm anxious to hear from him, of course.

19   Have your expert take a look, to get his opinion on that as

20   well.  See you at 2:00 o'clock.

21              MS. CHANES:  If I may have a copy of your expert's

22   bio or resume?

23              MR. EBERT:  I don't have one.

24              She's going to testify to her credentials,

25   your Honor.

Proceedings                                    75

1          THE COURT:  But usually you turn this over to

2     counsel.  Well, you must have something.  See whether you can

3     accommodate her.

4          MR. EBERT:  You had her name since yesterday.

5          THE COURT:  Look, let's not put it on the record.

6                    (Lunch recess.)

7          THE COURT:  Ready to continue?

8          MS. CHANES:  Yes, your Honor.

9          THE COURT:  All right.  So who do you have now,

10    Mr. Ebert?

11         MR. EBERT:  Motion for directed verdict.

12         THE COURT:  Okay.  Denied.

13         MR. EBERT:  Okay.  Erin Thompson, please.

14         THE COURT:  "Directed verdict" is not the right

15    phrase.  That's what happens after the trial.  This is an

16    application for preliminary injunctive relief.  There's no

17    such animal for directed verdict, just thought I'd let you

18    know.

19         MR. EBERT:  I know it was a complete -- I'll move

20    on.

21         THE COURT:  You're a very conscientious lawyer.

22         THE CLERK:  At this time ask you to remain standing.

23    Raise your right hand.  You're affirming the testimony you're

24    about to give to the Court in this proceeding will be the

25    truth, the whole truth and nothing but the whole truth?

NICOLE CANALES, CSR, RPR

```
                       Proceedings                       76

 1              THE WITNESS:  Yes.

 2              THE CLERK:  Please have a seat and please state and

 3   spell your name.

 4              THE COURT:  You don't have to have it that close.

 5              THE WITNESS:  I have the plague, so I'm afraid I'll

 6   lose my voice.  Is that all right?

 7              THE COURT:  Is that okay for you?

 8              THE WITNESS:  Uh-huh.

 9              THE COURT:  You don't have to swallow it.  Okay.

10   And we don't want to hear your tonsils.

11              THE WITNESS:  Nobody wants to hear that.

12              THE COURT:  Have you ever testified in court before?

13              THE WITNESS:  I have not.

14              THE COURT:  First time?

15              THE WITNESS:  Yes.

16              THE COURT:  Okay.  So we have your name and we know

17   you are, once again, who?

18              THE WITNESS:  Erin Thompson, E-r-i-n,

19   T-h-o-m-p-s-o-n.

20              THE COURT:  So let's have Mr. Ebert question you.

21              MR. EBERT:  Thank you, your Honor.

22                        DIRECT EXAMINATION

23   BY MR. EBERT:

24   Q    Where do you work?

25   A    I am currently an assistant professor of art law and art
```

```
                          Proceedings                    77
```

1   crime at John Jay College.

2           THE COURT:  John Jay has an art department?

3           THE WITNESS:  They do.

4           THE COURT:  A big one?

5           THE WITNESS:  No.

6           THE COURT:  A small one.

7           THE WITNESS:  There's about eight professors.

8           THE COURT:  Are they up at 57th Street?  Is that

9   where you were?

10          THE WITNESS:  Uh-huh.

11  Q    (BY MR. EBERT)  What course or courses do you teach now?

12  A    Currently this semester, I'm teaching modern art and the

13  survey of art history, both with a focus on art crime.

14          THE COURT:  Art crime.

15          THE WITNESS:  Uh-huh.

16          THE COURT:  What is art crime?

17          THE WITNESS:  Well, that's -- it's a broad field

18  that encompasses all of the interactions between art and

19  criminal behavior.  So, for example, Nazi looted art, or

20  destruction of art during wartime.  I specialize, in

21  particular, in the looting and smuggling of antiquities.

22          THE COURT:  What about all those 1500 artworks that

23  suddenly surfaced this week in Germany.

24          THE WITNESS:  Germans didn't destroy them all.

25          THE COURT:  What do you make of that?  Why were they

Proceedings                                    78

1    preserved and others destroyed?

2            THE WITNESS:  The Germans sought to rid their

3    society of what they considered to be degenerate modern art,

4    so they burned a few, and then they realized why not fund the

5    war effort by selling these to foolish other people outside of

6    Germany.  So, apparently, these paintings were kept by an art

7    dealer who was charged by the Nazis with selling them, but he

8    scammed the Nazis and kept a few.

9            THE COURT:  So he was a good art dealer?  He

10   preserved them?

11           THE WITNESS:  He should have given them back after

12   the war, but --

13           THE COURT:  Took him awhile to do that.  Why did it

14   happen now?  This has nothing to do with this case.  I'm just

15   curious since you're an expert.

16           THE WITNESS:  I believe in that case the current

17   holder of the apartment was charged with tax evasion for

18   selling these -- a few of these works of art to make a living,

19   so there was a raid on his apartment.

20           THE COURT:  He kept them secret all these years

21   because of that?

22           THE WITNESS:  Uh-huh.

23           THE COURT:  Do you know who the person is, by any

24   chance?

25           THE WITNESS:  I don't remember his name, but he's an

                        Proceedings                    79

1   art dealer, so his father, I believe, was the one who worked

2   with the Nazis.

3           THE COURT:  What is likely to happen to them now?

4           THE WITNESS:  It depends on what their ownership is.

5   Germany is now very invested in returning art to Jewish

6   families.  Some of them may have come from German national

7   museums, and in which case, they would just go back to the

8   museums.

9           THE COURT:  They're safe now, safely preserved, and

10  whoever ultimately gets them back will be determined.  It's

11  not like aerosol art; right?

12          THE WITNESS:  (Inaudible response)

13          THE COURT:  Good.

14  Q    (BY MR. EBERT)  Can you tell us about your educational

15  history after high school, please?

16  A    So I received a Bachelor's degree in the History of Art

17  from Barnard College.  Then I went to graduate school at

18  Columbia, where I received a JD from Columbia Law School, and

19  a Master's in Art, and a Master's in Philosophy, and a PhD in

20  Art History from Columbia.

21  Q    And can you tell us --

22  A    And a graduate of School of Arts and Sciences.

23  Q    Can you tell us about your work during and after college?

24  A    Yes.  So during graduate school, I interned for the legal

25  departments of the Guggenheim Museum and the Philadelphia

                    NICOLE CANALES, CSR, RPR

Proceedings                                                    80

1    Museum of Art, and I also taught as an adjunct instructor, art

2    history, at Columbia, Pace, Suny, Rutgers, Brooklyn College.

3              THE COURT:  Am I to deduce from that that you have a

4    hard time keeping a job?

5              THE WITNESS:  You're to deduce the struggle of

6    adjunct professors who are hired for semesters only.

7              THE COURT:  Are you now full professor?

8              THE WITNESS:  Now, I am, yes.  This is my first

9    semester as a full-time professor.  Prior to this, after

10   graduating from law school, I worked for Hogan Lovells as an

11   associate, a private law firm, and then worked for the city,

12   for the Conflicts of Interest Board, as an agency enforcement

13   attorney.

14             THE COURT:  Did you know all of the partners at

15   Hogan Lovells?

16             THE WITNESS:  No.

17             THE COURT:  Ever come across Steve Edwards?

18             THE WITNESS:  Yes.  I worked for him, yes.

19             THE COURT:  He's a good musician.

20             THE WITNESS:  He played at the Christmas party.

21             THE COURT:  Small world.  All right.  Go ahead.

22   Q    (BY MR. EBERT)  Are you a member of any art-related

23   professional organizations?

24   A    Yes, I'm a member of the College Art Association, which

25   is a professional association for college art professors and

NICOLE CANALES, CSR, RPR

Proceedings                                      81

1    also the International Commission of Museums, which is a

2    UN-related organization.

3    Q     Written articles about art?

4    A     Yes.  Most recently I published an Op-Ed in the

5    L.A. Times last month about the looting of Syrian antiquities

6    during the conflict there.  I've published articles on tax

7    deductions for the donations of looted art and the return of

8    Nazi-looted art.  And forthcoming from the Oxford Encyclopedia

9    of Art Esthetics, I have an article on the deliberate

10   destruction of art.

11              THE COURT:  You're an academic, basically.  Are you

12   also an artist yourself?

13              THE WITNESS:  No, your Honor.  I enjoy and criticize

14   but do not produce.

15              THE COURT:  You're a critic but not a participant;

16   right?  I just want to get a sense, because the other folks

17   who were here actually are caught up in actually being

18   artists.

19              THE WITNESS:  Uh-huh.

20              THE COURT:  But this is not your bet.  Strictly

21   academic.

22              THE WITNESS:  (Inaudible response)

23              THE COURT:  Correct?

24              THE WITNESS:  Correct.

25              THE COURT:  Go ahead.

Proceedings                                                    82

1   Q    (BY MR. EBERT)   And are there any styles of art that

2   you're most interested in?

3   A    I specialized, did my dissertation in ancient Greek and

4   Roman art, but during both my graduate and undergraduate

5   studies and teaching career, I've had to study and teach all

6   areas of art from keeth (phonetic) painting to contemporaries,

7   as they say.

8   Q    And within contemporary art, are there any particular

9   styles or movements that you have taught?

10  A    Yes.   I frequently teach modern and contemporary art with

11  the main style such as Pop Art, minimalism, happenings and so

12  on.

13  BY THE COURT:

14  Q    Pop Art, what does that incorporate?   Would that include

15  aerosol work or any type of work like that when you say "Pop

16  Art"?

17  A    The beginning of aerosol art -- we were using the term in

18  the 1980s -- did overlap with Pop Art, and many well-noted and

19  respected aerosol artists have also been generally categorized

20  by fellowship as Pop Art.

21  Q    I'm interested, because you know a lot more than I do.

22  I'm just here trying to get better educated and you can help

23  me.   So I'm trying to get a handle on things like Pop Art,

24  graffiti art, aerosol art.   I hear all these phrases being

25  bandied about, so I ask you, you know, is there a difference

NICOLE CANALES, CSR, RPR

Proceedings                                          83

1   between Pop Art and aerosol art -- is one incorporated in the

2   other?  Is aerosol art simply a current modern type of advent,

3   or does it have a stark basis to it?  I'd like to know a

4   little bit about that from your expertise.

5   A    How long have you got?

6   Q    I've a lifetime appointment.

7   A    So in the 1960s, 70s and 80s, a generation of artists

8   decided that they were -- no longer wanted to be beholden to

9   the museum system, to, you know, hoity-toity, highfalutin

10  critics; they wanted to speak directly to the people.

11  Q    To the public.

12  A    To the public.  So a number of artists began doing things

13  like going out and conducting performances in public, where

14  unsuspecting members of the public would become unconscious

15  participants and bystanders.

16  Q    You call that "performance art?"

17  A    Performance art.

18  Q    Street musicians type of things?

19  A    Sometimes even more intrusive and startling than that.

20  Sometimes the goal was to shock the public.  There also began

21  to be a number of artists who would perform unauthorized

22  modifications of public buildings.  Say, like, Madda Clark, in

23  the 1970s, would go and cut holes in abandoned warehouses

24  in -- the piers along the West Side.

25  Q    That's not lawful, that's creating a building.

Proceedings                                    84

1   A      Uh-huh.  But the unlawfulness was almost part of the

2   point.  These artists who wanted to interact directly with the

3   public often have subversive, antiestablishment message.  So

4   the idea was to put work out there for people to encounter

5   that would shock them out of their normal thoughts.

6   Q      Was there a particular phrase that would describe that

7   type of work?

8   A      It's usually known as street art.

9   Q      Street art?

10  A      Which has several pertinent characteristic.  And graffiti

11  art or aerosol artists are part of this larger umbrella.

12  Q      Tell me about the advent of so-called, what I refer to

13  as, "aerosol art" because graffiti is against the law if you

14  don't have the owner's permission, broadly defined; is that

15  correct?  Graffiti is anything at all put on a building

16  without the owner's permission?

17  A      I would say, yes.  But the phrase "graffiti art" is a

18  phrase usually that refers to the more artistic end of any

19  sort of marking on a building, whether legally --

20  Q      I want to know about that.  Is there a difference between

21  aerosol art and graffiti art?  I mean, what's the phrase that

22  I should use in this case?

23  A      The one I see in the literature most frequently is

24  "graffiti art."  I searched for the term "aerosol art," which

25  plaintiffs use, and saw only a limited number of, a few.  But

NICOLE CANALES, CSR, RPR

Proceedings                                          85

1   to me they're more or less synonymous.

2   Q    The plaintiffs themselves refer to many times as

3   "graffiti art."  I'm the one that's talking about

4   referring to aerosol art, because they use aerosol.  I guess

5   graffiti could be aerosol plus anything else; right?

6   A    Uh-huh.

7   Q    So here we're talking about this particular way in which

8   this work is created by using aerosol paint or spray; right?

9   A    (Inaudible response)

10  Q    Would it be acceptable to refer to this as aerosol art?

11  A    I think so, in the same way we refer to oil painting or

12  water color.

13  Q    Can you give me some idea of the etymology of history of

14  when this type of stuff started to appear and what its reach

15  is today in our culture internationally?  Domestically?

16  A    To go very far back, to my classical education, graffiti

17  is -- from the Latin, it just means "writings."  So ancient

18  graffiti survives from Pompeii and Herculean -- and has some

19  of the same sort of content as graffiti does now.

20  Q    They were painted on the walls way back then?

21  A    Mostly the ones that survived were scratches but also

22  paintings.

23  Q    Historical basis to this?

24  A    Yes, this form, it seems to be a human impulse to leave

25  one's name or thoughts on the walls for others.

Proceedings                                      86

1   Q    So going back to the days of the Greeks and the Romans, I
2   mean, was there an acceptable concept to -- we know that there
3   are paintings on caves, and walls and everything like that.  I
4   guess that's because there were no canvases.  And I'm
5   wondering from a historical aspect where all this stems from?
6   A    Excuse me.  There have been long impulses to -- I mean,
7   plaintiffs talked about mural painting, so the idea of
8   transforming a wall into a work of art certainly has, along
9   that basis -- although most of those murals, frescos, oil
10  painting on walls have been meant to endure for a long time.
11  Leonardo Da Vinci's "The Last Supper" is an oil painting in
12  Milan on the wall.
13  Q    I thought so.
14  A    And it's an oil painting that's been there for more than
15  500 years.
16  Q    Is that the La Scala?
17  A    Nearby.
18  Q    So that's on the wall?
19  A    Correct.
20  Q    And that's been preserved through history?
21  A    Correct.
22  Q    With some difficulty, I guess?
23  A    With some difficulty.  The entire building was bombed
24  during World War II.
25  Q    That's one of the ways it can disappear, but right now

1   it's become, I guess, a public monument, I guess.  It's owned

2   by the city?

3   A    The church, which it's in.

4   Q    So they preserve it.  How about now?  Let's fast forward.

5   So you have a lifetime appointment.  I want to try to get this

6   done and over today, in terms of getting your testimony.

7   Where have -- these folks here -- you know what this is all

8   about.  We've been showing you these 24 pictures, and we hear

9   about these artists who talk about expressing themselves in

10  this format, and I'd liked to know the history and the

11  background.  Is it more common today?  If there's a movement

12  today and, if so, what's it all about?

13  A    Yes, sir.  The 1970s and 80s are what are considered to

14  be the peak of graffiti art, aerosol art, street art of this

15  type.  When the artists took spray paint as a medium, that

16  would allow them to quickly portray messages directly to the

17  public.

18  Q    You think that's something that's of artistic value or

19  something that's relevant to our society and our culture?

20  A    Well, as modern art has shown, anything and everything

21  has potential to be art, but I think it's generally understood

22  that spray paint used as an innovative art form of widespread

23  public recognition has greatly declined since the 1980s, so in

24  preparing for this case, I can think of only one contemporary

25  street artist with widespread public recognition.

Proceedings                                      88

1    Q    You have been to 5Pointz?  It's kind of unique.  You look

2    at that, and it gets your attention right away.  A lot of

3    people have seen it.  Apparently they come from all over the

4    place to see it; is that correct?

5    A    Correct.

6    Q    What's all that?  How does that fit into the scheme of

7    things, in terms of the concept of art and its relevancy to

8    our society?

9    A    Well, I think 5Pointz is a good example of the essential

10   characteristics of street art.  First, in that it is a

11   competitive art form, so the people that are coming to visit

12   are coming to see the newest, the latest, the greatest not the

13   old master, so to speak.  Second, it's characteristic in that

14   it's directly addressed to the public, and the public can

15   react to it as it will.  It can ignore it.  It can bang trash

16   cans against it.  It can mutilate it.  Street art is meant to

17   be ephemeral art form, which is documented upon its creation;

18   photographs, videos, and then left to developments, to the

19   public, to the public authorities, to do with it as they will.

20   Q    As an expert, what do you think in that regard?  Is it

21   something worthy for recognition, perhaps?

22            MS. CHANES:  I'm sorry, your Honor.  I'm sorry to

23   interrupt.  With all do respect, I object to her being

24   qualified as an expert.  I don't think the foundation's been

25   laid for her expertise.

Proceedings                                          89

1          THE COURT:  You have your objection.

2          Answer my question now.

3          THE WITNESS:  Are you speaking street art as a

4  genre, 5Pointz in particular or these particular works?

5          THE COURT:  I'm going to let you question her.  I

6  mean this is not normally what I do in a trial.  This is

7  something I'm treating a little bit out of the box.

8          MS. CHANES:  I understand.  I think she might

9  benefit from water, benefit by taking some of the --

10          THE WITNESS:  Am I not hearable?

11          THE COURT:  She's doing fine.  I'm interested in

12  getting educated here.

13          MS. CHANES:  I understand.  I think her throat's

14  bothering her.

15  BY THE COURT:

16  Q    Do you remember the question I just asked you?

17  A    Yes.  You want to know about the relevance, and I asked

18  if you're interested in the relevance of street art as a genre

19  or 5Pointz as a site.

20  Q    You can talk to me about 5Pointz a little bit.

21  A    So 5Pointz, I think, has been an interesting site for

22  street art, but it's merely one of a number of sites, and it's

23  interesting to the public as a changing display, a changing

24  gallery.  You said it attracts people's attention.  Just in my

25  own example, I had frequently passed it on the way to PS1

Proceedings                                    90

1   across the street.  I looked at it.  I noted their graffiti,

2   but I hadn't known that there was any organization there.

3   Q     Catches your eye?

4   A     Catches your eye, but so do many displays of graffiti.

5   Q     But, apparently, a lot of people come to see this.  We've

6   heard testimony about how attractive it is.  Corporate people

7   come to look at it, school children.  People come from all

8   around the world, so it has received that type of recognition,

9   I suspect; right?

10  A     That is true, but the attention of a subculture does not

11  satisfy, in my opinion, the recognition required by VARA.

12  Q     All right.  So you've been asked to come here to give

13  expert testimony on recognized stature?

14  A     Correct.

15  Q     What specifically were you asked by Mr. Ebert to opine

16  about?

17  A     The history of art in general and destruction of art,

18  vis-à-vis, art law, and perhaps specifically some thoughts

19  about VARA.

20  Q     All right.  So when -- you were asked to opine as to what

21  would constitute the work of recognized stature on this

22  particular statute that I have to grapple with.

23  A     Yes, your Honor.

24  Q     You have a sense of how the court goes about deciding

25  what work is a work of recognized stature?

1  A    I have a sense how courts have gone about that issue.

2  Q    I don't think there's a lot of courts that have addressed

3  this, have they?

4  A    No, your Honor.

5  Q    Tell me what you know about that, and let's segue way

6  from that into what we're talking about here.

7  A    Your Honor, I'm sure, is well aware the statute does not

8  define.

9  Q    Doesn't define it.  Where did it come from, this phrase?

10 Somewhere it came full blown in 1990?

11 A    Correct, your Honor.  So I believe -- in my opinion,

12 there are three ways of dealing with the definition of --

13 Q    Do you know what Congress had in mind when they enacted

14 that?

15 A    The legislative history, case law --

16 Q    Tell me about it.

17        MS. CHANES:  If I may, your Honor, I'm sorry, I need

18 to get another objection on the record.  She's here as an art

19 expert and not a legal expert.

20        THE COURT:  You can make all the objections you

21 want, if you so feel inclined.  You can let the record reflect

22 that you object to everything that I'm doing.

23        MS. CHANES:  I don't.

24        THE COURT:  You can raise your objections.

25        Answer my questions.

Proceedings                                    92

1          THE WITNESS:  So if -- looking at legislative

2    history, we see that the first draft of the bill was

3    introduced without this recognized stature language, that all

4    works of art under the first draft would receive protection.

5          THE COURT:  Whether she's technically an expert or

6    not, you know, she's my expert now.  I need help.

7          MS. CHANES:  I understand.

8          THE COURT:  So I'm going to use her while I have her

9    here.  Because I can appoint people, as you know, under the

10   statute; right?

11         MS. CHANES:  I understand.

12         THE COURT:  In areas where the Court doesn't have

13   expertise, so I'm going to use her for those purposes.

14         MS. CHANES:  I just need to make the record.

15         THE COURT:  Go ahead.

16         THE WITNESS:  So --

17         THE COURT:  Doesn't mean I'll agree with them.

18         MS. CHANES:  Understood.

19         THE WITNESS:  During the drafting, and debate and

20   voting of this law, it was recognized by other members of

21   Congress that a right against destruction was deeply

22   antithetical to the urinal trend of the United States Property

23   Law, so the phrase "recognized stature" was put in as a higher

24   bar, so not just all works of visual art would receive this

25   protection, only works of recognized stature.  And the court

NICOLE CANALES, CSR, RPR

Proceedings                                        93

1   recommended that decision makers, such as your Honor, consult

2   art experts, collectors --

3   BY THE COURT:

4   Q    It's not my standard.  I have to look at this.  It's very

5   attractive and it appeals to me, but that's irrelevant because

6   I'm not the expert.

7   A    And the reason why this higher bar was put in was to --

8   Q    It's a balance?

9   A    To balance.  The public's interest in preserving a work

10  that is publically valuable versus the property.

11  Q    So it deals with the destruction, but it's also possible

12  mutilation, this concept of the moral integrity, what does

13  that mean?

14  A    VARA has three main rights.  All works of art receive the

15  right of attribution, so if an artist decides they want to

16  remove their name from association with a work, it was a

17  juvenile work, it's been restored badly, they can ask people

18  to remove their name from display while displacing the work of

19  art.  The second right under VARA is the right against

20  intentional distortion, modification or mutilation if that

21  change would harm the artist's reputation.

22  Q    If it harms reputation?

23  A    Yes.

24  Q    And so if I owned a work of art and I decided to, you

25  know, put a cross over it or paint over it, would I have the

Proceedings                                    94

1   right under the statute to do that?  Would that be something

2   that would violate the statute even though I'm not the owner?

3   A    The question would be whether what you did to the work of

4   art harms the artist's reputation?

5   Q    It would have to be seen?  If I had this in my private

6   collection, if nobody saw it, then I can't harm the artist's

7   representation?

8   A    Correct.  Or if the artist is not very well known,

9   doesn't have the reputation to harm.

10  Q    But if people came to my house and saw this, saw it

11  mutilated or the integrity of it is compromised, that could be

12  actionable under this statute?

13  A    Correct.

14  Q    Go ahead.

15  A    And, then, the third right is the right to prevent the

16  destruction of work, but that is the highest bar.

17  Q    That's the higher bar?  Has to be recognized stature?

18  A    Correct.

19  Q    So all the other things deal with the artistic integrity

20  and reputation, whether it's a work of recognized stature or

21  not, but now when we come to destroying it, which is what

22  we're talking about here, it has to be one of recognized

23  stature.

24  A    Because the drafters recognize that something exactly

25  like this case could happen, where --

NICOLE CANALES, CSR, RPR

Proceedings                                         95

1    Q    This is the case.  Any other cases like this?

2    A    Yes, there have been a small number of cases under which

3    the recognized stature has been discuss the for VARA.

4    Q    Tell me about it.  I want to make sure my law clerk has

5    found them all.

6    A    I'm very sure that he has.  And, really, he only needs to

7    look at one, because they're both influential.  It's

8    *Carter versus Helmsley-Spear, Inc.*

9    Q    Southern District?

10   A    Correct.  And in that case, the court found that the

11   recognized stature provision was a, quote unquote,

12   "gatekeeping measure" for the avoidance of nuisance suits.

13   Q    So we're doing the right thing here by having this

14   gatekeeping hearing?

15   A    Correct.  And the court in that case also said, again,

16   that Congress had -- that the decision maker should consult

17   experts to find out the opinion of the art experts and a cross

18   section of society as a whole.

19   Q    Right.  So you're being put forward as an expert in

20   this -- I got to pronounce the name correctly.  Ms. Chanes --

21   to see whether or not you really are a qualified expert to

22   opine about these things.  But in the meantime, we know your

23   academic background.  Is there anything else you want to tell

24   me about your so-called expertise?  I don't want to cut you

25   short.

Proceedings                                              96

1   A    Just to clarify that my special area is the use of legal

2   regimes (sic) to prevent the destruction of works of art that

3   are deserving of preservation.

4   Q    I want to get back to what's something of recognized

5   stature?  You're telling me that we have this legislative

6   history and then the *Carter* case; right?

7   A    Yes.

8   Q    What comes down the pipeline here?

9   A    So both legislative history, and the plain text of the

10  statute, and the case law suggests that you have to look for

11  recognition of the particular work that -- for which

12  protection is being claimed.

13  Q    You focus on the work?

14  A    Not the genre, not the artist, but that particular work.

15  Q    The artist is irrelevant here?

16  A    Not every work created by an artist is in dispute (sic)

17  with plaintiff's expert.  Not every work created by an artist

18  is deserving of recognition under VARA.

19  Q    So we talked about Picasso putting a dot on the canvas

20  and Rembrandt.  So by itself intrinsically that doesn't have

21  any particular value, but the fact that it's associated with

22  Picasso would or would not make it a work of recognized

23  stature under the statutory embrace?

24  A    Being made by Picasso isn't sufficient to show recognized

25  stature, or else banks couldn't stamp his checks cancelled

NICOLE CANALES, CSR, RPR

Proceedings                                          97

1   after he signed them, or else a restaurant would have to

2   preserve the tablecloth after he dribbled barbecue sauce on

3   it.

4   Q    The artist doesn't make a difference?

5   A    One of many factors.

6   Q    Who the artist is is a factor that the Court should

7   consider?

8   A    Correct.  But more important to me is the recognition of

9   that work.  So, for example, in preparing to testify here, I

10  looked for any scholarly or popular mentions of these 24

11  enumerated works of art.  I looked in dissertations, in books,

12  in journal articles.

13  Q    So recognition, you're taking a literal view of that

14  word; has to be recognized by somebody other than the being on

15  this wall?

16  A    Yes.  I decided to start with the very lowest level of

17  what recognition could mean.  And I found that for 19 of the

18  24 works of art, there were no dissertations, no journal

19  articles, no other scholarly mentions of the workman book.

20  And for 19 of these 24 works, if I Googled the name of the

21  work and the name of the artist, there were no Google results.

22  No one at all had seen fit to put on the Internet the name of

23  that work.

24  Q    They talk about these websites.  I heard something about

25  that.

Proceedings                                                          98

1    A    There are many websites that mention 5Pointz as a site.

2    There are some websites that have, sort of incidentally,

3    images, pictures of these works of art.  But no one has, for

4    19 of these works, recognized at all them under their proper

5    titles.

6    Q    How about the artists we heard about?  The Too -- what's

7    her name again.

8              MS. CHANES:  TooFly.

9    BY THE COURT:

10   Q    I heard she's well known internationally.  Mr. Cohen is

11   well known internationally.  That's not the case?

12   A    So I looked at the names of the artists for scholarly

13   recognition.  With the exception of Lady Pink, none of these

14   artists had been mentioned in a dissertation, or a scholarly

15   book or a journal article.

16   Q    But the general reputation throughout the world, I hear

17   testimony that they're known all over.

18   A    I believe they're known within the subculture of aerosol

19   art fans, but that --

20   Q    You recognize in that so-called well known subculture

21   they're well known people?

22   A    I understand that this is what plaintiffs are claiming --

23   Q    I'm just asking you.  I'm not telling you what they're

24   claiming.  I'm asking you the subculture.  You have a

25   subculture where somebody's recognized within the subculture

1   that is of some value?

2   A    Yes, you can.  But what I would like for is whether that

3   particular work by that person has been recognized within that

4   subculture, and I could not find that.  So 10 of the 17

5   plaintiffs have their own website, and only three of the 24

6   works are mentioned even on their artists' own websites.

7   Q    Now, you said that 19 out of 24, you could not find any

8   so-called recognition, as you just defined it.  How about the

9   other 5?

10  A    Three are mentioned by the artists themselves or on the

11  5Pointz website.  And then two of the remaining works each

12  have one mention a piece on a street art website, on a blog or

13  an artist's blog.

14  Q    That's what you found?

15  A    Correct.  So even under a sort of dictionary definition,

16  plain meaning of recognition, to have one mention at all on

17  the whole of Google seems to me --

18  Q    You've expressed that, in terms of what's out there in

19  that physical world.  But there's testimony, and I suppose you

20  agree, that lots of people come to see this 5Pointz, and they

21  look at these works.  You don't question that, do you?  I mean

22  busloads of children and these corporate people, just

23  thousands of people come to that site.  It's become pretty

24  well known even though it may not be on any -- in any book or

25  scholarly treatise, you're not questioning that, are you?

Proceedings                                    100

1    A    No.

2    Q    Is that a form of recognition?

3    A    They're recognizing the site, they're not recognizing any

4    particular one work of art.

5    Q    They would have to come to see a particular work of art?

6    A    Correct.

7    Q    If they did that, then that would be some form of

8    recognition?

9    A    Correct.

10   Q    So am I correct in understanding that recognition, you

11   know, is somewhat an expansive concept?  You can have academic

12   recognition.  You can have practical recognition by people

13   flocking to see something.  Even if it's not in any book, it

14   would all be under the umbrella of this concept of

15   recognition; right?

16   A    Correct.

17   Q    How about the quality of the work, what if something's of

18   outstanding quality but it's not in any books or academic

19   studies?

20   A    Well, quality is certainly one of the factors in the

21   stature of work of art, but I think it's not what the statute

22   is going for, because the stature is recognizing not

23   particular qualities of objects but the way these qualities

24   are valued by the public.  So, for example, to use some of the

25   factors that the plaintiffs were talking about earlier, a

Proceedings                                    101

1   Persian rug has outstanding technical qualities, and color,

2   and design but it is not -- I can burn a Persian rug.  It's

3   not protected by the statute.

4   Q     So now you know I gave a homework assignment to

5   Ms. Mastrion.  I gave you the same homework assignment, to

6   look at what the court put in its gallery.  I guess that's a

7   form of recognition, it's in the court gallery.  Would that

8   qualify as recognition?

9   A     Well, I took the liberty of taking one of the flyers that

10  are on the table there, which helps me do some analysis of

11  recognition, because, again, I'm just one person, my personal

12  opinion doesn't speak to it.

13  Q     Certainly there's a public aspect to the artwork that's

14  in the gallery?

15  A     The fact that the work is in a gallery chosen from a

16  number of artists, available to the public.  This flyer says

17  that the artist is a professor or at Cooper Union and Pratt,

18  which speaks to judgment of his stature as an artist,

19  presumably, quality of his artwork.  And the flyer quotes from

20  a New York Times article about the artist, which, again, is

21  one form of --

22  Q     The fact that -- real actual recognition by newspapers

23  and academic credentials?

24  A     And the table in the exhibit very helpfully had three or

25  four books and exhibit catalogs featuring the artist.

Proceedings                                    102

1   Q     So that would ring the bell?

2   A     I'd have to do more work to see how many scholars, how

3   many newspaper articles, what the general consensus is.

4   Q     Right.  But, you know, it's recognition of a form, so if

5   you have that threshold recognition, which, I guess, is what

6   you're saying, even though you'd like to know more, would the

7   quality of the work make a difference?

8   A     It's more the consensus of the scholarly community and

9   the art community on that work.  So just to give your Honor an

10  example, comparative example, Banksy has had -- has been

11  mentioned in something like a hundred and thirty dissertations

12  and more than 1500 scholarly articles.

13  Q     He's out there?

14  A     Very much out there.  A work that he revealed on

15  October 31st, a little over two weeks ago, I searched for the

16  title of that work and his name is there more than 400,000

17  Google hits.

18  Q     That's recognition?

19  A     That's recognition.

20  Q     How about the stature part?

21  A     There's a general consensus, I don't know among the

22  public, that his work is innovative and adds to the history of

23  art.

24  Q     So you need the recognition and stature.  Stature seems

25  to me embraces things that are innovative, whether it has

NICOLE CANALES, CSR, RPR

Proceedings                                      103

1   artistic value, whatever that's all about.  How would you then

2   assess whether a work is of stature?  It may have not been

3   recognized yet, but it's of stature, in any event.  Would have

4   to be both?

5   A    It would have to be both.

6   Q    You told me about recognition, an academic type of thing.

7   How about stature?  How do we determine whether the work in

8   our gallery is a work of stature?

9   A    Well, I noted your Honor is the owner of one of those

10  paintings, so if you want my art-appraisal services, I'm not

11  going to do it on defendant's dime.

12  Q    I'm trying to get a handle.  I use that because -- as a

13  logical thing.  It's in the courthouse and, obviously, I have

14  an interest in all of that, so it's why I have you here.  You

15  can use it if you choose to tell me how to go about deciding

16  whether the work we chose to put there is one of stature or

17  not?

18  A    Well, I think that stature is much more difficult to

19  define than recognized.

20  Q    But the statute tells me I have to do this; right?  So

21  how do I do it?

22  A    If something isn't recognized, then you don't have to --

23  Q    It is recognized.

24  A    If it is recognized, I think you can look at a critical

25  assessments of the work, so as an art historian --

NICOLE CANALES, CSR, RPR

Proceedings                                               104

1    Q    Would you be able -- I don't know if I can do it.  I may

2    like it, but, you know, what do I know?  How do we find out --

3    you know, I have to decide what something of stature is.  How

4    do I do it?  Go ahead.

5    A    What usually makes things last in the history of art is

6    the way in which they change our idea of what --

7    Q    Innovative.  Is the work downstairs innovative?  Does it

8    ring that bell?  You don't think so.  You can tell me.  Don't

9    worry, you're not going to get thrown in jail.

10   A    It doesn't ring the bell for me, because the forum of the

11   of political murals has had its heyday in the 1930s and 40s.

12   Some of the literature mentioned that this artist is

13   influenced by a student of Diego Rivera, who would be a very

14   hard bar to pass in terms of evolving the art form.

15   Q    Anything else?  How about what -- other factors do I

16   consider in deciding whether it is of stature?  Innovation,

17   you mentioned.

18   A    Changing the history of art, so uniqueness.  So, for

19   example, it's very much more difficult to achieve stature

20   using an art form or art style that has been around for a

21   couple of decades, rather than --

22   Q    I've haven't seen a lot of things quite like that.  I

23   mean, I don't know what you're talking about.

24   A    I'm big fan of New York graffiti during the 1980s.

25   Q    You're what?

Proceedings                                                105

1   A    A fan of graffiti art of the 1980s.

2   Q    You are?

3   A    I am.  The so-called "Wild Style," if your Honor hasn't

4   watched the movie, I recommend it.

5   Q    What's the movie?  Who is in the movie?

6   A    Selection of New York graffiti artists, including Lady

7   Pink, who is one of the plaintiffs --

8   Q    She's in there too?

9   A    She is, because in the 1980s her work was innovative, was

10  creative, but not -- that doesn't mean that everything she

11  does for the entire rest of her life has that same impact.

12  Q    You seem to be presenting a very strict type of standard;

13  it has to be breakthrough, something that hasn't been done

14  before.  Is that what you're trying to tell me?

15  A    Because I believe that's what the legislative intent is

16  it's not a balancing provision if one --

17  Q    Where do I find that in the legislative history it has to

18  be this exceptional kind of thing that you describe?

19  A    You can provide your chambers with --

20  Q    No, you can tell me.

21  A    I believe there's records on discussion, discussions in

22  Congress, and you can look at the difference between the

23  drafts of the act.

24  Q    It has to be something really wow, really way out there,

25  really different?

Proceedings                                          106

1    A    Something of value to the public.

2    Q    We may be talking in circles now?

3    A    I'm an academic; I can't help but do that.

4         THE COURT:  All right.  You want to ask any further

5    questions, Mr. Ebert?  She's giving you the benefit of her

6    knowledge.

7    Q    (BY MR. EBERT)  Just to be clear, you formed an opinion

8    whether any of these 24 works have achieved recognized

9    stature?

10   A    I have formed an opinion.  I don't believe any of them

11   are recognized stature.

12   Q    And that's based on the elements that you describe to

13   your Honor, the research that you did, your knowledge of the

14   field?

15   A    Correct.  My failure to find any -- or only a miniscule

16   amount of public discussion.

17   Q    Is there any street art or graffiti that you know that

18   has achieved recognized stature?

19   A    There is.  So as I was explaining to your Honor, Bansky,

20   Keith Haring, Basquiat, all of whom have been the subject of

21   numeral dissertation, scholarly attention, public love, public

22   recognition.

23   Q    But are those -- are there individual works that you can

24   identify?

25        THE COURT:  The Bansky, is that something that is

Proceedings                                              107

1   really innovative or is it just recognized because it's out

2   there?

3             THE WITNESS:  It is innovative.  For example, during

4   his residency in New York and this past month, he was --

5   balloons in the shape of graffiti letters.  He combined live

6   performance and sculpture.  And not to mention the messages of

7   his work are generally wittier, more incisive than prior

8   artists.

9             THE COURT:  How about these light bulbs, these

10  people's faces on light bulbs, I've never seen anything quite

11  like that before; would you say that's innovative?

12            THE WITNESS:  I believe that light bulbs have been

13  used in cartoons as the idea symbols since the 1920s, so, to

14  me, to put a face on them isn't that much of a stretch.

15            THE COURT:  Anything else you want to ask?

16            MR. EBERT:  Yes.

17  Q    (BY MR. EBERT)  Are you aware of the works at times --

18  works at 5Pointz are painted over, new images are put up and

19  they're painted over?

20  A    Yes.

21  Q    Does that affect your opinion whether these works have

22  achieved recognized stature?

23  A    Something can be ephemeral and achieve recognized

24  stature, but the ephemeral nature of the painting affects my

25  opinion of what preservation of what that means.

Proceedings                                        108

1    BY THE COURT:

2    Q    Give me an example of something ephemeral but has

3    achieved recognized stature?

4    A    So, really, any work of art that's painted on an outdoor

5    surface is vulnerable to changes of weather, of aging.  Keith

6    Haring painted over his career thousands of works in public

7    places.  As far as I'm aware, only two of them remain in their

8    original locations, and one of them is currently being

9    restored in Philadelphia, which means, essentially, repainting

10   it.

11   Q    In any event, recognized stature has to be something

12   that's permanent.  Could be something that's ephemeral, as you

13   say, as long as it otherwise qualifies as something that's

14   recognized of stature?

15   A    Yes, I mean, there have been works that have been

16   destroyed that are still recognized, but it speaks to me

17   more --

18   Q    It's a factor?

19   A    It's a factor.

20   Q    Any other factors out there that I should think about?

21   You talk about the innovation factor, this risk factor;

22   whether it's ephemeral or not is a factor.  I guess the

23   artist, the recognition of the artist is a factor; right?

24   A    You can look, as *Carter* suggested, at the opinions of a

25   cross section of society.  If there's love out there, name

NICOLE CANALES, CSR, RPR

Proceedings                                              109

1    recognition, appreciation by a broad array of people, as

2    opposed to just a subculture that speaks --

3    Q     What do you mean by a broad array of people?  Thousands

4    of people have come to see the works at 5Pointz.  That's a

5    pretty broad array, isn't it?

6    A     Not considering the population of New York, the art-going

7    public.  The Metropolitan Museum of Art has something like 16

8    million visitors a year, so a couple of thousand is not --

9    Q     So our gallery downstairs is never going to make it;

10   right?

11   A     So you could look also at valuation on the art market.

12   Q     Monetary aspects?

13   A     Banksy's works of art are worth hundreds of thousands of

14   dollars.

15   Q     So is that a factor, also, the economic or the value --

16   economic value of the painting?

17   A     I think that's a factor that allows you to get at

18   recognition of stature.

19   Q     Anything else out there?  I'm just giving you the

20   opportunity to tell me what the factors are, what you think

21   should be considered.  The *Carter* case has been followed by a

22   few other courts; right?

23   A     Uh-huh.  I think I've given your Honor enough of --

24   Q     What?

25   A     I think I've given you enough of my ideas.

Proceedings                                      110

1          THE COURT:  Just giving you the opportunity.

2          Anything else?

3     Q    (BY MR. EBERT)  Have you observed any of the actual works

4     of 5Pointz?

5     A    Yes, I visited earlier this week.

6     Q    Have you observed the condition of the works on the

7     building?

8     A    Yes, so the -- many of the works, I'm -- not those named

9     in the complaint, but many of the other works have sustained

10    some level of damage.  They have paint flaking off from things

11    banging against them or from paint bubbling away from

12    underlying paint layers.  So, in my opinion, these objects,

13    even if defendants don't do anything to the building, are not

14    going to be around for more than a couple of years.

15         THE COURT:  Anything else?

16         MR. EBERT:  Your Honor, just from Ms. Thompson's

17    professional purposes, I move to qualify her as an expert.  I

18    don't know if that's implied, that she's been qualified, but I

19    ask that she be qualified as an expert in art history and

20    contemporary art.

21         THE COURT:  Whatever.  We're here.

22    Cross-examination.  Do you have any other questions?

23         MR. EBERT:  No.  Thank you, your Honor.

24         THE COURT:  Go ahead.

25

NICOLE CANALES, CSR, RPR

Proceedings                                        111

CROSS-EXAMINATION

BY MS. CHANES:

Q     Good afternoon, Ms. Thompson.  Do you have a CV?

A     Not with me, but you can find most of my CV on the John

Jay website.

Q     Do you have a CV other than a listing of your resume on

the website that you distributed?

A     Yes.

Q     And did you provide that to defendants in this action?

A     I believe I may have in the past.

Q     Ms. Thompson, you said you never testified in court

before; is that correct?

A     Correct.

Q     And you said -- and so you've never been designated as an

expert by any court; correct?

A     Correct.

Q     What do you consider your primary area of expertise?

A     The history of art.

Q     Do you have any expertise in the area of street art or

aerosol art?

A     Insofar as it's part of the recognized movements in the

history of art, but contemporary aerosol art is not my strong

suit.

Q     So you know more about historical stuff from the 70s and

80s but not current stuff?

1    A    Correct.

2    Q    So you're not here testifying as an expert on street art,

3    aerosol art; correct?

4    A    I'm testifying on what it means to be a recognized work

5    of art for which a broader perspective and the whole work of

6    history of art is more valuable than a particular expertise in

7    one area.

8    Q    So you're not testifying as an expert in street art or

9    the aerosol art; correct?

10            MR. EBERT:  Objection, your Honor.  She answered the

11   question.

12            MS. CHANES:  I was looking for a yes or no.

13            THE COURT:  Objection overruled.

14            You may answer that question.

15            THE WITNESS:  I am not testifying as an expert in

16   this particular genre.

17   Q    (BY MS. CHANES)  Do you have any expertise with respect

18   to any of the Hip Hop arts movements?

19   A    No.

20   Q    So you're not testifying as a member of the Hip Hop Arts

21   Movement; correct?

22   A    No.

23   Q    And I believe --

24            THE COURT:  There is such a movement; do you

25   recognize that?

Proceedings                           113

1           THE WITNESS:  Yes.

2           THE COURT:  It's pretty profound.  It's really very

3    much part of our culture, isn't it?  Or you ignore it

4    completely?  It may not be your bag?

5           THE WITNESS:  It's not my bag, but I'm aware of --

6           THE COURT:  Just aware.  It seems to be a pretty

7    significant part of our culture.  Hip Hop musicians all over

8    the place.

9           THE WITNESS:  Many things are part of our culture

10   today.

11   Q    (BY MS. CHANES)  Are you aware that the Hip Hop Arts

12   Movement is the fastest growing art movement in the country at

13   this point?

14   A    How are you defining it?

15   Q    I would say fastest growing by -- growing by revenue,

16   generated across the scope of Hip Hop aerosol art, DJ-ing,

17   break dancing.

18          THE COURT:  There's literature about that.  You

19   know, people write about Hip Hop, and all these things, all

20   the time, don't they?

21          THE WITNESS:  Yeah, I'm not seeing a connection

22   between the music and the visual arts aspect for this.

23          THE COURT:  I mean --

24          THE WITNESS:  To call something the fastest growing

25   but to attribute -- most of that has to be attributed to music

Proceedings                                    114

1    rather than the visual arts --

2    Q    (BY MS. CHANES)  I actually didn't say that.  I was

3    referring to the movement as a whole.  I didn't say that most

4    of the revenue is coming from the music.

5    A    No, I'm assuming that.

6    Q    Okay.  So --

7              THE COURT:  You know, in your world, don't you want

8    to know about what the Hip Hop Movement is and how that

9    interfaces with what's happening in the creative world today?

10   You don't care about that?

11             THE WITNESS:  Well, my contemporary artist friends

12   and interests take different aspects of the contemporary

13   artwork.

14             THE COURT:  Doesn't sound like you know a heck of a

15   lot about Hip Hop art, or about aerosol art or about any of

16   these movements right now at all.  It's not your thing?

17             THE WITNESS:  Not in that contemporary form.

18             THE COURT:  You refer to them as subculture.

19   Q    (BY MS. CHANES)  I believe you testified you did

20   independent research on 5Pointz?

21   A    I visited the site and conducted research online.

22   Q    Did you read any books about 5Pointz?

23   A    I'm not aware that there are any books solely about

24   5Pointz.  I looked at 5Points' mention in other books.

25   Q    Could you give us an example of a few of the books you

Proceedings                                    115

1    read?

2    A    I haven't read the whole books, I looked at the excerpts

3    that mentioned 5Pointz.

4    Q    Could you give us an example of those books?

5              THE COURT:  I guess she's asking you what books did

6    you read that refer to 5Pointz or discussed it.

7              THE WITNESS:  I can't --

8    Q    (BY MS. CHANES)  Or -- to make it easier, or the artists,

9    the particular artists of the particular works of art at issue

10   here?

11   A    So I could not find any references to the particular

12   works of art at issue here, nor to most of the artists.  I

13   can't remember the titles.  I apologize.

14   Q    About how many books did you read?

15   A    I found 5Pointz mentioned in something -- records

16   indicating that it was mentioned in something like ten books,

17   so I looked at the excerpts from them, but it was mainly

18   thanking graffiti artists for letting the author observe.

19   Q    Was that online research, or did you go to a book store

20   and look at the street art section in the book store?

21   A    I did not go to a book store.  I looked at the Columbia

22   University library system catalog, which electronically

23   indexes excerpts from books.

24   Q    And how large is the Columbia University library?  I'm

25   not asking you to be an expert; I seriously don't know.

Proceedings                                          116

1   A    It's the -- America's premier selection in art history

2   text.

3   Q    Art history but not contemporary art; is that what you're

4   saying?

5   A    No, art history includes contemporary art.

6   Q    You said you visited 5Pointz once in connection with your

7   appearance here?

8   A    Correct.

9   Q    And how long were you there?

10  A    About an hour.

11  Q    You mentioned, when you were talking about your areas of

12  expertise, that you really focus on art crime; is that

13  correct?

14  A    Correct.

15  Q    But there's no crime at issue here; correct?

16  A    I think plaintiffs would allege that if art was

17  destroyed, that was a criminal act.  But art crime in the way

18  I look at it includes the unlawful destruction of art.

19  Q    So your testimony here really doesn't have to do with any

20  of these artworks being crimes; correct?

21       MR. EBERT:  Being what?

22  Q    (BY MS. CHANES)  Being done illegal?  Sorry.

23  A    Correct.  There's no dispute, as far as I'm aware of

24  that.

25  Q    When you were talking about your expertise -- or,

Proceedings                                        117

1   actually, strike that.  When you were talking about the

2   recently discovered works of Nazi-looted art that Judge Block

3   mentioned, and you, I believe, mentioned that the Nazis banned

4   that art because it was considered to be degenerate modern art

5   that they wanted to get rid of; is that correct?

6   A    Correct.

7   Q    Is that a frequent theme you have seen throughout art

8   history as new art movements come along, where the new art

9   movement -- for instance, like the Fobes (phonetic) is

10  referred to as degenerate or even cubism, degenerate modern

11  art that is going to lead to the downfall of society?  You can

12  have some more water, if that would make your life easier.

13  A    If I'm still here in the afternoon, I'll have to bring

14  some Purell.

15        Actually, the Nazis are often paradoxically

16  accredited with making rhetoric about degenerate art no longer

17  being acceptable, so some people say the uprise of abstract

18  expressionists art was helped along by people not willing to

19  be seen as fascists in their disapproval of it, but there's

20  certainly many art movements, from impressionism, really, from

21  the 1880s on --

22        THE COURT:  We don't have to get into all of that.

23  Q    (BY MS. CHANES)  Also, in your testimony, you referred to

24  the 60s, 70s and 80s being sort of the heyday of street art

25  and that's it's essentially been all downhill from there; is

Proceedings                                              118

1    that correct?

2    A    Correct, in the heyday, not all downhill, but less

3    interesting to the ongoing history of art.

4    Q    Are you aware of the fact that Sotheby's and the Doyle

5    Gallery, etcetera, are having record-breaking street art

6    auctions now?

7    A    And is that of art created now or of art such as Basquiat

8    or Haring that was created earlier and being sold now?

9    Q    It is including art that's being created now, including

10   contemporaries of this one, Carlos Game and Luis Lamboy, I

11   believe.

12   A    I believe if you look at the prices brought by 80's

13   street artists, they are millions of dollars higher than

14   contemporary street artists.  They'll have to wait, perhaps, a

15   couple of decades.

16        THE COURT:  Should I wait a couple decades before I

17   render my decision here?

18        MS. CHANES:  Yes.

19        THE WITNESS:  I have no opinion to that, your Honor.

20        MS. CHANES:  You're a lifetime appointee, but don't

21   push it.

22   Q    (BY MS. CHANES)  You had also testified that street art

23   is meant to be ephemeral; is that true?

24   A    As a generally recognized characteristic of the genre,

25   yes.

NICOLE CANALES, CSR, RPR

Proceedings                                              119

1   Q    And when you mean -- strike that.  And by that you mean
2   illegally painted street art; is that correct?
3   A    No, the work of street art could be legal, so Bansky
4   sometimes receives permission from building owners, but makes
5   street art such as out of balloons that can't survive for more
6   than a couple of days.
7   Q    But isn't Bansky's balloon piece kind of unique?
8   A    There are other street artists who render works in
9   posters (phonetic), or in stickers, sticker art, yarn,
10  bombings.  Many street artworks are rendered in media that
11  can't survive for more than a couple of weeks.
12  Q    So your opinion that street art is meant to be ephemeral
13  is based on how the piece is painted, whether it's yarn, or
14  paper, or balloons or something like that, so if it's painted
15  with permanent paint -- I'm sorry.  Is that correct?
16  A    No, that's one factor.  But, for instance, the
17  competitive nature of street art also influences my belief
18  that it is recognized to be ephemeral.  In street art there's
19  a limited amount of public space in which artwork can be
20  placed, so if an artist is painting over other artworks or
21  artists' works in order to create their own work of art, they
22  have to recognize the work of art they make is subject to
23  being painted over in turn.
24  Q    Why?  I mean, I honestly don't understand.  Why do -- if
25  it's a legal wall and they paint on it, why do they have to

1    recognize that it's going to be painted over by somebody else?

2    A    It's about the general history of street art.  There

3    might be particular situations in which an artist believes

4    that he or she is being commissioned to make a work that will

5    last for a long time.

6    Q    So when you said that the street artists expect their

7    work to be ephemeral, do you have any person knowledge from

8    discussions or interviews you've read with artists that that's

9    what they want?

10   A    In -- I read the exhibits attached to the complaint, in

11   which several of the plaintiffs discussed how they know that

12   their work is going to be painted over or demolished.

13   Q    Although I believe, in most cases, those plaintiffs were

14   testifying regarding illegal work and not work that had been

15   done with the artists' permission?

16   A    So as far as I understand, 5Pointz is meant to be a

17   microcosm of general street art, so the qualities that

18   characterize illegal street art, I don't see are supposed to

19   be changing that much for the illegal street art here.

20   Q    Some of it would be intended to be permanent and some

21   would be intended to be ephemeral just like traditional street

22   art?

23   A    From what I understand of how the system at 5Pointz

24   works.

25   Q    I'm sorry.  That's not the question I asked.  I asked --

Proceedings                                    121

1   you said the 5Pointz was a microcosm of the street art

2   movement, and so I'm asking, as a microcosm of the street art

3   movement, since some works are intended to be permanent and

4   some works are intended to be, you know, just last for a day,

5   does 5Pointz then -- wouldn't 5Pointz then qualify as having

6   some permanent works and some temporary works?

7   A    I see that I haven't been clear enough, so I believe that

8   in the street art world in general, outside of 5Pointz, those

9   works are understood as ephemeral, so 5Pointz is different in

10  its nature if some of those works are intended to be

11  permanent.  Although, based on the material and the exposure

12  to the weather, the other activities there, I don't see how

13  anyone could reasonably believe they are going to last

14  forever.  Not even Leonardo da Vinci can survive undamaged.

15  Q    Isn't it true, then, that any work of art eventually is

16  going to deteriorate, whether it's Leonardo da Vinci, or a

17  statue, or the works at 5Pointz or Bansky's works?

18  A    When the sun fails, eventually works of art will go away,

19  but an artist can choose to make and protect their work of art

20  in a way that will ensure that it will last longer.

21  Q    But an artist cannot protect their work of art after they

22  no longer own it; is that correct?

23  A    Incorrect, because that's what VARA allows them to do.

24  Q    But they can't protect it from the elements after they no

25  longer own it?

Proceedings                    122

1   A    Incorrect, I believe you can protest someone keeping your

2   work of art -- someone putting your painting in their garden,

3   if that's going to mutilate it, under the statute.

4   Q    I think the statute says ordinary wear and tear, and the

5   elements of natural deterioration aren't covered by VARA.

6   A    That's correct, but putting a water color in your

7   garden --

8           THE COURT:  Exposing it to obvious harm wouldn't be

9   protected?

10          THE WITNESS:  Correct.

11  Q    (BY MS. CHANES)  Just to circle back, when you said that

12  street art is meant to be ephemeral, you have no personal

13  knowledge of that fact; is that correct?

14  A    No, I'm not a graffiti artist, but from everything that I

15  have read about history of street art and plaintiffs' own

16  activities, that is what I understand.

17  Q    So the answer to that question is, no, you have no

18  personal knowledge?

19  A    No personal knowledge.

20  Q    Thank you.  You had mentioned the *Carter* case and talking

21  about the gatekeeping -- *Carter* being *Helmsley-Spear*, the

22  Southern District, and you mentioned that the test established

23  by the Southern District for determining recognized stature

24  recognized three different ways to determine recognized

25  stature.  One, it was through the testimony of art experts,

NICOLE CANALES, CSR, RPR

Proceedings                                                123

1   which you discussed, and also the testimony of a cross section

2   of society, which you also discussed; but the third criteria

3   established by the Southern District was that members of the

4   art movement itself can be -- their testimony can be

5   dispositive as to the recognized stature repeats; is that

6   correct?

7   A    No.  *Carter* mentions the art community as the dispositive

8   factor, not the particular movement in question, so you would

9   look at -- you could ask a section of all practicing artists,

10  art collectors.  The art market is a good way of getting at

11  this idea of the art community.

12  Q    Would the art community have to be the entire art

13  community throughout the world or could it not be, for

14  instance, the Hip Hop Movement?

15  A    No, because self-recognitions are not, I think, what VARA

16  is looking for.  VARA is looking for value to the public, so

17  you would have to achieve some consensus among some portion of

18  the community.

19  Q    But aren't members of the Hip Hop Movement members of the

20  public?

21  A    Correct.

22  Q    And aren't there -- I don't know, but I understand that

23  there are millions of fans of Hip Hop, the whole movement in

24  this country.  And I'm not asking you to testify to that,

25  because I don't know the answer and you don't know the answer.

Proceedings                                      124

1   But if there are millions of people in that movement that

2   recognize that -- you know, the validity of the stature of

3   these works of art, wouldn't that be sufficient under VARA?

4   A    If they had recognized the validity of these particular

5   works, perhaps, but my searching found nary a mention of 19 of

6   the 24 works, even by these potential millions of Hip Hop

7   fans.

8   Q    Is there anything in VARA that requires that the work at

9   issue be mentioned by a particular name in a particular

10  publication?

11  A    VARA doesn't define the term.

12  Q    So just the fact that you can't find anything when you

13  Googled those names doesn't mean that they're not a recognized

14  stature; correct?

15  A    I disagree, because under the dictionary definition of

16  recognized, someone has to be doing the recognition.  So if

17  you get zero Google results, that doesn't seem like

18  recognition to me.

19  Q    Is Google the only source for determining recognition of

20  a work of art?

21  A    No, but it allows one to search other sources.

22  Q    But if Google isn't dispositive as to whether or not

23  something is recognized, then your testimony that you Googled

24  these particular names and didn't find them fails, doesn't it?

25            MR. EBERT:  Objection, your Honor.

1          THE COURT:  Sustained.  It's argumentative.  Go

2    ahead.

3    Q    (BY MS. CHANES)  I'm just trying to understand.  On the

4    one hand, Ms. Thompson talked about -- talks about people

5    recognizing artwork, and she said the lowest level of what

6    recognition could mean under *Carter*, Wallace and VARA was that

7    recognition by the experts, but I actually think that the

8    lowest level of -- excuse me.  Isn't the lowest -- question:

9    Isn't the lowest level of recognition actually some cross

10   section of society or members of the arts community?

11   A    I think the lowest level that you could possibly

12   interpret VARA is just the dictionary definition of

13   "recognize."  Google isn't perfect, but it is certainly the

14   best way we currently have of understanding anyone's

15   understanding, awareness, appreciation of anything in

16   particular.  But if you define the recognized stature

17   provision alone, it becomes meaningless.  Any level of

18   recognition serves to satisfy it.

19   BY THE COURT:

20   Q    I think what you're saying is the art community could

21   embrace the street artists, performance artists.  I mean you

22   call them subculture.  Subculture could be a significant part

23   of the overall culture.  I don't think Thomas (sic) is talking

24   about everybody in the United States, when they're talking

25   about the art community.  It embraces all different aspects of

Proceedings                                          126

1    it; right?

2    A    Correct, but I think they would be talking about all

3    artists.

4    Q    I think you also said aerosol art can be part -- could be

5    recognized.  You mentioned Bansky.  But when talking about

6    these particular works, specifically, have not been

7    recognized.  They're not of stature.  I'm not so sure I

8    understand the difference between recognition and stature yet.

9    You seem to be co-mingling them to me.  Stature seems to be

10   something that deals with the quality of the work.

11   Recognition seems to be something to say whether or not that

12   particular work, given its quality, you know, is something

13   that people know about.  I'm a little confused about that.

14   They're two different things here; right?

15   A    I think --

16   Q    Seems to me that stature deals with a qualitative

17   concept, maybe recognition with a quantitative concept; does

18   that sound right?

19   A    That sounds reasonable to me.

20   Q    The work can be of high quality by artists, even if it's

21   not, you know, recognized, so to speak, by law, respectfully

22   population, large population; correct?

23   A    That's correct.

24   Q    So when you looked downstairs, you can say that's a work

25   of quality, even though they may not be recognized by a large

NICOLE CANALES, CSR, RPR

Proceedings                                    127

1    segment of the public?  How would you define it?

2    A    Again, you're trying to get me to evaluate --

3    Q    Yeah, because you said it has to be a breakthrough type

4    of thing, and I have testimony here that says it's not so.  I

5    look at some of these works here in these pictures, and they

6    seem to be pretty high quality to me.  The degree of

7    difficulty, colors, all these things have been mentioned by

8    people whom testified, and you say that doesn't mean a row of

9    beans.  I don't think you really mean that.  I mean a line

10   drawn is one thing, but these -- Banksy, that seems to be a

11   complex work of color and design; isn't that something of

12   stature?

13   A    But again --

14   Q    You just discount all of that completely?

15   A    No, I don't think that that's what the statute is going

16   for, because like the Persian rug I brought up before, things

17   can be very high in quality without being a work of visual art

18   that is important to the history of visual art.  It's

19   important to the public --

20   Q    So you seem to place a very high burden here, a very high

21   standard on what could be considered recognized stature?

22   A    I do.

23   Q    Has to be a da Vinci, or a Picasso or something like

24   that; is that what you're saying?

25   A    Bansky has certainly recognized stature.

Proceedings                          128

1   Q     He's an example of someone's who is an aerosol artist;

2   right?

3   A     (Inaudible response)

4   Q     And he's part of the subculture, I guess, isn't he?

5   A     Yes, but he's also achieved broader recognition.  If my

6   mother knows who Bansky is, he's a recognized artist.

7   Q     So your mother should be the standard; right?

8   A     You can call her up.  I'll give you her number.

9   Q     It's hard to get your hands around it, isn't it?

10  A     It's true.

11         THE COURT:  Anything else?

12  Q     (BY MS. CHANES)  Going pack to *Carter v. Helmsley-Spear,*

13  you've read the drafting history too, maybe you can help me

14  out here.   In either the *Carter* case or the drafting

15  history -- and I cannot remember this -- there was a quote

16  about the reason they put in the recognized stature -- that

17  Congress put in the recognized stature requirement, and it was

18  essentially a gatekeeping mechanism to keep out nuisance

19  lawsuits, and the example given was like your kid's finger

20  painting.  I can't remember where I read that.  Do you recall

21  seeing that in the drafting history or the case law?

22  A     I recall seeing the phrase "gatekeeping mechanism" in the

23  *Carter* lawsuit, but that might have been in the legislative

24  history as well.  But the *Carter* lawsuit does discuss that and

25  the education of nuisance lawsuit.

Proceedings                                        129

1    Q     And one of the reasons that the gatekeeping mechanism was

2    added was to prevent judges from having to sit and serve as

3    art critics; is that correct?

4    A     Correct.  There would be a battle of the experts instead.

5    Q     You had mentioned that -- people come to 5Pointz,

6    thousands of people that come every month, that they're coming

7    to just see 5Pointz -- in recognition of 5Pointz and not in

8    recognizing any particular piece or to see any particular

9    piece; is that correct?

10   A     Insofar as research shows.

11   BY THE COURT:

12   Q     That's why people come to museums too?

13   A     Correct.

14   Q     When they go to the museums, they may see a particular

15   painting that draws their attention.  They're coming into the

16   museum.

17   A     I think that cuts both ways.  That means that not all

18   works of art even in the museum potentially are recognized.

19   And also I disagree; I think many people go to see the Mona

20   Lisa or Starry Night.

21   Q     So you think Congress intended the statute to be limited

22   to works like the Mona Lisa and Starry Night?

23   A     No, that's a very high standards.  That why I --

24   Q     I would have to deal with the gatekeeping standard.  That

25   seems to be -- not a gatekeeping standard, that seems to be

NICOLE CANALES, CSR, RPR

Proceedings                                      130

1    more than a gatekeeping, it seems to be a tomb, so to speak.

2    A    I don't think it has to be that high, but there has to be

3    some sort of gate to keep.  You can't allow any work --

4    Q    But I'm dealing with a situation where we have testimony

5    that thousands of people have come; these people are well

6    known in that subculture world, and people who have testified

7    under oath.  You don't take issue with that either?

8    A    No, but I haven't read any testimony of the recognition

9    of these --

10   Q    May not have that academic recognition.  May not be the

11   type of recognition that you're trained to really opine about.

12   Could be a different type of recognition.  We have a world

13   that's in motion here.  Things happen.  Things change, forms

14   of recognition.  I don't know if it's academic, necessarily.

15   You're not saying it's academic?

16   A    I wasn't only looking at academic recognition.

17   Q    Thousands of people come from all over the word to look

18   at 5Pointz.  I've had testimony to that.

19   A    And not a single one of them has written anything about

20   what these --

21   Q    That's the standard?

22   A    That's the definition of recognition.

23   Q    Whether it's been written about?

24   A    No, I'm thinking about the dictionary definition of

25   recognition.

Proceedings                                    131

1   Q     Dictionary --

2   A     I have seen no evidence that anyone has recognized these

3   particular works of art by title.

4            THE COURT:  Well, that's what your standard is.

5   We'll see.  Go ahead?

6   Q     (BY MS. CHANES)  Just to sort of finish off where I was,

7   when you said that no one comes to 5Pointz just to see a

8   particular piece, do you know that for a fact?

9   A     No, I'm just deducing that from their failure to mention

10  any particular pieces.

11           THE COURT:  It's all based upon what's in the

12  Columbia library; right?

13           THE WITNESS:  Isn't life itself?  And the Internet

14  as a whole.  Those are my sources, Columbia and the Internet.

15  Q     (BY MS. CHANES)  Levity aside, so you don't know that

16  people don't go to 5Points to --

17           THE COURT:  She's already testified.  Good ahead.

18  Q     (BY MS. CHANES)  When you spoke briefly about the court's

19  collection of artwork downstairs, which is becoming famous,

20  you had mentioned that there were flyers that were circulated,

21  available in connection with that exhibit; is that correct?

22  A     Correct.

23  Q     And you mentioned some of the quotes in those flyers;

24  correct?

25  A     Correct.

Proceedings                                    132

1   Q    And were those quotes about the artworks that are up

2   downstairs?

3   A    It's a quote from the Times.  I can't tell if the

4   article's discussing just the artists or any of the particular

5   artworks.

6   Q    So as far as you know, the quotes could be just about the

7   artists and not about the artworks?

8   A    Correct.

9   Q    Would that change your opinion about the stature of the

10  work and based on what the Times is talking about?

11  A    As I said, I'm not able to come to a decision about the

12  stature of the artist based on these factors.

13          THE COURT:  But the stature of the artist is a

14  relevant factor, I guess; right?

15          THE WITNESS:  Correct.

16          THE COURT:  Then you have to look at the particular

17  work that's associated with that particular artist; right?

18          THE WITNESS:  Correct.

19          THE COURT:  So then that particular work is one that

20  is recognized stature?

21          THE WITNESS:  Correct.

22  Q    (BY MS. CHANES)  Okay.  You had also testified -- and I'm

23  almost done -- that the thing that -- what makes a work of art

24  last is that it's innovative; is that correct?

25  A    That is one of the potential factors.

NICOLE CANALES, CSR, RPR

Proceedings                              133

1   Q    All right.  And you said that VARA was designed

2   specifically to cover these unique innovative pieces; correct?

3              THE COURT:  It's being repetitious.  She's already

4   testified.  Anything else?

5              MS. CHANES:  You also testified -- this is slightly

6   repetitious, your Honor.

7   Q    (BY MS. CHANES)  But you testified public love and public

8   recognition is a criteria for recognized stature under VARA;

9   is that correct?

10  A    It could be a factor if the --

11  Q    I didn't say the dispositive factor, I said that's one of

12  the criteria for recognized stature recognition; correct?

13  A    It could be.

14  Q    Okay.  Is Bansky's stencil art innovative?

15             THE COURT:  Is what?

16  Q    (BY MS. CHANES)   Banksy's stencil art innovative?

17  A    He's certainly not the first to use stencils, but I

18  believe he's among the first to use them, and as large a scale

19  and with his innovative message he has.

20  Q    So it's the messages about what he's doing, contained in

21  what he's doing, not the actual works himself?

22             MR. EBERT:  Objection.

23             MS. CHANES:  I'm just trying to understand.

24             THE COURT:  No.  No, you can explain that.  You use

25  Banksy as an example.  That's a subculture and qualifies as

NICOLE CANALES, CSR, RPR

Proceedings                                    134

1    recognized stature; you've testified about that.  His works.

2    Some of his works, I guess; right?  All of his works?

3              THE WITNESS:  No, some of his works have achieved

4    enough recognition.

5              THE COURT:  Specific work?

6              THE WITNESS:  Yes.

7              THE COURT:  Go ahead.

8    Q    (BY MS. CHANES)  And you had also -- you were

9    specifically asked, I think by the judge, about the -- Meres

10   One's cartoon faces, the light bulbs with the faces on them?

11   A    Correct.

12   Q    You said light bulbs have been around as ideas in

13   cartoons since 20s, and you didn't think it was particularly

14   innovative to turn them into cartoon characters; correct?

15   A    Correct.

16   Q    Similarly, creating a cartoon character out of a mouse,

17   such as Mickey Mouse, is not particularly innovative; correct?

18   A    Unless he's the first --

19             THE COURT:  Let me ask you this, do you have any

20   more questions, because I have to use the facilities.  We can

21   take a break now.

22             MS. CHANES:  I can talk really fast.

23             THE COURT:  Go.

24   Q    (BY MS. CHANES)  And you said unless it was the first

25   person to use --

Proceedings                              135

1  A    To -- I believe Mickey Mouse was among the first animated

2  cartoons, if not the first, so the idea of animating

3  characters is innovative, but after Mickey Mouse, the idea of

4  adding eyes and talking to anything else, really, is not as

5  innovative.

6            THE COURT:  I think we've covered it.

7            MS. CHANES:  Nothing further.

8            THE COURT:  We'll take a 15-minute break, and then

9  we'll have Mr. Wolkoff testify next.

10            MR. EBERT:  Yes, your Honor.

11            THE COURT:  All right.  Fifteen minutes.

12                      (Recess)

13            THE COURT:  Mr. Wolkoff is testifying next?

14            MR. EBERT:  He is.

15            THE COURT:  Let me say for the record, Ms. Chanes,

16  when I said I was going to constitute Ms. Thompson as

17  the Court's expert, that's not really correct.  And it's not

18  appropriate, because under the district rules, it has to be an

19  independent person, etcetera, etcetera; you have to have the

20  opportunity to chime in.  But since there's no jury, and

21  whether you say she's qualified or not, I have to hear all the

22  testimony anyway.

23            MS. CHANES:  I understand, your Honor.

24            THE COURT:  So I was just trying to flush it out in

25  that context.  So I think we've had an open discussion, and

NICOLE CANALES, CSR, RPR

Proceedings                                    136

1    you can tell me, and I may or may not decide to give some

2    weight, limited weight, or whatever.  But I had to hear it all

3    one way or the other.

4              MS. CHANES:  I understand, your Honor.

5              THE COURT:  It's different when you have a jury here

6    and you have to separate the parts, but regardless of whether

7    you make the application or not, I still have to hear the

8    testimony.

9              MS. CHANES:  I understand, your Honor.

10             THE COURT:  That's all we're trying to do.  And I

11   think we had fair opportunity for everybody to flush out

12   whatever we were curious about.  I mean, this is an

13   interesting area, obviously.  And, obviously, the Court's

14   interested in the case, otherwise I wouldn't be doing this.

15   But we should be open and all -- have a positive view that

16   we're trying to get to the underbelly of something that is

17   kind of a not so well defined, and it's kind of an amorphous

18   area of what judges have to do.  And we have many cases when

19   we have duelling experts.  It's not unusual.  In medical

20   cases, one says this, one says that, and the poor judge has to

21   scratch her chin and decide, well, what do you do for all this

22   stuff; right?  This may be another one of those types of

23   cases.

24             We've had some different testimony already.  I'm

25   anxious to hear from your final expert as to whether she

Proceedings                                          137

1   agrees or disagrees with Ms. Thompson.  I'm anxious to hear

2   what she has to say, to what extent we have a very

3   conservative view of what Congress intended or more expansive

4   view, to what extent should it embrace subcultures.  These are

5   interesting things, I think, in the art community, however you

6   define that.  I'm just trying to grapple with that stuff.

7          MS. CHANES:  And you thought you wouldn't get any

8   new and interesting cases this year.

9          THE COURT:  Well, you know, there's one part of

10  this -- I'm sharing things.  I'm very open, as you can tell,

11  in my thoughts, maybe sometimes to a fault.  But I was

12  thinking initially about not burdening you all with a hearing,

13  but then the more I thought about this being a gatekeeping

14  issue and I thought about what gatekeeping means, we should

15  really see whether the gate should be opened and without

16  prejudging what would happen after that.  I thought we would

17  go in this direction, and I think it's of some value to the

18  public that we're doing this.  It's an open forum, and we're

19  getting information out, and people have the opportunity to

20  chime in on things that are with us in this world today.  I

21  just wanted to say so you understand where I'm coming from.

22  You're entitled to know that.

23          MS. CHANES:  Understood, your Honor.

24          THE COURT:  Sometimes I could be wrong.  Sometimes I

25  try to use comedic aspects to say things because I just can't

Proceedings                                    138

1    resist the temptation, right, but it's all intended for

2    serious purpose.  I just want you all to realize that.

3                MS. CHANES:  Understood.  And sometimes the comedic

4    remarks keep us awake.

5                THE COURT:  This is part of the joy of our

6    profession.

7                Mr. Wolkoff, how are you?

8                THE WITNESS:  Okay.

9                THE CLERK:  Do you affirm the testimony you're about

10   to give to the Court will be the truth, the whole truth and

11   nothing but the whole truth?

12               THE WITNESS:  Yes.

13               THE CLERK:  Thank you.  Please have a seat.

14               THE COURT:  If you give me the opportunity to talk

15   to your client before --

16               MR. EBERT:  How long do I have?  How many questions?

17               THE COURT:  You're not limited, but you know what I

18   want to find out.  I want to find out what his understanding

19   was, how this all came about.  I have a sense that he's a man

20   of good will, and he's trying to do good things, and does this

21   fall into the category of no good deed goes unpunished.

22   There's some sort of an understanding here -- he'll tell us

23   all about it right now.

24               THE CLERK:  Mr. Wolkoff, could you state and spell

25   your name for the -- please.

```
                       Proceedings                    139
1            THE WITNESS:  Jerry, Gerald, Wolkoff, W-o-l-k-o-f-f.
2            THE CLERK:  Thank you.
3                      DIRECT EXAMINATION
4    BY MR. EBERT:
5    Q    What's your work, Mr. Wolkoff?
6    A    Real estate.
7    Q    And what do you do in real estate?
8    A    Generally develop.
9    Q    And can you briefly describe types of properties that you
10   develop briefly?
11   A    Yes, I have commercial properties, and I take -- most of
12   my life I've taken vacant land and put buildings on them.
13   Q    In what areas of the city have you developed properties?
14   A    Brooklyn, Queens, and then out on the island, in
15   Staten Island.
16   Q    Very briefly, again, your work history?  How did you get
17   to this point to be in real estate?
18   A    Well, I started -- I started very young in business.  I
19   went --
20            THE COURT:  You mean you started when you were a
21   little younger?
22            THE WITNESS:  A little younger.  But I started to
23   work when I was 12 years old.  I didn't have a father.  Mother
24   was on home relief, so I went to work for somebody in the
25   Bronx.  It was a politician by the name of Abe Stark.  I went
```

Proceedings                               140

1  in and told Mr. Stark, "I need a job."  I wanted to get out of

2  home relief, and he gave me a job.

3           THE COURT:  He was the same one that had the sign

4  up?

5           THE WITNESS:  Right.  Hit the suit.  In fact, Carl

6  Forlough (phonetic) used to come in for a suit every year

7  because he protected the sign.

8           THE COURT:  I'll share this with everybody that I

9  was almost born in Evans Field.  My mother was at the game the

10  night before.  That obviously has nothing to do with this

11  case.

12           MS. CHANES:  But it's funny.

13           THE WITNESS:  From working with Mr. Stark, I -- to

14  make a long story short, I went into the floor waxing business

15  when I was 14 years old.  By the time I was 18 years old, I

16  was the largest floor waxer in New York.  Sold the business.

17  Went into real estate.  Built two houses for people that lived

18  near me in Brownsville.  Told them I'm in the real estate

19  business.  Brought some property and built two houses for

20  them.  And I made $2,000 on each house, and I had to wax a lot

21  of floors for $2,000.  And then I started to buy land in the

22  Brownsville, Brooklyn area, and I started to build -- I

23  started with the two houses.  Then I went four, and then six,

24  and then I just kept building houses in areas that I played

25  ball as a younger person.  And I went into an area called

```
                         Proceedings                    141

 1   Kinarcy, and then I went into Basin (phonetic).  From there I
 2   went to Staten Island.  From Staten Island, I went into
 3   High Pog (phonetic).  I'm in Islip now and developing
 4   properties, to make a long story short.
 5   Q    (BY MR. EBERT)  How far did you get in school?
 6   A    High school, just about finished.
 7   Q    Did you not go to college?
 8   A    No, I couldn't afford to.
 9   Q    When did you first acquire the property that we're
10   talking about here?
11   A    A little over 40 years ago.  It's my first building, my
12   commercial building.  I was building houses, and I decided to
13   see -- in the housing development, you build, and you sell and
14   you just keep doing that.  And I thought maybe I can start
15   getting income, so I bought this building on Jackson Avenue.
16   It's my first building.
17   Q    Did you acquire the whole block when you started?
18   A    No, there were three pieces out, and I acquired them over
19   the last -- in fact, the last piece I bought was in -- about
20   five years ago.
21   Q    Tell us what -- how is the property used currently?
22   What's on it?  How is it used?
23   A    Currently, the tenants are moving out.  Probably by --
24   sometime by the end of this month, 90 percent will be empty.
25   There's probably about 80 percent now empty, and by the end of
```

<div align="center">Proceedings                                    142</div>

1   this month, it will be 90-plus percent, and by January 5th it

2   should be a hundred percent.

3   Q     And what are the buildings used for?

4   A     Commercial.  Very few residential on Jackson Avenue, but

5   basically commercial.

6   Q     Rental properties?

7   A     All rental, yes.

8   Q     Did you adopt any particular leasing strategy for this

9   property?

10  A     Yes.  When I saw Citicorp being built, I -- I'm just a

11  block from Citicorp, which is -- I said this is the time that

12  my property will get some value, and I'll eventually build

13  something there like a Citicorp.  At first I was thinking of a

14  commercial building, and I started to sign all my leases with

15  90-day -- 60 and 90-day demolition clauses.  So all my leases

16  that I sign had 60 and 90-day demolition clauses, and that was

17  for at least 15 years.

18            THE COURT:  How's the Citicorp building doing these

19  days?  I pass it all the time, and I'm just curious.

20            THE WITNESS:  It's fine.  Citicorp -- in fact, that

21  whole area is booming.

22            MR. EBERT:  I'm sorry, your Honor.

23            THE COURT:  It's all right.

24  Q     (BY MR. EBERT)  Why did you put in these 60, 90-day

25  clauses?

<div align="center">NICOLE CANALES, CSR, RPR</div>

Proceedings                                        143

1   A    Because I knew eventually I'm going to be build a

2   building.  At first I thought it was going to be an office

3   building.

4   BY THE COURT:

5   Q    Let's get to why we're here.  You obviously had some

6   relationship with Meres or Mr. Cohen.

7   A    Jonathan Cohen, yes.

8   Q    He talked about when he first met you and what your

9   understanding was.  There was nothing in writing, but you had

10  some sort of understanding.  Tell me all about that.

11  A    I met Jonathan Cohen -- what happened years ago, I met

12  this Pat Dillilo (phonetic).  He had come to me and -- he knew

13  me as Jerry.  And he said to me, Jerry, what I would like to

14  do -- he was taking graffiti off walls in and around Queens,

15  and he said the artists -- I know some artists and they'd love

16  to put some work on it.

17  Q    Who is this person again?

18  A    Pat Dillilo.  He was the originator -- they started what

19  was called the Phun Factory.

20  Q    How long ago was that?

21  A    Maybe 18, 19 years ago.

22  Q    He came with the idea of decorating?

23  A    Putting graffiti on the building.  So I said fine.  I

24  said let's see how it goes.  Start with it.  Go.  And during

25  that time -- I can't tell you that, but maybe it was, like,

Proceedings                                      144

1    10, 11 years ago, Jonathan was one of the -- I believe one of

2    the artists, but he was with Pat Dillilo.  And Pat always

3    knew, because at that time, eventually I'm going to take down

4    the building.  And I had three criteria; no pornographic, no

5    political, and no religious.

6    Q    But you were amenable to having the building decorated?

7    A    Yeah, your Honor.  I'd said let's start -- because at the

8    beginning, I had a problem with the neighbors in the

9    neighborhood, and they start seeing graffiti going up and I

10   would speak -- because I knew them.  I was somewhat active in

11   the area.  And I -- I said, watch, it will evolve itself.  And

12   it's something that I can always change.  We can always

13   whitewash the building or do something to it.  And I liked

14   what was happening.  To this day, I like what's happening;

15   there's no problem with it.  But it's -- sometime I got to

16   take down the building.

17          So I had, at that time, some sort of a problem with

18   Pat Dillilo, and Jonathan was one of the people that were

19   there, had come over to me and said, Jerry, I'd like to do

20   what Pat is doing; in fact, I'll do a better job.  And

21   Jonathan's a nice young man.  I've seen him there, you know,

22   before.  And I said, sure, Jonathan, I have no problem with

23   that.  But, again, my criteria, and I'm going to be knocking

24   down the building.

25   Q    You told him that?

Proceedings                                          145

1   A      Yes, absolutely.  And he knew all along, and so he put up

2   these, Jonathan -- and he got these other graffiti artists to

3   do the building, and over the years --

4   Q      It became a happening?

5   A      Not only a happening.  I thought it was terrific.  I

6   thought what Jonathan and the artists did was wonderful, but

7   it was always -- if you would take five years ago or eight

8   years ago, what they did then is as nice as what they did

9   three months ago.  They painted over their own work.  It was

10  always temporary.  Anything that was even from temporary to

11  permanent was maybe another three years, another four years.

12  It was never there to stay permanent forever.  It was -- in

13  fact, when I had a problem, and I had manlifts there, what

14  they called cranes.  I let them use it.  Use it.  Go at night.

15  Use it.  They don't mind even doing this at night.  And what

16  they did, as everybody said, I think is wonderful also.

17  Q      Also it made your property attractive to the community, I

18  guess?

19  A      No.  To myself and maybe to the average laymen, yes.  To

20  me, I liked it so I kept it.  But if you're a businessman,

21  going in and wanting to come into my building, you got

22  concerns of that type of building, you know.  To maybe

23  yourself, your Honor, or me, I liked it.  Since it's my

24  building, you don't want to come in, don't come in.

25  Q      I've heard some testimony it became something larger than

NICOLE CANALES, CSR, RPR

1    you might have anticipated; there's a lot of people that

2    started to come and look at this, and it became -- I think

3    somebody said international recognition even.  Do you remember

4    seeing people come in there all the time?

5    A    Let me tell you, your Honor.  This isn't knew.  This is

6    back 15 years, 12 years ago they had come.  If they didn't do

7    nice work, I would have stopped it.

8    Q    Right.  But I'm concerned with what type of recognition.

9    A    Not recognition.  The main thing that everybody's

10   speaking here, about recognition, it was always temporary,

11   always temporary, your Honor.  Please, I must --

12   Q    Relax.  I understand.

13   A    Okay.

14   Q    We'll get into that.  But I just want to know who was

15   coming there?

16   A    People.

17   Q    Thousands of people were coming?

18   A    Not thousand, but you get people there.  Collectively

19   they come because it's beautiful.  It absolutely is beautiful.

20   I'm not going to sit here and tell you it's not beautiful.  If

21   I didn't think it was beautiful, I wouldn't let them do it.

22   Q    But people were coming?

23   A    To this day they're coming.  They came -- if you listen

24   to their expert testimony that they had or the testimony from

25   the expert, he comes every month to take pictures.  He's not

Proceedings                                              147

1   taking the same pictures every month.  He sees new work.

2   Q    It became a popular place, a designation and the public

3   was embracing it?

4   A    Absolutely.

5   Q    Tell me a little bit about the arraignments you made with

6   the city, I guess, or the Queens board.  Just give me an idea

7   of when that started and what came out in the wash.

8   A    We have to go through a process in order to get to what

9   they call the "your lad" (phonetic).  So we have to go

10  through -- you do your environmental.

11  Q    Planning board?

12  A    Yes, but even before that, before you go to planning --

13  before you go to the planning board to get the permission, you

14  go through maybe a year of going up and back to your building;

15  they don't like your building, change the building; make this

16  building -- and the reason for that is -- two ways to do it.

17  I didn't have to go through any of that, as a right.  I did

18  that to get more density on my property.  When you get more

19  density on your property, naturally I can create more

20  apartments.  Now, by creating more apartments, I can take the

21  same doorman that you have coming in, that you're paying X

22  amount, if 600 people are paying for him is one thing.  If I

23  can get a thousand people paying for them, now I can make my

24  rents cheaper.

25  Q    I understand you want to maximize the use of your

1    property.  But you got final commission.  Where -- just tell

2    me where the permit process is.

3    A    It's all finished.  I've got -- not the permit.  I got

4    the unanimous approval from City Planning, from the bureau

5    president's office.  She does that, and -- which is one of the

6    things unheard of, city counsel recently gave me unanimous

7    approval.

8    Q    Just tell me was there any discussion about the existing

9    5Pointz works of art on the building?

10   A    Yes.

11   Q    Tell me about that.

12   A    On each one of these hearings, people from 5Pointz

13   come -- had came down to tell them why 5Pointz should stay,

14   and they gave their reasoning; they're passionate about it, so

15   they said they feel this is international.  It should stay.

16   So they listened to them, and they gave me the approval, said

17   I -- they weighed it, and they felt what I'm going to be doing

18   was, in -- my thing, important.  So they each weighed it.

19   They gave me the approval to go forward.

20   Q    Did you have any discussion as to whether any place would

21   be made available for future aerosol art or what we're talking

22   about in this case?

23   A    Yes.  Absolutely.

24   Q    Tell me about that.

25   A    In the building that I'm going to build, we're putting up

Proceedings                                               149

1    walls for the aerosol people to come back and put up again,

2    the aerosol.

3    Q    They can replicate?

4    A    They can make changes.  Like maybe one will stay up there

5    five months.

6    Q    Where are these walls?  Is this the condition that the

7    authorities created, or is this something you did on your own

8    volition?

9    A    It was -- the authorities -- but this was a combination.

10   I've always had intentions of bringing the graffiti people

11   back.

12   Q    And was it necessary for you to do that, to get the

13   consents or the permissions that you receive from the

14   authorities?

15   A    Yes.

16   Q    Was this necessary, quid quo pro?

17   A    It's documented that we're going to have graffiti artists

18   back.

19   Q    The city authorities wanted this and you agreed?

20   A    Yes.  Absolutely.

21   Q    Tell me about the space that you're going to have for the

22   so-called graffiti artists?

23   A    Well, we have -- well, like the building I started, I sit

24   here now and we have particular walls to -- for the graffiti

25   artists to come back, which is 60-foot high.  I'm not thinking

Proceedings                                          150

1    of walls this high.  We got 60-foot walls for them to come

2    back.  But like when I first started, it evolves.  We know

3    what we're going to be doing, and who knows from there what

4    happens?  We -- if it goes, we just keep on seeing where it

5    goes.  Even --

6    Q    Let me interrupt.  You're going to have Mr. Cohen still

7    be the so-called quasi-curator to decide what goes up on the

8    new wall, so to speak?

9    A    I'm not so sure.

10   Q    Maybe somebody else?

11   A    Maybe somebody else.

12   Q    It's not going to be me, though?

13   A    Maybe.

14   Q    This is a large space, and you're going to allow folks to

15   come back?

16   A    Graffiti artists will be back, yes, if they choose to.

17   Q    I understand you can't force them to do so.

18   A    No.

19   Q    Are you planning for this to be in writing?

20   A    It's in writing now.

21   Q    So is there a document that defines where the graffiti

22   artists will be able to do this work?

23   A    Somewhat, yes.

24   Q    We have something of that here?  I'm just curious.  I

25   mean, is it as large as the space that exists right now?

Proceedings                                151

1   A    No.

2   Q    Half the size?

3   A    Less than half the size.

4   Q    Less than half the size?

5   A    Less than half the size.  But as we sit here now, who

6   knows where else I'm putting it in my building.

7   Q    You might decide --

8   A    Sure.  Even when I decided in the Phun Factory, we

9   walked.

10  Q    As I understand, there's a part that you have to allow

11  graffiti artists; that was the deal you made?

12  A    Yes.

13  Q    And, then, you may voluntarily also allow them to come

14  back, as you've done in the past?

15  A    Yes, I think what they -- for me, personally, I think

16  that the term that I use makes a "cool" building.

17  Q    It's a cool building?

18  A    A nice building.

19  Q    And, also, it's economically advantageous, because it

20  might attract more tenants?

21  A    The type of tenants.  Not every tenant wants to come into

22  a building that has graffiti.  I like what I'm doing, so you

23  move into my building, but it doesn't attract -- there is a

24  segment that just don't want to go there, would not go there.

25  I don't know, but --

NICOLE CANALES, CSR, RPR

Proceedings                              152

1    Q    There's a segment that would really be attracted to it?

2    A    Otherwise, I wouldn't be doing it.

3    Q    So you made this assessment that it's your economic

4    interest, but you also have some sense --

5    A    It was no economic interest to bring them here.  At the

6    beginning, had no economic interest.  It's my feeling that --

7    what I like.  I can't draw anything, so when I see what these

8    people do, it's amazing to me.

9    Q    So you're telling me that really on your own volition

10   you're very supportive of what this is about?

11   A    Always, your Honor.  If you don't mind me going back,

12   look, I own a place called Pilgrim State Hospital in

13   Long Island.

14   Q    There are a lot of people there that can do graffiti

15   work, I suspect?

16   A    Very well.  I met with Jonathan and Marie at my office.

17   I had taken them around -- the property that I'm buying, that

18   I bought, that I'm going to be doing it, I'm creating what I

19   call like a SoHo district there.  We will have the largest

20   outdoor sculptured work in the state of New York.  So I sat

21   with Jonathan and Marie and asked them their opinion, and I

22   showed them, which is larger than I have now.  I think it

23   would be a great idea to do what I've created there or they

24   created there, actually, with my permission to do something

25   there.  They looked at it.  They said fine and give me some

Proceedings                              153

1   suggestions.  Marie said why don't we do this, because they
2   have that type of talent and Jonathan has that foresight to do
3   something like that.  So they said let me think about it over
4   the winter.  Mind you this is maybe May, June.
5              Prior to that, we went to City Planning, went to the
6   borough president's office.  They came down to object to what
7   I'm doing.  Still let them paint.  I didn't stop them.  Still
8   let them come, even though they objected.  I didn't say stop
9   painting graffiti.
10  Q    Who?
11  A    Marie came down and some of the others that might be
12  sitting here had came down to object to me taking down --
13  taking down 5Pointz or my building on Jackson Avenue.
14  Q    They were upset about that?
15  A    They were upset about it.  I understand their passion.
16  The passion that they have is nowhere near the passion that I
17  have to build this building, this I can tell you.  This is my
18  first building.  They could never buy it.  Nobody could buy
19  this building from me.  There's no amount of money that you
20  can buy this building for.  It's not for sale.
21  Q    How many tenants do you expect to have?
22  A    At least a thousand apartments.
23  Q    Big operation?
24  A    Yes.  It will create thousands of jobs.
25  Q    Is there any way of incorporating the existing walls into

Proceedings                                         154

1    the new --

2    A    Impossible.

3    Q    Engineering impossible?

4    A    Engineering impossible.  Impossible.  Financially

5    impossible.  Engineering.  Just --

6    Q    I guess you would if you could, but you can't?

7    A    No, I'm going to say why.  It's not that.  They like to

8    be involving (sic) art.  They've always done it.  As I told

9    you before, they had come down to complain that they want to

10   keep this.  I understood their passion.  I sat with them

11   outside.  Say hello to them, shook their hands, kept on going,

12   because I knew I would eventually get the city to agree with

13   it.  Allowed them to paint.  Met with them in June.  Sat with

14   them.  All of a sudden they come up with this painting, and

15   now they put in this law of VARA.  "I got you, Jerry.  I got

16   you."  "What did I do to you?  I let you keep painting.  What

17   is that gotcha?"

18   Q    VARA came into existence, if I recall, in 1990, but this

19   started before that.

20   A    No, what I'm saying, your Honor, I let them paint

21   because it was temporary.  So they come in.  They showed

22   paintings here today -- if you look at the paintings that they

23   showed that was done, more than half was done in 2013, and

24   maybe ten of them were done in the last month and a half.

25   "Gotcha, Jerry.  We're going to paint and gotcha."  And to sit

Proceedings                                    155

1   here and say they didn't know it was temporary, they come up

2   here and say, oh, I didn't know it was temporary.  We showed

3   them; they say it's temporary.

4          And, another thing, you can see even the person that

5   did beautiful graffiti on his stuff, that came from Europe,

6   now is upstate painting somewhere, he said, on his own

7   painting it says "Save 5Pointz."  Doesn't he know it's coming

8   down?

9   Q    Anyway.  Calm down.

10  A    I'm calm.  I'm sorry, your Honor.  I'm passionate.

11  Q    A lot of passion in this building.

12  A    Well, because --

13  Q    You don't have to go on.  I got to sort of chime in a

14  little bit.

15         THE COURT:  Do you want to ask any other questions,

16  Mr. Ebert?  I mean, I think he's got it all out, unless

17  there's something else you want to bring out.

18         MR. EBERT:  No, your Honor.  I can submit these

19  exhibits.  They're also exhibits to his affidavit that's been

20  submitted on the motion, the community board resolution.

21  That's in the affidavit.

22         THE COURT:  So --

23         MS. CHANES:  I'm sorry --

24         THE COURT:  You want to inquire?

25         MS. CHANES:  Could you just ask a question about the

Proceedings                                          156

1   exhibit, your Honor?  This community board resolution that is

2   a written agreement that Mr. Wolkoff was referring to

3   between -- as far as providing space for artists?

4              THE COURT:  I have that.

5              MS. CHANES:  I'm asking if that's it; that was his

6   testimony?

7              THE COURT:  That's what I want to see.

8              MR. EBERT:  Yes.

9              THE COURT:  Which document is that, so I know what

10  I'm looking at.

11             MR. EBERT:  I can hand it back up, but it's

12  Exhibit 7.  Should I just hand them back up, your Honor.

13             THE COURT:  Do I have all the exhibits?  I guess I

14  do.

15             MR. EBERT:  They were attached to his affidavit.

16             THE COURT:  All right.  So make sure we have them.

17             Mike, do you have all these?

18             THE CLERK:  Yes.

19             THE COURT:  Go ahead.  You want to question

20  Mr. Wolkoff?

21             MS. CHANES:  So that was exhibit what?

22             MR. EBERT:  I'll give you a copy.

23             MS. CHANES:  Already.  Thank you.

24             THE COURT:  You haven't lost your Brooklyn accent,

25  by the way.

Proceedings                                           157

1          THE WITNESS:  Thank you.  I thought I'd been in

2   Long Island too long.

3                         CROSS-EXAMINATION

4   BY MS. CHANES:

5   Q     Good afternoon, Mr. Wolkoff.  You mentioned just now that

6   when the graffiti was initially being put on your building

7   certain people had concerns about going into a building with

8   graffiti art, is that correct, when you first started?

9   A     Well, when I first started, the graffiti -- when the

10  graffiti -- my perception is from the outside and speaking to

11  somebody, that they were concerned about that type of building

12  with the graffiti, yes.

13  Q     That certain people might not want to go inside?

14  A     Yes.

15  Q     At the time was the 5Pointz building mostly artists'

16  studios?

17  A     No.

18  Q     Did they gradually convert to artists' studios over the

19  years?

20  A     Much later on, yes.

21  Q     And going back to the testimony you just finished, you

22  said that 80 percent of the buildings are empty now, the

23  buildings that comprise that block; is that correct?

24  A     No, I said by the end of this month 80 percent to

25  90 percent will be vacant.

NICOLE CANALES, CSR, RPR

Proceedings                                              158

1   Q     But the -- I'm sorry.  I can't -- how many tenants are
2   there?
3   A     Twenty some odd.
4   Q     Okay.  Mr. Wolkoff, you were aware that Mr. Cohen and
5   other artists are painting at 5Pointz; correct?  You were
6   aware that Mr. Cohen --
7   A     Oh, yes.  Yes, yes, yes.
8   Q     And you gave him permission to paint the outside of the
9   building; correct?
10  A     I gave Jonathan Cohen control of who he brings in.  I
11  don't know any of the artists.  I may have seen them, but I've
12  never said to an artist, "Paint."
13          THE COURT:  You gave them the green light?
14          THE WITNESS:  Yes.  Absolutely.
15          THE COURT:  We've heard all that.
16          THE WITNESS:  Yeah, sure.
17  Q     (BY MS. CHANES)  And that permission spanned a number of
18  years; correct?
19  A     Yes.
20  Q     Did you also give the artist permission to paint inside
21  the building?
22  A     No.
23  Q     Did you see during your visit to the building that the
24  building was being painted on inside?
25  A     Yes.

Proceedings                                        159

1   Q    Did you tell the artists to stop doing that?

2   A    No.

3   Q    And the artists have been painting on the inside of the

4   building for years too; correct?

5   A    No, the staircase is.  But now, recently, they went into

6   the floors itself, which I've never given permission.  I don't

7   know how they got in there, but there is art inside because

8   it's been empty, your Honor.

9   Q    So your testimony is that you gave -- that you knew?

10  A    Permission for the outside not the inside, yes.

11  Q    And you gave Mr. Cohen an office at 5Pointz?

12  A    Not an office, no.

13  Q    That little room on the loading dock?

14  A    It's not an office.  I wouldn't consider that an office.

15  I would consider that a little space.

16  Q    I think it helps the court reporter if only one of us

17  speaks at once.

18            THE COURT:  We're doing fine.  We're doing fine.

19  Q    (BY MS. CHANES)  All right.  So you gave Mr. Office --

20  you gave Mr. Cohen a small space in the loading dock that he

21  uses as an office; correct?

22  A    Yes, free of charge.

23  Q    And you also gave Mr. Cohen space to store ladders at

24  5Pointz; correct?

25  A    No, I did not.

NICOLE CANALES, CSR, RPR

Proceedings                                        160

1    Q    Were you aware that he was using another space at 5Pointz

2    to store ladders?

3    A    No, I did not.

4    Q    Were you aware that the artists used ladders to paint at

5    5Pointz?

6    A    Yes.

7    Q    Did you have any understanding of where those ladders

8    were stored?

9    A    No.

10   Q    Did you give Mr. Cohen space to store painting supplies

11   and equipment?

12   A    I don't understand.  Did I give him the equipment?

13   Q    No, did you give him space to store painting supplies and

14   equipment?

15   A    No, in that little room?  These are -- as far as I'm

16   concerned, these were aerosol cans.  It didn't take much space

17   for them to put an aerosol can.  And the artists, I thought,

18   bring their own.  So I didn't give him any space to bring

19   aerosol cans anywhere.  If he wants to put it in that storage

20   space, that's fine.

21        THE COURT:  Ms. Chanes, the space is not going to

22   depend on this, really, so let's move on to something that's

23   more relevant.

24   Q    (BY MS. CHANES)  Mr. Wolkoff, you claim that you had an

25   understanding with the artists, that permission that you were

Proceedings                                161

1   giving them to paint at 5Pointz was temporary; correct?

2          MR. EBERT:  Objection.  He only had an agreement

3   with Mr. Cohen.  He never said anything about the artists.

4          THE COURT:  You can answer.

5          I think he's already answered.

6          THE WITNESS:  I said I don't know any artists.

7          THE COURT:  He said his relationship was with

8   Mr. Cohen.

9   Q   (BY MS. CHANES)  So you gave permission to Mr. Cohen to

10  have -- Mr. Cohen and other artists to paint at 5Pointz?

11  A    It's up to him, yes, to bring in the artists, yes.

12  Q    And that so-called understanding was not in writing;

13  correct?

14  A    Correct.

15  Q    In fact, do you have any written releases from any of the

16  plaintiffs' artists in this case?

17  A    I don't know any of the artists.

18  Q    Do you have any written releases from --

19         THE COURT:  The answer is no.

20  Q   (BY MS. CHANES)  Okay.  Are you aware sitting here today

21  that VARA requires written release?

22         THE COURT:  It's not what he knows about VARA.  He

23  doesn't have anything in writing.  We understand that.

24  Q   (BY MS. CHANES)  Okay.  Mr. Wolkoff, you testified before

25  that 5Pointz is a popular tourist attraction; correct?

NICOLE CANALES, CSR, RPR

```
                          Proceedings                    162

1    A    Yes.

2    Q    And you said people come from all over to see the

3    building and artwork; correct?

4    A    I believe so, yes.

5    Q    Are you aware that 5Pointz is listed on numerous

6    New York City tour guides?

7    A    Could be.

8              THE COURT:  But from your own knowledge, from what

9    you notice?

10             THE WITNESS:  They come.  Sure.

11             THE COURT:  It's a tourist attraction.

12             THE WITNESS:  I think it's going to be again a

13   tourist attraction.  Understand this, it's not stopping.  For

14   some reason or other they think it's stopping.

15             THE COURT:  I understand.  What they're saying is

16   that --

17             THE WITNESS:  Yes, people come there, absolutely.

18             MS. CHANES:  And the reason people come to

19   5Pointz --

20             THE COURT:  He doesn't know the reason people come.

21   It's a tourist attraction.  They come because of what's on the

22   walls.

23             MS. CHANES:  Okay.

24             THE COURT:  What else do you have?

25   Q    (BY MS. CHANES)   Mr. Wolkoff, you have earned a
```

Proceedings                                        163

1   significant amount of money over the years as a result of the
2   artwork on the 5Pointz; correct?
3   A    Wait.  Hold on.
4            THE COURT:  Objection sustained.
5            MR. EBERT:  Objection.
6   Q    (BY MS. CHANES)  Mr. Wolkoff, how much money -- was there
7   a movie called --
8            MR. EBERT:  Objection, your Honor.
9            THE COURT:  I haven't heard the question yet.
10  Q    (BY MS. CHANES)  Mr. Wolkoff, was there a movie called
11  "Now You See Me" filmed at 5Pointz last year?
12  A    Yes.
13  Q    And that movie was filmed over a period of approximately
14  three months; is that correct?
15  A    I wouldn't know how long it took.
16  Q    Have you seen the movie?
17  A    No.
18  Q    Were you paid for the use of the movie -- by the movie
19  crew to use 5Pointz?
20  A    I believe so, and I believe -- I had very little to do
21  with it, your Honor.  My son handled that, so I couldn't tell
22  you the amount.
23           THE COURT:  They made a movie.
24           THE WITNESS:  They made a movie.  I don't have no
25  problem, but I didn't see it.

Q (BY MS. CHANES) And the reason they made the movie was because of the artwork; correct?

MR. EBERT: Objection, your Honor.

THE WITNESS: I can't tell you why they made the movie. I have no idea.

THE COURT: Next question.

You had no personal contact?

THE WITNESS: I had no personal contact.

THE COURT: He knows there was a movie. He knows nothing about it. Go ahead.

Q (BY MS. CHANES) Mr. Wolkoff, there was a movie called "Trasers" that was also filmed at 5Pointz; are you aware of that?

A No, but it could be. I don't know.

Q Are you aware of the fact that 5Pointz is used at -- in various video shoots?

A Yes.

Q Such as video shoots for the musician Joss Stone?

A I don't know what you're talking about, Joss Stone, but could be. I don't know.

Q Are you paid for the use of 5Pointz for those video shoots?

A I don't know. Could be. My son handles that, I don't.

Q So your son -- wouldn't your son tell you?

MR. EBERT: Objection, your Honor.

Proceedings                                              165

1          MS. CHANES:  I'm interested, your Honor --

2          THE COURT:  He said he doesn't know.  He said his

3  son handles it.

4          MS. CHANES:  All right.  It goes to stature,

5  your Honor.

6          THE COURT:  But the question is totally improper of

7  this witness.

8          MS. CHANES:  All right.  Then I'll call David.

9  Q    (BY MS. CHANES)  Mr. Wolkoff, how tall is 5Pointz?

10 A    It starts from a single story, about 14 feet.  Then it

11 goes -- then you got some at three stories, some at two

12 stories, and the largest is -- 12,000 square foot is the five

13 story.

14 Q    All right.

15 A    That's 12,000 in square foot inside the building.

16 Q    And 5Pointz is painted pretty much top to bottom with

17 artwork; is that correct?

18 A    Yes.

19 Q    Some of the works on the upper stories of 5Pointz have

20 been there for years; correct?

21 A    Somewhat, yes.

22 Q    And some of theme have been there, in fact, before --

23 strike that.  Did you ever repaint 5Pointz after the graffiti

24 started to be painted on the building?

25 A    Yes.

Proceedings                                  166

1    Q    And when was that?

2    A    2009.

3    Q    Was that because the fire escapes collapsed?

4    A    Somewhat, yes.

5    Q    And then the city ordered you to do certain work on the

6    property; correct?

7    A    No, I had to straighten out for -- excuse me.  Where the

8    staircases came down.  A portion of a staircase came down,

9    took all of that.  I was so concerned about the other one

10   coming down, I voluntarily took it down myself not because of

11   the city.

12   Q    And after that, did you encourage the artists to paint at

13   5Pointz and cover the newly blank walls?

14   A    No, the word "encourage" is not -- I liked what they did.

15   Jonathan came to me and he wanted to paint.  They're painting

16   up until the judge stopped us from painting.

17   Q    So other than -- strike that.  Since the repainting of

18   the building at 5Pointz in 2009, a number of the works at that

19   property have been there for years; correct?

20   A    Very few.

21   Q    Very few?

22   A    Yes.

23   Q    Do the artworks on the upper stories change frequently?

24   A    That's few out of the thousands that were painted on,

25   yeah.

Proceedings                                    167

1   Q    Of the art works that are currently at 5Pointz, are --

2   the above-ground works, they've been in place, essentially,

3   since 2009?

4   A    Some of them, yes.

5   Q    Have most of them?

6   A    No.  Most of them throughout?

7   Q    Not most of them throughout, most of -- the upper story

8   works?

9   A    I couldn't say that.  I wouldn't -- I'm not sure.  I

10  don't think most of them are up there.

11  Q    Would it refresh your recollection if we showed you

12  pictures from just after the fire escapes failed to current

13  pictures?

14          THE COURT:  I don't think we need that.

15  Q    (BY MS. CHANES)  Mr. Wolkoff, you have pictures of the

16  works of art of 5Pointz hanging in your office; right?

17  A    I have -- hanging in my office I have articles from

18  5Pointz; one from the New York Times and one from the Real

19  Deal, of my son and I taking a picture by 5Pointz, and them

20  making a statement of what we're going to be doing with the

21  building in the future and the type of art.  And since you

22  mentioned it, probably 95 percent, since those pictures were

23  taken, are not there anymore.  There's new art.

24  Q    But those pictures were taken when you were walking on

25  the ground, correct, with street-level artwork behind you?

Proceedings                                    168

1   A     Some of them, it could be, yes.  And then -- and it's

2   not -- some of them are not even there anymore.  In fact, most

3   of them are not there anymore.

4              MR. CHANES:  Move to strike the additional

5   testimony, your Honor.

6              THE COURT:  Where are we going with this?  Let's

7   wrap it up.  Come on.

8              MS. CHANES:  I'm wrapping up.

9   Q     (BY MS. CHANES)  Mr. Wolkoff, you testified earlier about

10  planning hearings that you attended?

11  A     City Planning hearings, yes.  I attended City Planning

12  hearings, yes.

13  Q     And you said that you had received unanimous approval for

14  your planned development from City Planning.  And what were

15  the other two agencies?

16  A     City Planning.  Well, Borough Hall and the city counsel

17  unanimous.

18  Q     But isn't it true that the local community board voted

19  unanimously against your development?

20  A     Yes, but there's a proviso.  They sent me a letter.

21             MS. CHANES:  Move to strike.

22             THE WITNESS:  Judge, you want to hear the reason if

23  it's important?

24             THE COURT:  Go ahead.  You let me know.  Go ahead.

25             THE WITNESS:  The community board voted against my

NICOLE CANALES, CSR, RPR

Proceedings                                169

1  development.  I called up the head of the community board and

2  I said why would you vote against us?  He said because we got

3  lack of communications.  I didn't attend any of that.  I had

4  representatives attend.  So when I spoke to them, I said why

5  would you do this?  You don't know me.  He said nobody would

6  answer our questions.  I sat down with them.  They asked me

7  the questions.  One of them was art and things like that, and

8  I said absolutely.  They said it was a lack of communications,

9  Jerry.  So I said --

10           THE COURT:  I don't know --

11           THE WITNESS:  Excuse me.  But the bottom line is

12  they gave me a letter of support after that meeting.  They

13  gave me a letter of support, so I just wanted --

14           THE COURT:  I understand.  You went through the nuts

15  and bolts of the interaction.

16           THE WITNESS:  They came back.

17           THE COURT:  Go ahead.

18           MS. CHANES:  One additional question, your Honor.

19  Q    (BY MS. CHANES)  Mr. Wolkoff, I believe you testified

20  that you were in discussions with various artists as part of

21  the requirements for this permitting process about what you

22  would be doing with the space; is that correct?

23  A    No, you are incorrect.  I didn't speak to any artists.  I

24  spoke to Jonathan.  I never met with my other artists.

25  Q    Did you meet with Jonathan in connection with your City

Proceedings                                    170

1   Planning application?

2   A    My City Planning application, no.  I met with Jonathan in

3   between -- in fact, one of the things, when I worked with

4   Jonathan, I said, "Listen, I own this building.  Why don't you

5   do some of the walls," which his bulbs are on now.  When I

6   walked with Jonathan, I said, "Jonathan, look."  I said, "I

7   own the building.  Do it."

8            THE COURT:  One last question.  I have a few

9   questions.  Then we're going to wrap it up.

10  Q    (BY MS. CHANES)  Okay.  What I'm trying to get at is do

11  you have any agreement in place now with any of the plaintiffs

12  in this action, Jonathan or any of the other artists?

13  A    No, I do not have an agreement.

14           THE COURT:  There's no agreement that you have?

15           THE WITNESS:  No.

16  Q    (BY MS. CHANES)  Regarding the new space, and how it will

17  be used and how it will be allocated?

18  A    The only agreement that I have is with the city of

19  New York that I'm obligated to do this.

20  BY THE COURT:

21  Q    So this is the quid quo pro; for you to get permission to

22  do the thousand units, you have agreed to make the space

23  available?

24  A    Yes.

25  Q    Would you have done that on your own initiative?

NICOLE CANALES, CSR, RPR

1    A    Not so sure.  Probably.

2    Q    And you have other space that you could have used, if you

3    wish to do so, to allow these folks to also continue their

4    passion on other parts of your building?  You said you would

5    be willing to do that?

6    A    As we see what happens.

7    Q    Right.

8    A    And as we go.  No different than before.  We just -- I'm

9    sorry.  Things just happen.

10   Q    I understand that, but I just want to get a sense as to

11   whether you would be amenable to letting them use other space?

12   A    Yes, if it's proper and right, absolutely.

13   Q    What other space?  Is there any particular space in mind?

14   A    Your Honor, I have walls, you know, in between.

15   Q    Lots of walls?

16   A    I'm sorry.  Understand this, I like what these people do.

17   If I didn't, I would have stopped it 20 years or so.

18   Q    You could have done that.

19   A    I liked it.  I liked it even when they came to city

20   counsel to stop.  They kept doing it.  I didn't say stop.

21   They can't say I told them to stop.

22   Q    I guess what I'm trying to get a sense of is what if the

23   city counsel didn't make this a condition for all of the

24   permissions you received from the city authorities, I guess,

25   would you still have allowed these folks to use this property

Proceedings                                              172

1    in any event?

2    A    Your Honor, I brought him down -- I brought him down --

3    Q    Just answer my question.

4    A    I brought him down -- so you can understand where I'm

5    coming from, I had taken him to Long Island, my property

6    there, prior to all of this.

7    Q    You have a history of allowing him to do this?

8    A    So why would I not do this after?  I like what they do.

9    Q    But the city wanted to make sure it would happen, I

10   guess; right?

11   A    Because when they went down to make their complaints,

12   politically the city said, okay; Jerry, would you do this?  I

13   said absolutely.  It was never let me think about it, even.

14   Absolutely.

15           THE COURT:  Okay.  We understand.

16           MS. CHANES:  I got to move to strike that.

17           THE COURT:  Well, I've heard it anyway.  Go ahead.

18   Is there anything else?

19           MS. CHANES:  Actually, yes, two questions.

20   Q    (BY MS. CHANES)  One is with the new development, as

21   you're describing it, approximately how many square feet of

22   wall space would be available -- are you proposing to make

23   available for graffiti artists?

24   A    I don't know the exact square footage, your Honor.

25           THE COURT:  You mentioned it was about one-half of

NICOLE CANALES, CSR, RPR

Proceedings                                        173

1    what you have now.

2              THE WITNESS:  Less than one-half.

3              THE COURT:  One quarter?

4              THE WITNESS:  Yes, something like that.  I don't

5    know the square footage.  But it would be something that's

6    significant where they can do their work.

7    Q    (BY MS. CHANES)  But did you take -- when you planned

8    that, did you take into account that the fact aerosol fumes

9    are toxic?  Artists have to wear respirators, and it wouldn't

10   be safe for --

11             THE COURT:  I don't know why you're having this

12   discussion.

13             THE WITNESS:  Your Honor, listen to me.

14             THE COURT:  I think we've heard enough.  You can

15   step down.  Thanks a lot, Mr. Wolkoff.

16             THE WITNESS:  Your Honor, I appreciate it.  I just

17   want to say one thing, tomorrow's my 77th birthday.  I don't

18   want to disrespect.  Is it okay if I don't show up tomorrow?

19   I just don't want to show any disrespect.

20             THE COURT:  How will you be celebrating your

21   birthday?

22             THE WITNESS:  Going to Long Island, back to work and

23   catch up on all the work I did, that I enjoy most of all.  I'm

24   sorry to say but that's what I'm going to be doing.

25             THE COURT:  May be like Grandma Moses, you'll pick

NICOLE CANALES, CSR, RPR

Proceedings                                    174

1    up a paint brush when you're 88 years old and start painting.

2              THE WITNESS:  No, I can't paint.

3              THE COURT:  You may step down.

4              So I think we've heard everybody today.  Except we

5    have one more person.  We're going to hear the other expert

6    tomorrow.

7              MS. CHANES:  Your Honor, I have a request.  We

8    understood that Mr. Wolkoff Sr. was -- knew about the movies

9    and films that were filmed at 5Pointz, and they're relevant

10   because they go to the stature of the artwork.

11             THE COURT:  All right.  You have these -- you have

12   these films that were done there.  All right.  You can tell me

13   all about them.  You can, you know, make a record about all

14   the films that were done.

15             MR. EBERT:  We'll stipulate.

16             THE COURT:  The expert tomorrow can testify about

17   that; right?

18             MS. CHANES:  I don't think he knows about the films.

19             THE COURT:  What do you want me to do?  You want to

20   offer something in evidence to show me that it's recognized by

21   a wide segment of the population?  I'm not precluding you from

22   doing that.

23             MS. CHANES:  You know what, I can do that.  That

24   would be easiest and conserve the Court's time.  I'll draft

25   something and submit it.

NICOLE CANALES, CSR, RPR

Proceedings                                    175

1          THE COURT:  Your expert's going to be coming

2    tomorrow?

3          MS. CHANES:  Yes, your Honor.  And I believe you

4    said you wanted him at 11:00?

5          THE COURT:  I like to do it at 10:00, because I have

6    to catch a plane in the afternoon.

7          What else do we have tomorrow?

8          THE CLERK:  We have two conferences on at 2:30.

9          THE COURT:  We're going to have to read just those.

10   I'll talk to you about that.  They'll have to come earlier

11   because I have to get a plane.  I'm sorry I didn't tell you

12   that.

13         MR. EBERT:  I don't know what the expert's going to

14   testify about, but we may be willing to stipulate.  From what

15   his bio says, is that he's big in Hip Hop and this is a big

16   thing in Hip Hop.

17         THE COURT:  I want to hear from the expert.

18         Do you have an expert ready to go?

19         MS. CHANES:  Yes, your Honor.

20         THE COURT:  You've heard what Ms. Thompson said.

21   She may have a different view --

22         MS. CHANES:  He.

23         THE COURT:  He may have a different view of what

24   constitutes recognized stature; that's what I'm interested in.

25   So just -- you know, I have a feeling that I may not hear the

NICOLE CANALES, CSR, RPR

Proceedings                                    176

1   same testimony I heard from Ms. Thompson, such as the nature

2   of our business.  I'm anxious to hear all about that.

3   Ms. Thompson has taken the view of the statute that -- sort of

4   a strict instructionist (sic) view, if you might use that

5   phrase, I guess, that it's a high bar type of gatekeeping.  I

6   don't know how tall the gate is, how short the gate is; that's

7   what we want to find out.

8                    MS. CHANES:  Okay.

9                    THE COURT:  You have the *Carter* case.  You have all

10  this precedence.  We all know about it.  And I can decide

11  whether or not the gate is open or closed.  And in any event,

12  I'm not going to prevent him, in all probability, from not

13  going forward with the building.  I'm not going to play any

14  games with you.  But, you know, if they need the gatekeeping

15  and the statute, there may be compensatory aspects to this

16  thing.  I don't know.

17                    I told you before I would like to encourage aerial

18  artists, and I like to encourage people like Mr. Wolkoff to

19  allow this form of expression, to dot the landscape of urban

20  environments of New York City and elsewhere.  I would like to

21  see if the law can accommodate all of that.  Maybe you have

22  constructive thoughts on how the law can do that.  If I follow

23  your road map, I'm going to kill the aerosol industry here,

24  and I don't think you want to do that.  You're representing

25  these people.

Proceedings                                    177

1          MS. CHANES:  I actually disagree that finding for

2      plaintiffs would kill the aerosol art industry.  I think it

3      would do what VARA is supposed to do, which is to get people

4      to sign VARA waivers.

5          THE COURT:  But to get every one of a thousand

6      artists to sign a VARA waiver is an impractical burden.

7          MS. CHANES:  But there aren't a thousand legal

8      artworks that fall under VARA.  Remember VARA carves out

9      exceptions for works for hire, for advertising, for promotion.

10     VARA -- the VARA coverage for the building exception --

11         THE COURT:  Wouldn't it be nice if people like

12     Mr. Wolkoff didn't have to worry about getting all these VARA

13     waivers signed, and that the artists would feel that they are

14     being encouraged by the people like Mr. Wolkoff to come and do

15     their work and their passion on the buildings without having

16     to go through the technical niceties of VARA waivers.  Don't

17     you think there's a better thing to accomplish?

18         MS. CHANES:  Actually, I don't.  I think that you

19     and I make our living on the technical niceties, so we want to

20     preserve those at all costs.  In addition to that, and levity

21     aside, you know, Mr. Wolkoff, who is a sophisticated

22     businessman, who has bevies of lawyers at his disposal, you

23     know, if he put those provisions in his leases, he could have

24     just as easily drafted a VARA waiver that would take -- and

25     I'm sure, you know, if he had it, he could have gotten

1    plaintiffs to sign it, but he didn't.

2    Q    Well, if you have this VARA waiver, you present it to

3    Mr. Cohen, what would have happened?

4              MS. CHANES:  I don't know.  I wasn't there.

5              THE COURT:  Would he have signed it?

6              MS. CHANES:  I don't know.

7              THE COURT:  The VARA waiver says I can take the

8    building down and I require you to take all of your artwork

9    off any time I want; right?

10             MS. CHANES:  I believe so.

11             THE COURT:  And I just don't know.  You tell me

12   whether your clients would be amenable to that.

13             MS. CHANES:  Well, the statutory damages under VARA

14   are statutory damages that are meant to be punitive; they're

15   not a license to take down the artwork.

16             THE COURT:  Whatever.  But, you know, let's see what

17   the expert says tomorrow, and we'll sort it all out one way or

18   the other.  10:00 o'clock.  If you can please have Mr. Simmons

19   here, I would appreciate it.

20             MS. CHANES:  If I can have a copy of the CV for

21   Ms. Thompson.

22             THE COURT:  You can take care of that exchange of

23   information, and we'll see you tomorrow at 10:00.

24                      (Proceedings adjourned.)

25

Proceedings                                              179

\* \* \*

I certify that the foregoing is a correct transcript from the

record of proceedings in the above-entitled matter?

/s/ Nicole Canales                    November 9, 2013

  Nicole Canales                              Date

180

1

2                              INDEX OF WITNESSES

3                                                        PAGE

4    DANIELLE MASTRION

5    DIRECT EXAMINATION BY MS. CHANES                      8

6    CROSS-EXAMINATION BY MR. EBERT                       46

7    CROSS-EXAMINATION BY MR. EBERT (RESUMES)             59

8

9    LUIS LAMBOY JR.

10   DIRECT EXAMINATION BY MS. CHANES                     61

11   CROSS-EXAMINATION BY MR. EBERT                       70

12

13   ERIN THOMPSON (DEFENSE WITNESS)

14   DIRECT EXAMINATION BY MR. EBERT                      76

15   DIRECT EXAMINATION BY MR EBERT (RESUMES)            106

16   CROSS-EXAMINATION BY MS. CHANES                     111

17

18   GERALD WOLKOFF (DEFENSE WITNESS)

19   DIRECT EXAMINATION BY MR. EBERT                     139

20   CROSS-EXAMINATION BY MS. CHANES                     157

21

22

23

24

25

NICOLE CANALES, CSR, RPR